# Exhibit A

MPI#:   1956110

Billing System:  NAUTILUS

Acct: _____

███████████████████████████

Document Type: SUMMARY PLAN DESCRIPTION → **2017 - Marietta Memorial Hospital**

| | |
|---|---|
| Network Available: | Pg. -- |
| Benefits-In-Network: | Pg. 10, 17, 22, |
| Benefits-Out of Network: | Pg. 32 – 33 |
| Benefits-Dialysis Related: | Pg. 14, 17, 57, 58, 80 |
| COB: | Pg. 79 |
| Claims-Timely Filing: | Pg. 38 |
| Claims processing timeline | Pg. 38 |
| Appeals Address: | Pg. 39 |
| Appeals Timelines: | Pg. 39 |
| Definition UCR/R&C, Allowable, Max Allowed: | Pg. 2, 11 – 12, 17, 22 |

MCARE BASED LANGUAGE:   **YES** / NO       Pg. 79 - 85

PYMT BASED LANGUAGE:    YES / **NO**       Pg. --

The attached Summary Plan Description (SPD) and Summaries of Material Modification (SMM's) are copies of those that applied to the named plan as of September 21, 2017. The originals of the SMM's may not have been signed by an authorized representative of the Plan Administrator for this plan. For a signed copy of any SMM, contact the Plan Administrator.

These copies are provided for the convenience of plan participants and covered persons, and are not intended to replace the actual plan documents on file with the Plan Administrator, or the SPD and SMM's that were distributed to the Plan Participants in accordance with ERISA, or any other applicable law. Any discrepancies between these copies, and the actual SPD or SMM's will be resolved in favor of the original documents as maintained by the Plan Administrator. These documents may be amended by the Plan Administrator at any time, and such amendments will prevail over these documents.

## MARIETTA MEMORIAL HOSPITAL
## EMPLOYEE HEALTH BENEFIT PLAN
## SUMMARY PLAN DESCRIPTION
### SUMMARY OF MATERIAL MODIFICATIONS NO. 2

**This Summary of Material Modifications is a description of important changes which have been made to the Plan. You should read these changes carefully and keep this document with your copy of the Summary Plan Description. If you have any questions about these changes, you should contact the Plan Administrator for more information.**

The Marietta Memorial Hospital Employee Health Benefit Plan Summary Plan Description (hereinafter referred to as "SPD") is hereby amended and modified as set forth below. Such amendments are effective as of the dates listed below.

1) Effective August 1, 2017, the following "**Non-Discrimination Notice**" will be added to the SPD beginning on page 2:

### "Non-Discrimination Notice"

Marietta Memorial Hospital complies with applicable Federal civil rights laws and does not discriminate on the basis of race, color, national origin, age, disability, or sex.

Marietta Memorial Hospital does not exclude people or treat them differently because of race, color, national origin, age, disability, or sex. Marietta Memorial Hospital provides:

A. free aids and services to people with disabilities to communicate effectively with us;

B. written information in other formats (large print, audio, accessible electronic formats, other formats); and

C. free language services to people whose primary language is not English.

If you need these services, contact Marietta Memorial Hospital's Plan Administrator, Memorial Health Systems, Benefits Specialist. If you believe that Marietta Memorial Hospital has failed to provide these services or discriminated in another way on the basis of race, color, national origin, age, disability, or sex, you can file a grievance with Plan Administrator, Memorial Health Systems, Benefits Specialist, at 401 Matthew Street, Marietta, OH 45750 or call (740) 568-5607, or send a fax to (740) 374-1688.

You can file a grievance in person or by mail, fax, or e-mail. If you need help filing a grievance, Marietta Memorial Hospital's Plan Administrator, Memorial Health Systems, Benefits Specialist is available to help you. You can also file a civil rights complaint with the U.S. Department of Health and Human Services, Office for Civil Rights, electronically through the Office for Civil Rights Complaint Portal, available at https://ocrportal.hhs.gov/ocr/portal/lobby.jsf or by mail or phone at: U.S. Department of Health and Human Services, 200 Independence Avenue, SW Room 509F, HHH Building Washington, D.C. 20201, 1-800-368-1019, 800-537-7697 (TDD). Complaint forms are available at http://www.hhs.gov/ocr/office/file/index.html.

Spanish: ATENCIÓN: si habla español, tiene a su disposición servicios gratuitos de asistencia lingüística. Llame al 740-568-5607 (TTY: 740-568-5607).

Chinese: 注意：如果您使用繁體中文，您可以免費獲得語言援助服務。請致電740-568-5607 (TTY：740-568-5607) 。

German: ACHTUNG: Wenn Sie Deutsch sprechen, stehen Ihnen kostenlos sprachliche Hilfsdienstleistungen zur Verfügung. Rufnummer: 740-568-5607 (TTY: 740-568-5607).

Penn Dutch: Wann du Deitsch schwetzscht, kannscht du mitaus Koschte ebber gricke, ass dihr helft mit die englisch Schprooch. Ruf selli Nummer uff: Call 740-568-5607 (TTY: 740-568-5607).

Arabic: ملحوظة: إذا كنت تتحدث اذكر اللغة، فإن خدمات المساعدة اللغوية تتوافر لك بالمجان. اتصل - 740-568-5607 (:740 برقم 1

هاتف الصم والبكم : 1 - 740-568-5607 .

Vietnamese: CHÚ Ý: Nếu bạn nói Tiếng Việt, có các dịch vụ hỗ trợ ngôn ngữ miễn phí dành cho bạn. Gọi số 740-568-5607 (TTY: 740-568-5607).

Russian: ВНИМАНИЕ: Если вы говорите на русском языке, то вам доступны бесплатные услуги перевода. Звоните 740-568-5607 (телетайп: 740-568-5607).

French: ATTENTION: Si vous parlez français, des services d'aide linguistique vous sont proposés gratuitement. Appelez le 740-568-5607 (ATS: 740-568-5607).

Italian: ATTENTION: Si vous parlez français, des services d'aide linguistique vous sont proposés gratuitement. Appelez le 740-568-5607 (ATS: 740-568-5607).

Korean: 주의: 한국어를 사용하시는 경우, 언어 지원 서비스를 무료로 이용하실 수 있습니다. 740-568-5607 (TTY: 740-568-5607)번으로 전화해 주십시오.

Japanese: 注意事項：日本語を話される場合、無料の言語支援をご利用いただけます。740-568-5607（TTY：740-568-5607）まで、お電話にてご連絡ください。

Dutch: AANDACHT: Als u nederlands spreekt, kunt u gratis gebruikmaken van de taalkundige diensten. Bel 740-568-5607 (TTY: 740-568-5607).

Ukrainian: УВАГА! Якщо ви розмовляєте українською мовою, ви можете звернутися до безкоштовної служби мовної підтримки. Телефонуйте за номером 740-568-5607 (телетайп: 740-568-5607).

Romanian: ATENȚIE: Dacă vorbiți limba română, vă stau la dispoziție servicii de asistență lingvistică, gratuit. Sunați la 740-568-5607 (TTY: 740-568-5607)."

2) Effective August 1, 2017, the definition of "**MORBID OBESITY**" in Section 3.2, entitled, "**MEDICAL PLAN DEFINITIONS**," as set forth in Article III of the SPD, is amended in its entirety, as follows:

"**MORBID OBESITY**
The term "Morbid Obesity" means that a Covered Person:

   A.  has a body mass index (BMI) of forty (40) or greater;
   B.  is a male who is one hundred (100) pounds over his ideal body weight; or
   C.  is a female who is eighty (80) pounds over her ideal body weight; or
   D.  has a BMI of thirty-five (35) to forty (40) and one (1) or more obesity related diseases, such as type II diabetes, high blood pressure, heart disease, sleep apnea, gastroesophageal reflux disease (GERD), polycystic ovarian syndrome (PCOS) or pseudotumor cerebri."

3) Effective August 1, 2017, Section 3.2, entitled, "**MEDICAL PLAN DEFINITIONS**," as set forth in Article III of the SPD, is amended by adding thereto the following new definition:

"**PROTON BEAM THERAPY**
The term "Proton Beam Therapy" means a type of radiation therapy that uses streams of protons (tiny particles with a positive charge) to kill tumor cells. Because it causes less damage to healthy tissue, Proton Beam Therapy is often used for cancers that are very close to critical parts of the body. It is used to treat cancers of the head and neck and organs such as the brain, eye, lung, and spine."

4) Effective August 1, 2017, Article VI, entitled, "**COST MANAGEMENT SERVICES**," as set forth in the SPD, is amended by adding thereto the following new Section:

"**6.8     PRE-CERTIFICATION OF PROTON BEAM THERAPY**
The Plan requires that all proton beam therapy be pre-approved by the Utilization Review Service prior to any proton beam therapy procedure. As soon as possible after a Covered Person's Physician has determined that therapy is necessary, but not later than forty-eight (48) hours prior to the commencement of the therapy, the Covered Person's Physician, the Covered Person or the Hospital or facility where the procedure is to be performed must notify the Utilization Review Service and submit any documentation required by such service. The Covered Person is ultimately responsible for making sure this notification is made. The Utilization Review Service

reserves the right to request additional records or information from the Covered Person, the Covered Person's Physician, Hospital or other facility or provider that is related to the proton beam therapy.

If prior approval is not obtained for any of these services, charges for such therapy will be subject to a penalty. Expenses for therapy services or supplies that would have been approved for payment by the Utilization Review Service, as the entity designated by the Plan Administrator to handle utilization review, will be paid at the non-Preferred Provider level described in Section 2.6. This penalty will not be considered as a Covered Expense under any other Plan provision, and shall not apply towards any Deductible, Out-of-Pocket limit, or maximum benefit limit. In addition to this penalty, any services and supplies that would not have been approved for payment will not be covered under this Plan."

5)  Effective August 1, 2017, Subsection AA in Section 9.1, entitled, **"MEDICAL BENEFITS – COVERED EXPENSES,"** as set forth in Article IX of the SPD, is amended in its entirety, as follows:

"AA.  **Reconstructive Surgery:** Charges for reconstructive surgery necessary to repair a dysfunction or disfigurement resulting from Injury, tumor or congenital anomaly which has resulted in a functional defect or deficit, or surgery related to gender transitioning. Covered Expenses include breast reconstruction in connection with a mastectomy, including:

1.  reconstruction of the breast on which the mastectomy was performed;

2.  surgery and reconstruction of the other breast to produce a symmetrical appearance; and

3.  prostheses and physical complications of all stages of mastectomy, including lymphedemas.

Such reconstruction must be performed in a manner determined in consultation with the attending Physician and the Covered Person."

6)  Effective June 1, 2017, Article X, entitled, **"OTHER MEDICAL BENEFITS,"** as set forth in the SPD, is amended by adding thereto the following new Section:

**"10.2  DIABETES MANAGEMENT PROGRAM**

The Plan includes a comprehensive Diabetes Management Program (for purposes of this provision "Program") which provides specific benefits for all Covered Persons diagnosed with diabetes. All Covered Persons with diabetes are automatically eligible and enrolled in the Program. Covered Persons with diabetes will be identified through information obtained through claims and other information submitted to the Plan, referrals by utilization review and case management and from other sources. The goal of the Program is to help each Covered Person better manage his or her medical condition by focusing on his or her lifestyle, and any barriers hindering the progression to a healthier lifestyle.

For Covered Persons participating in the Diabetes Management Program, the Plan will provide benefits for the following services and supplies at one hundred percent (100%) with no Deductible if completed by a Marietta Memorial PHO/Tier I Provider.

A.  annual wellness physical;

B.  diabetic medications and supplies through the separate Employer-sponsored prescription plan, obtained through a contracted pharmacy; and

C.  the following tests:

1.  Hemoglobin A1C;

2.  diabetic eye exam;

3.  lipid panel;

4.  blood pressure screening; and

5.  flu vaccines."

3

7) Effective August 1, 2017, Subsection AA in Section 13.1, entitled, "**MEDICAL PLAN BENEFIT EXCLUSIONS AND LIMITATIONS,**" as set forth in Article XIII of the SPD, is amended in its entirety, as follows:

"AA. **Hearing:** Charges for hearing aids, other than as specifically listed as covered through a Marietta Memorial PHO/Tier I Provider, or for cochlear implants and other devices or implants used to restore hearing."

8) Effective August 1, 2017, Subsection AV in Section 13.1, entitled, "**MEDICAL PLAN BENEFIT EXCLUSIONS AND LIMITATIONS,**" as set forth in Article XIII of the SPD, is hereby deleted in its entirety.

9) Effective August 1, 2017, Subsection BC in Section 13.1, entitled, "**MEDICAL PLAN BENEFIT EXCLUSIONS AND LIMITATIONS,**" as set forth in Article XIII of the SPD, is deleted in its entirety, and replaced with the following:

"BC. **Specific Provider Exclusions**: Services obtained through White Fence Surgical Suites, Northpointe Surgical Suites, Southeast Ohio Surgical Suites and Lancaster Specialty Surgery Center will not be covered under the Plan, regardless of whether the Provider is part of any designated Preferred Provider network."

10) Effective August 1, 2017, Article XIV, entitled, "**GENERAL INFORMATION,**" as set forth in the SPD, is amended by adding thereto the following new Section:

"**14.13 DISCRIMINATION COMPLAINTS**

It is the policy of Marietta Memorial Hospital not to discriminate on the basis of race, color, national origin, sex, age or disability. The Plan Administrator has adopted an internal grievance procedure providing for prompt and equitable resolution of complaints alleging any action prohibited by Section 1557 of the Affordable Care Act (42 U.S.C. § 18116) and its implementing regulations at 45 C.F.R. pt. 92, issued by the U.S. Department of Health and Human Services. Section 1557 prohibits discrimination on the basis of race, color, national origin, sex, age or disability in certain health programs and activities. Section 1557 and its implementing regulations may be examined in the office of the Plan's Benefits Specialist, who has been designated by the Plan Administrator to coordinate the efforts of Marietta Memorial Hospital to comply with Section 1557:

Plan Administrator, Memorial Health Systems
Benefits Specialist
401 Matthew Street
Marietta, OH 45750
(740) 568-5607
(740) 374-1688 - fax

Any person who believes they or someone else has been subjected to discrimination on the basis of race, color, national origin, sex, age or disability may file a grievance under this procedure. It is against the law for Marietta Memorial Hospital to retaliate against anyone who opposes discrimination, files a grievance, or participates in the investigation of a grievance.

The following procedures apply to complaints submitted under these procedures:

A. grievances must be submitted to the Plan Administrator, Memorial Health Systems, Benefits Specialist within sixty (60) days of the date the person filing the grievance becomes aware of the alleged discriminatory action;

B. a complaint must be in writing, containing the name and address of the person filing it. The complaint must state the problem or action alleged to be discriminatory and the remedy or relief sought;

C. the Plan Administrator, Memorial Health Systems, Benefits Specialist (or her/his designee) shall conduct an investigation of the complaint. This investigation may be informal, but it will be thorough, affording all interested persons an opportunity to submit evidence relevant to the complaint. The Plan Administrator, Memorial Health Systems,

Marietta Memorial Hospital Employee Health Benefit Plan _____ Summary of Material Modifications No. 2

Benefits Specialist will maintain the files and records of Marietta Memorial Hospital Employee Health Benefit Plan relating to such grievances. To the extent possible, and in accordance with applicable law, the Plan Administrator, Memorial Health Systems, Benefits Specialist will take appropriate steps to preserve the confidentiality of files and records relating to grievances and will share them only with those who have a need to know;

D. the Plan Administrator, Memorial Health Systems, Benefits Specialist will issue a written decision on the grievance, based on a preponderance of the evidence, no later than thirty (30) days after its filing, including a notice to the complainant of their right to pursue further administrative or legal remedies; and

E. the person filing the grievance may appeal the decision of the Plan Administrator, Memorial Health Systems, Benefits Specialist by writing to the Plan Administrator within fifteen (15) days of receiving the Plan Administrator, Memorial Health Systems, Benefits Specialist's decision. The Plan Administrator shall issue a written decision in response to the appeal no later than thirty (30) days after its filing.

The availability and use of this grievance procedure does not prevent a person from pursuing other legal or administrative remedies, including filing a complaint of discrimination on the basis of race, color, national origin, sex, age or disability in court or with the U.S. Department of Health and Human Services, Office for Civil Rights. A person can file a complaint of discrimination electronically through the Office for Civil Rights Complaint Portal, which is available at https://ocrportal.hhs.gov/ocr/portal/lobby.jsf or by mail or phone at:

U.S. Department of Health and Human Services
200 Independence Avenue, SW
Room 509F, HHH Building
Washington, D.C. 20201

Complaint forms are available at: http://www.hhs.gov/ocr/office/file/index.html. Such complaints must be filed within one hundred eighty (180) days of the date of the alleged discrimination.

The Plan Administrator will make appropriate arrangements to ensure that individuals with disabilities and individuals with limited English proficiency are provided auxiliary aids and services or language assistance services, respectively, if needed to participate in this grievance process. Such arrangements may include, but are not limited to, providing qualified interpreters, providing taped cassettes of material for individuals with low vision, or assuring a barrier-free location for the proceedings. The Plan Administrator, Memorial Health Systems, Benefits Specialist will be responsible for such arrangements."

Marietta Memorial Hospital hereby adopts the above amendments to the Marietta Memorial Hospital Employee Health Benefit Plan Summary Plan Description effective on the dates listed above.

ADOPTED this _____ day of _____, 2017.

PLAN ADMINISTRATOR FOR THE
MARIETTA MEMORIAL HOSPITAL
EMPLOYEE HEALTH BENEFIT
PLAN

## MARIETTA MEMORIAL HOSPITAL
## EMPLOYEE HEALTH BENEFIT PLAN
## SUMMARY PLAN DESCRIPTION
### SUMMARY OF MATERIAL MODIFICATIONS NO. 1

**This Summary of Material Modifications is a description of important changes which have been made to the Plan. You should read these changes carefully and keep this document with your copy of the Summary Plan Description. If you have any questions about these changes, you should contact the Plan Administrator for more information.**

The Marietta Memorial Hospital Employee Health Benefit Plan Summary Plan Description (hereinafter referred to as "SPD") is hereby amended and modified as set forth below. Such amendments are effective as of the dates listed below.

1.) Effective August 1, 2016, Subsection B in the definition of **"DEPENDENT"** in Section 3.1, entitled, **"GENERAL PLAN DEFINITIONS,"** as set forth in Article III of the SPD, is amended in its entirety, as follows:

"B. the Participant's child who meets all of the following conditions:

1. is the Participant's or the Participant's spouse's natural child, adopted child, stepchild, a child for whom the Participant or the Participant's spouse has Legal Guardianship or legal custody pursuant to a valid court order or is a child Placed For Adoption with the Participant; and

2. is less than twenty-six (26) years of age. The child will continue to be an eligible Dependent until the end of the month in which he or she reaches age twenty-six (26). The age requirement is waived for any mentally or physically handicapped child who is incapable of self-sustaining employment and is chiefly dependent upon the Participant for support and maintenance, provided the child suffered such incapacity prior to attaining nineteen (19) years of age. Proof of incapacity must be furnished to the Plan Administrator, or its designee, within thirty-one (31) days of the date the child's coverage would have ended due to age, and may be requested annually thereafter."

2.) Effective March 1, 2017, the definition of **"DEPENDENT"** in Section 3.1, entitled, **"GENERAL PLAN DEFINITIONS,"** as set forth in Article III of the SPD and as amended above, is amended in its entirety, as follows:

**"DEPENDENT**

The term "Dependent" means:

A. the Participant's legal spouse who is not eligible for coverage under a health plan sponsored by his or her employer that provides similar benefits. This requirement is waived under the following circumstances:

1. if the spouse is enrolled in his or her employer sponsored coverage;

2. if the Plan Administrator, in its discretion, determines that the employee contribution for the other coverage is above that which is deemed reasonable under this Plan's criteria; or

3. if the spouse's employer sponsored coverage has no available plan option for which the spouse's physician/provider participates. This exception shall only apply if the spouse's physician/provider is in the Marietta Memorial PHO.

The relationship between the Participant and his or her legal spouse must have met all requirements of a valid marriage contract in the state in which such parties were married; or

B. the Participant's child who meets all of the following conditions:

1. is the Participant's or the Participant's spouse's natural child, adopted child, stepchild, a child for whom the Participant or the Participant's spouse has Legal

Guardianship or legal custody pursuant to a valid court order or is a child Placed For Adoption with the Participant; and

2.  is less than twenty-six (26) years of age. The child will continue to be an eligible Dependent until the end of the month in which he or she reaches age twenty-six (26). The age requirement is waived for any mentally or physically handicapped child who is incapable of self-sustaining employment and is chiefly dependent upon the Participant for support and maintenance, provided the child suffered such incapacity prior to attaining nineteen (19) years of age. Proof of incapacity must be furnished to the Plan Administrator, or its designee, within thirty-one (31) days of the date the child's coverage would have ended due to age, and may be requested annually thereafter.

The Plan Administrator has the right to obtain sufficient proof of Dependent status from any Participant under the Plan who is requesting coverage of his or her Dependents.

This definition and all provisions of this Plan are intended to comply with state and federal law as both regard "Qualified Medical Child Support Orders" and "Medical Child Support Orders," as those terms are defined in the law. The Plan Administrator has established procedures governing "Qualified Medical Child Support Orders". Covered Persons under this Plan can receive upon request, free of charge, a copy of such procedures from the Plan Administrator.

The term "Dependent" excludes these situations:

A.  a spouse who is legally separated or divorced from the Participant. Such spouse must have met all the requirements of a valid separation agreement or divorce decree in the state granting such separation or divorce;

B.  any spouse on active military duty; or

C.  any person who is covered under this Plan as an individual Participant."

3.) Effective August 1, 2016, Subsection X in Section 9.1, entitled, "**MEDICAL BENEFITS – COVERED EXPENSES,**" as set forth in Article IX of the SPD, is amended in its entirety, as follows:

"X.  **Physician's Services:** Charges for Physician's services provided at a Hospital or other Inpatient facility, including surgical and anesthesia services, while the Covered Person is an Inpatient or Outpatient, including emergency room services. Charges for multiple surgical procedures performed during the same operative session will be limited as described in the definition on page 31.

Covered Expenses, including both Physician and facility expenses, for robotic surgical procedures and related expenses will be limited to the Reasonable and Customary charge for the same surgical procedure performed under standard methods. This provision shall not apply if such surgical procedure is performed at Marietta Memorial Hospital."

Marietta Memorial Hospital hereby adopts the above amendments to the Marietta Memorial Hospital Employee Health Benefit Plan Summary Plan Description effective on the dates listed above.

ADOPTED this _____ day of _____, 2017.

PLAN ADMINISTRATOR FOR THE MARIETTA MEMORIAL HOSPITAL EMPLOYEE HEALTH BENEFIT PLAN

Guardianship or legal custody pursuant to a valid court order or is a child Placed For Adoption with the Participant; and

2. is less than twenty-six (26) years of age. The child will continue to be an eligible Dependent until the end of the month in which he or she reaches age twenty-six (26). The age requirement is waived for any mentally or physically handicapped child who is incapable of self-sustaining employment and is chiefly dependent upon the Participant for support and maintenance, provided the child suffered such incapacity prior to attaining nineteen (19) years of age. Proof of incapacity must be furnished to the Plan Administrator, or its designee, within thirty-one (31) days of the date the child's coverage would have ended due to age, and may be requested annually thereafter.

The Plan Administrator has the right to obtain sufficient proof of Dependent status from any Participant under the Plan who is requesting coverage of his or her Dependents.

This definition and all provisions of this Plan are intended to comply with state and federal law as both regard "Qualified Medical Child Support Orders" and "Medical Child Support Orders," as those terms are defined in the law. The Plan Administrator has established procedures governing "Qualified Medical Child Support Orders". Covered Persons under this Plan can receive upon request, free of charge, a copy of such procedures from the Plan Administrator.

The term "Dependent" excludes these situations:

A. a spouse who is legally separated or divorced from the Participant. Such spouse must have met all the requirements of a valid separation agreement or divorce decree in the state granting such separation or divorce;

B. any spouse on active military duty; or

C. any person who is covered under this Plan as an individual Participant."

3.) Effective August 1, 2016, Subsection X in Section 9.1, entitled, "**MEDICAL BENEFITS – COVERED EXPENSES**," as set forth in Article IX of the SPD, is amended in its entirety, as follows:

"X. **Physician's Services:** Charges for Physician's services provided at a Hospital or other Inpatient facility, including surgical and anesthesia services, while the Covered Person is an Inpatient or Outpatient, including emergency room services. Charges for multiple surgical procedures performed during the same operative session will be limited as described in the definition on page 31.

Covered Expenses, including both Physician and facility expenses, for robotic surgical procedures and related expenses will be limited to the Reasonable and Customary charge for the same surgical procedure performed under standard methods. This provision shall not apply if such surgical procedure is performed at Marietta Memorial Hospital."

Marietta Memorial Hospital hereby adopts the above amendments to the Marietta Memorial Hospital Employee Health Benefit Plan Summary Plan Description effective on the dates listed above.

ADOPTED this ___22___ day of ___June_____, 2017.

PLAN ADMINISTRATOR FOR THE MARIETTA MEMORIAL HOSPITAL EMPLOYEE HEALTH BENEFIT PLAN

**MARIETTA MEMORIAL HOSPITAL
EMPLOYEE HEALTH BENEFIT PLAN
SUMMARY PLAN DESCRIPTION**

**REVISED EFFECTIVE AUGUST 1, 2016**

**THIS DOCUMENT CONTAINS ALL PROVISIONS OF THE PLAN. ANY CONFLICT OR AMBIGUITY ARISING BETWEEN THIS DOCUMENT AND ANY OTHER DOCUMENT OR COMMUNICATION, INCLUDING, BUT NOT LIMITED TO, ANY SUMMARY PLAN DESCRIPTION, BROCHURE, OR ORAL OR VIDEO PRESENTATION, DESCRIBING THE RIGHTS, BENEFITS, OR OBLIGATIONS OF THE COMPANY AND PARTICIPANTS UNDER THE PLAN SHALL BE RESOLVED IN FAVOR OF THIS PLAN DOCUMENT.**

Marietta Memorial Hospital Employee Health Benefit Plan Summary Plan Description————————————————

# MEDICAL BENEFITS ADMINISTRATORS, INC.

Established in 1989, Medical Benefits Administrators, Inc. (MBA) is a subsidiary of Medical Benefits Mutual Life Insurance Co., one of the oldest health insurance firms in the United States. In 1938, the company entered the insurance business operating under the name Hospital Services Association. Later, it became known as HSA of Ohio.

The name, Medical Benefits Mutual, was adopted in 1987, signaling the company's establishment as a full-fledged mutual life insurance company. Medical Benefits Administrators, Inc. builds on this great service tradition and commitment to the future by delivering the services the marketplace demands.

MBA is pleased to have been chosen as your Benefit Manager. MBA is committed to the fundamental criteria which distinguish us from the crowd. The first is a commitment to excellent claims administration. The second is a commitment to long term relationships with the people we serve.

We will appreciate your comments and strive to make any dealings with us as simple as possible. If you have any questions about a claim, we invite you to call us at (800) 423-3151, e-mail us at medben@medben.com or to drop in at our offices at 1975 Tamarack Road, Newark, Ohio 43055.

## TABLE OF CONTENTS

**Article I**      **Plan Information** ..................................................................................................7

**Article II**     **Schedule of Benefits**.........................................................................................10
        2.1    Coverages Available under this Plan ...............................................10
        2.2    Schedule of Medical Benefits ..........................................................10
        2.3    Medical Deductible ...........................................................................11
        2.4    Copayments .......................................................................................11
        2.5    Medical Coinsurance and Out-of-Pocket Limits ............................12
        2.6    Medical Coinsurance and Copayment Amounts................................12
        2.7    Medical Plan Benefit Maximums .....................................................13
        2.8    Schedule of Dental Benefits..............................................................17
        2.9    Dental Deductible ..............................................................................18
        2.10   Dental Coinsurance Amounts ...........................................................19
        2.11   Dental Plan Benefit Maximums ........................................................19
        2.12   Predetermination of Benefits ............................................................19
        2.13   Schedule of Vision Benefits..............................................................19
        2.14   Participating Provider Vision Copayments ......................................19
        2.15   Vision Frequency Limitations ...........................................................19
        2.16   Vision Benefit Maximums and Limitations.......................................20

**Article III**    **Definitions** .......................................................................................................21
        3.1    General Plan Definitions....................................................................21
        3.2    Medical Plan Definitions ...................................................................28
        3.3    General Dental Plan Definitions ........................................................34
        3.4    Common Dental Terms.......................................................................34
        3.5    Vision Plan Definitions......................................................................37

**Article IV**     **Claim and Appeal Procedures**.........................................................................38
        4.1    Initial Filing of Claims......................................................................38
        4.2    Requests for Additional Information .................................................38
        4.3    Appeals of Adverse Benefit Determinations.....................................39
        4.4    Access to Documents, Records or Other Information .......................40
        4.5    External Review Rights and Procedures.............................................40
        4.6    Additional Appeal Rights ..................................................................40
        4.7    Examination .......................................................................................41
        4.8    Plan Administrator Discretion ...........................................................41

**Article V**      **Coverage and Eligibility** .................................................................................42
        5.1    Coverage under this Plan ...................................................................42
        5.2    Participant Eligibility ........................................................................42
        5.3    Dependent Coverages ........................................................................42
        5.4    Participant Effective Date ..................................................................43
        5.5    Dependent Effective Date ..................................................................43
        5.6    Newborn Children...............................................................................43
        5.7    Special Enrollment Periods ...............................................................43
        5.8    Open Enrollment.................................................................................45
        5.9    Participant Termination .....................................................................45
        5.10   Dependent Termination .....................................................................45
        5.11   Continuation of Coverage during Disability......................................46
        5.12   Continuation of Medical Coverage to Early Retirees with Severance
               Packages.............................................................................................46
        5.13   Family and Medical Leave Provisions...............................................47
        5.14   USERRA Rights .................................................................................47

3

Marietta Memorial Hospital Employee Health Benefit Plan Summary Plan Description————————

| | | |
|---|---|---|
| **Article VI** | **Cost Management Services**..................................................................**49** | |
| | 6.1 | Utilization Review...........................................................................49 |
| | 6.2 | Continued Stay Review....................................................................50 |
| | 6.3 | Weekend Admission Review.............................................................50 |
| | 6.4 | Emergency and Urgent Care Review..................................................50 |
| | 6.5 | Discharge Planning.........................................................................51 |
| | 6.6 | Individual Benefits Management........................................................51 |
| | 6.7 | Second Surgical Opinion..................................................................51 |
| **Article VII** | **Continuation Coverage under COBRA**..........................................**52** | |
| | 7.1 | Right to Elect Continuation Coverage.................................................52 |
| | 7.2 | Notification of Qualifying Event........................................................52 |
| | 7.3 | Length of Continuation Coverage......................................................52 |
| | 7.4 | Termination of Continuation of Coverage............................................52 |
| | 7.5 | Multiple Qualifying Events...............................................................53 |
| | 7.6 | Total Disability..............................................................................53 |
| | 7.7 | Carryover of Deductibles and Plan Maximums.....................................53 |
| | 7.8 | Payments of Premium.....................................................................54 |
| | 7.9 | Definitions....................................................................................54 |
| | 7.10 | COBRA Bankruptcy Provisions under Title XI.....................................55 |
| **Article VIII** | **Major Medical Expense Benefits**.................................................**56** | |
| | 8.1 | Coinsurance Percentage and Deductible..............................................56 |
| | 8.2 | Allocation and Apportionment of Benefits...........................................56 |
| **Article IX** | **Description of Medical Benefits**...................................................**57** | |
| | 9.1 | Medical Benefits – Covered Expenses.................................................57 |
| **Article X** | **Other Medical Benefits**...............................................................**64** | |
| | 10.1 | Organ and Tissue Transplant Benefits.................................................64 |
| **Article XI** | **Description of Dental Benefits**.....................................................**65** | |
| | 11.1 | Dental Benefits – Covered Expenses...................................................65 |
| | 11.2 | Alternate Course of Treatment..........................................................65 |
| | 11.3 | Predetermination of Benefits.............................................................65 |
| | 11.4 | Class I – Diagnostic and Preventive Dental Services - Covered Expenses ....65 |
| | 11.5 | Class II –Primary Dental Services - Covered Expenses ...........................66 |
| | 11.6 | Class III –Prosthetic and Complex Restorative Dental Services - Covered Expenses....................................................................................67 |
| | 11.7 | Class IV – Orthodontic Covered Expenses...........................................67 |
| **Article XII** | **Description of Vision Benefits**.....................................................**69** | |
| | 12.1 | Vision Benefits – Covered Expenses...................................................69 |
| | 12.2 | Participating Provider Claims............................................................69 |
| | 12.3 | Limitations on Charges by Participating Providers for Non-Covered Extras.69 |
| **Article XIII** | **Exclusions and Limitations**.........................................................**71** | |
| | 13.1 | Medical Plan Benefit Exclusions and Limitations..................................71 |
| | 13.2 | Dental Benefit Exclusions and Limitations...........................................75 |
| | 13.3 | Vision Plan Benefit Exclusions and Limitations....................................77 |
| **Article XIV** | **General Information**...................................................................**79** | |
| | 14.1 | Coordination of Benefits..................................................................79 |
| | 14.2 | Third Party Recovery, Subrogation and Reimbursement ..........................81 |
| | 14.3 | Medicare Benefits..........................................................................85 |
| | 14.4 | Additional Rights of Recovery..........................................................85 |
| | 14.5 | Facility of Payment........................................................................86 |

4

————————————————————— Marietta Memorial Hospital Employee Health Benefit Plan Summary Plan Description

|  |  |  |
|---|---|---|
| 14.6 | Administration of the Plan | 86 |
| 14.7 | Non-Alienation and Assignment | 87 |
| 14.8 | Failure to Enforce | 87 |
| 14.9 | Fiduciary Responsibilities | 87 |
| 14.10 | Disclaimer of Liability | 87 |
| 14.11 | Administrative and Clerical Errors | 88 |
| 14.12 | Rescission of Coverage | 88 |

**Article XV**   **Privacy** ............................................................................**89**

| 15.1 | Privacy of Health Information | 89 |
| 15.2 | Use and Disclosure of Protected Health Information | 89 |
| 15.3 | Disclosures of Health Information to the Company | 89 |
| 15.4 | Access of Covered Persons to Protected Health Information | 90 |
| 15.5 | Amendment Rights | 91 |
| 15.6 | Security of Protected Health Information | 91 |

**Article XVI**   **Statement of ERISA Rights** ............................................**92**

Marietta Memorial Hospital Employee Health Benefit Plan Summary Plan Description

*[This page intentionally left blank.]*

# ARTICLE I
## PLAN INFORMATION

**NAME OF PLAN**
The name of the Plan is the Marietta Memorial Hospital Employee Health Benefit Plan.

**PURPOSE OF THE PLAN**
Marietta Memorial Hospital executes this document, including any amendments, to establish a health benefit plan for the exclusive benefit of its participating employees and their eligible Dependents and to grant them legally enforceable rights under this Plan. While Marietta Memorial Hospital has every intention of continuing this Plan indefinitely, it reserves the right to amend or terminate the Plan, and the benefits provided hereunder, at any time.

The Plan Administrator has issued a Summary Plan Description to each Participant which summarizes the benefits to which that person is entitled, to whom benefits are payable, and the provisions of this Plan principally affecting the Participant and his or her covered Dependents.

**PLAN EFFECTIVE DATE**
The original Plan Effective Date was August 1, 2000. This revision of the Plan is effective August 1, 2016.

**AMENDMENT OR TERMINATION**
Marietta Memorial Hospital may amend or terminate the Plan at any time by means of a writing signed by a person authorized by Marietta Memorial Hospital to do so. Any such amendment or termination shall become effective upon its execution or on such date as may be specified in that writing. Such amendment, modification or termination may result in the termination of Participant and Dependent coverage under the Plan. Expenses incurred prior to any Plan termination will be paid as provided under the terms of the Plan prior to such termination. Any termination of the Plan will be communicated by Marietta Memorial Hospital to the Participants.

The terms of the Plan cannot be amended or modified by oral statement(s). Only the Plan Administrator can interpret the terms of the Plan.

Upon Plan termination, any Plan assets remaining in the Plan's account(s) will be distributed by the Plan Administrator to the Plan Sponsor and/or Participants, in accordance with method(s) set forth in ERISA, or any other applicable law or regulation. The Plan Administrator shall pay all eligible Plan benefits and expenses before any distribution is made.

Marietta Memorial Hospital reserves the right, at any time and from time to time, to modify or amend, in whole or in part, any or all of the provisions of the Plan.

**PLAN ADMINISTRATOR TAX ID NUMBER (EIN)**
31-4379509

**PLAN ADMINISTRATOR**
Marietta Memorial Hospital
401 Matthew Street
Marietta, Ohio 45750
(740) 374-1416

**PLAN NUMBER**
501

**GROUP NUMBER**
10200

7

Marietta Memorial Hospital Employee Health Benefit Plan Summary Plan Description——————————————————

## PLAN YEAR

The Plan Year is a time period defined for fiscal purposes and used for certain Plan reporting and disclosure requirements. The Plan Year will begin on August 1st and end on July 31st of the following year.

## CALENDAR YEAR

The Calendar Year is the period beginning January 1st and ending December 31st which is used in the application of Deductible, Coinsurance and benefit maximum amounts.

## TYPE OF ADMINISTRATION

Contract Administration.

## DESCRIPTION OF PLAN

The Plan is an employee health and welfare benefit plan providing medical benefits and a Preferred Provider network, dental benefits and vision benefits utilizing a Participating Provider network. A copy of the Plan documents and insurance contracts, if any, are on file at the Plan Administrator's office and may be read by any Covered Person at any reasonable time. In the event of any discrepancy between any summary of this Plan and the actual provisions of the Plan document, the Plan document shall govern.

This Plan is self-funded by the Company or Employers, and administered in accordance with the provisions of ERISA. As such, the provisions of ERISA preempt the application of state insurance law to this Plan.

The Plan shall not be deemed to constitute a contract between the Company and any employee or to be a consideration for, or an inducement or condition of, the employment of any employee. Nothing in the Plan shall be deemed to give any employee the right to be retained in the service of the Company or to interfere with the right of the Company to discharge any employee at any time.

## NAMED FIDUCIARY

Marietta Memorial Hospital
401 Matthew Street
Marietta, Ohio 45750
(740) 374-1416

## AGENT FOR SERVICE OF LEGAL PROCESS

Marietta Memorial Hospital
401 Matthew Street
Marietta, Ohio 45750
(740) 374-1416

In addition, service of legal process may be made upon the Plan Administrator or a Plan Trustee, if a Trustee has been appointed.

## FUNDING

The Plan is funded through a trust agreement, directed by the Trustee(s) appointed by Marietta Memorial Hospital, which is known as Marietta Memorial Hospital Employee Health Benefit Plan Trust Agreement. The Trustee(s) appointed are listed below. Funds for payment of claims considered under the Plan are forwarded to account(s), governed by the Trust, from which claims are to be paid. All funds received by the Trust shall be governed as described in the Trust Agreement. A copy of the Trust Agreement is on file at the Plan Administrator's office and may be read by any Covered Person at any reasonable time.

**TRUSTEE(S)**
Eric Young
Chief Financial Officer
Marietta Memorial Hospital
401 Matthew Street
Marietta, Ohio 45750

**ASSIGNMENT**
A Covered Person's benefits may not be assigned, except by consent of the Company, other than to Providers of Plan benefits.

**SOURCE OF CONTRIBUTIONS**
The Plan is funded by contributions made by the Employer and employees who are participating in the Plan. As of the Plan Effective Date, Participant Contributions are required for Dependent Coverage.

The Company shall, from time to time, evaluate the funding method of the Plan benefits and determine the amount to be contributed by the Employer and the amount to be contributed, if any, by the Participants for each type of coverage.

**BENEFIT MANAGER – MEDICAL AND DENTAL BENEFITS**
Medical Benefits Administrators, Inc.
1975 Tamarack Road
P. O. Box 1099
Newark, Ohio 43058-1099
(740) 522-8425
(800) 423-3151
www.medben.com

**BENEFIT MANAGER – VISION BENEFITS**
VisionPlus of America, Inc.
1975 Tamarack Road
P.O. Box 1260
Newark, Ohio 43058-1260
(740) 522-8425
(800) 252-3447
www.visplus.com

**UTILIZATION REVIEW SERVICE**
American Health Holding, Inc.
(888) 877-8084

**GRANDFATHERED STATUS UNDER PPACA**
This Plan is currently considered to be non-grandfathered for the purposes of the Patient Protection and Affordable Care Act.

9

## ARTICLE II
## SCHEDULE OF BENEFITS

### 2.1  COVERAGES AVAILABLE UNDER THIS PLAN

This Plan will allow Participants and their eligible Dependents to select the following health care options:

    A.  medical coverage;

    B.  dental coverage; and/or

    C.  vision coverage.

A Participant can select any or all of the above options. At the time of enrollment, a Participant must select which options, if any, in which such Participant and/or his or her Dependents should be enrolled. All Family members are not required to be enrolled in the same coverages. The coverages as described below shall only apply to a Covered Person to the extent that the Covered Person has been enrolled in, and coverage has become effective for the type of coverage selected, as described in this Article. A Participant can change his or her plan options, terminate any coverage, or enroll in coverage that was previously waived during the Plan's annual open enrollment period or during a special enrollment period. In such case, the modified coverage will become effective on the date specified in Section 5.7 or Section 5.8, as applicable.

### 2.2  SCHEDULE OF MEDICAL BENEFITS

*In order to be eligible for any of the benefits described in Section 2.2 through Section 2.7, the Covered Person must actually be enrolled in the medical coverage as described in Article V.*

This Plan provides three (3) different levels of benefits. Eligibility for reimbursement at a particular level is dependent upon the category of Provider providing the services or supplies. The highest level of reimbursement is available for services or supplies received from Preferred Providers who are part of the Marietta Memorial PHO (Tier I). The next level is available for services or supplies received from Providers who are considered Preferred Providers under this Plan, but who are not part of the Marietta Memorial PHO ("Other Preferred Providers" or Tier II). The lowest reimbursement level applies to Providers who are not part of any Plan Preferred Provider network (Tier III). Covered Expenses provided by an Other Preferred Provider or a non-Preferred Provider may be eligible for consideration at a higher level of benefits under any of the following circumstances:

    A.  a Dependent child resides outside the service area of a Preferred Provider network even if the Provider providing the services is not part of any Plan Preferred Provider network. Such services will be paid at the Other Preferred Provider level, unless the service was provided by a PHO Provider (which will continue to pay at the Tier I level);

    B.  a Covered Person obtains professional services for radiology, pathology, anesthesiology, or the services of an emergency room Physician in a Marietta Memorial Hospital PHO facility, or an Other Preferred Provider Hospital or facility. Such professional services will be reimbursed at the same level as the facility in which they are received, regardless of the level of reimbursement that would otherwise apply to the Provider rendering the services;

    C.  the Covered Person requires Medically Necessary services or supplies while traveling outside of the service area of the Preferred Provider network. This provision shall not apply if the reason for the travel was to obtain such services or supplies. Such services will be considered at the Marietta Memorial PHO level of benefits;

    D.  the Covered Person requires treatment in an Emergency, and cannot reasonably obtain such treatment from a Preferred Provider or cannot express a Provider preference due to his or her medical condition. The Marietta Memorial PHO level of benefits will apply

until the Covered Person's condition has sufficiently stabilized so that transfer to a Preferred Provider for any required continued treatment is reasonably possible; or

E.  if a Provider who was previously in a medical practice that is part of the Marietta Memorial PHO moves to a practice that is not part of such PHO, Covered Expenses for services received from such Provider will continue to be considered at the level of the Marietta Memorial PHO, but only if approved by the Plan Administrator, in its discretion.

Preferred Providers are Physicians, Hospitals and certain facilities which have agreed to provide services and supplies to Covered Persons under this Plan in accordance with previously determined discounted fee schedules. The provisions of the agreements with the Preferred Providers allow Covered Persons to benefit from these discounted fees. As this Plan utilizes more than one network, the fees which can be charged by a Preferred Provider may vary in accordance with the fee schedule which has been agreed to by a particular network. After the Plan has paid the appropriate benefits to a Provider based on such fees, these Providers have agreed not to bill a Covered Person under this Plan for the amount above the discounted fee. Of course, the Covered Person's Deductibles Copayments and Coinsurance, if applicable, will still be applied as described in this Article.

If a Provider is not a Preferred Provider under this Plan, the Plan will determine Covered Expenses based upon the Reasonable and Customary fee for the services. In many cases, the amount which would be considered as Reasonable and Customary will be in excess of the fee which a Preferred Provider network Provider would charge for the same service under the Plan. This means that the Covered Person may be responsible for an increased dollar amount if a non-Preferred Provider is utilized. In addition, the payment of any amount in excess of the Reasonable and Customary fee shall be the responsibility of the Covered Person, in addition to the Deductibles, Copayments and Coinsurance otherwise applicable under this Plan. For lists of the Preferred Providers, including those in the Marietta Memorial PHO, please contact the Plan Administrator.

**This Schedule of Medical Benefits is intended to provide only a general description of the medical benefits. This Plan contains limitations and restrictions which are described later in this document and could affect any benefits which may be payable.**

## 2.3  MEDICAL DEDUCTIBLE

|  | Marietta Memorial PHO/ Tier I | Other Preferred Providers/ Tier II | Non-Preferred Providers/ Tier III |
|---|---|---|---|
| **Individual Calendar Year Deductible** | None | $1,000.00 | $2,000.00 |
| **Family Calendar Year Deductible Limit** | None | $2,000.00 | $4,000.00 |

Amounts applied to the Tier II Deductibles do <u>not</u> apply to the Tier III Deductibles, and vice versa.

## 2.4  COPAYMENTS

A $20.00 Copayment shall apply to all charges made by a Marietta Memorial PHO/Tier I Physician for an office visit when an office visit charge is made, including visits to a Marietta Memorial PHO/Tier I Urgent Care Facility, but not including visits related to wellness services. The balance of the charges for the office visit, and all services performed in the office during the same visit will be paid as described in Section 2.6. The Copayment shall only apply to the first visit, per Pregnancy.

A $100.00 Copayment shall apply, per day to any Inpatient confinement in a Marietta Memorial PHO Hospital, including confinements related to Pregnancy and the treatment of Mental/Nervous Disorders, Alcoholism or Substance Abuse. If the Covered Person receives intensive Outpatient

11

Marietta Memorial Hospital Employee Health Benefit Plan Summary Plan Description————————————

therapy for the treatment of Mental/Nervous Disorders, Alcoholism or Substance Abuse, the Copayment shall be $50.00, per day, at the Tier I level. The balance of the charges will be paid as described in Section 2.6.

A $100.00 Copayment shall apply, per visit, to a Marietta Memorial PHO/Tier I Hospital emergency room. This Copayment will apply, per visit, to all emergency room charges in an Emergency situation, regardless of the level of the Provider.

A $250.00 Copayment will apply to all non-office based Outpatient surgery facility charges in a Hospital or free-standing facility or to, cardiac catheterization, endoscopic procedures and epidural pain injections in a Hospital setting at the Marietta Memorial PHO level.

Copayments may apply to other services under this Plan, as described in Section 2.6, on a per visit, per date of service, per service or per trip basis. If multiple procedures which are subject to individual Copayments are performed during the same office visit, only one (1) Copayment shall apply.

## 2.5  MEDICAL COINSURANCE AND OUT-OF-POCKET LIMITS

**Marietta Memorial PHO/Tier I Coinsurance** ...................................................... 90%

**Other Preferred Provider/Tier II Coinsurance** .................................................. 70%

**Non-Preferred Provider/Tier III Coinsurance** .................................................. 50%

See Section 2.6, Medical Coinsurance and Copayment Amounts, for Coinsurance amounts which vary from this standard.

### Calendar Year Out-of-Pocket Limits

| | Marietta Memorial PHO/Tier I *(includes Copayments and the Covered Person's share of Coinsurance paid at this level)* | Other Preferred Providers/Tier II *(includes Deductibles and the Covered Person's share of Coinsurance paid at this level)* | Non-Preferred Providers/ Tier III |
|---|---|---|---|
| **Effective Through December 31, 2016** | | | |
| **Individual** | $1,500.00 | $6,350.00 | Unlimited |
| **Family** | $3,000.00 | $12,700.00 | Unlimited |
| **Effective January 1, 2017 and After** | | | |
| **Individual** | $1,500.00 | $6,850.00 | Unlimited |
| **Family** | $3,000.00 | $13,700.00 | Unlimited |

Amounts attributable to expenses paid at the Tier III level, services and supplies that are not covered under this Plan, in excess or the Reasonable and Customary limitations or in excess of any Plan maximum, or attributable to any penalty under this Plan will not apply to the Out-of-Pocket limits listed above. Amounts applied at the Tier II level will not apply to the Tier I level, but the total amounts applied at both levels will not exceed the Tier II limits.

## 2.6  MEDICAL COINSURANCE AND COPAYMENT AMOUNTS

*Deductibles are applied on a Calendar Year basis, while Copayments will be applied on a per visit, date of service or per service basis; both reflect amounts to be paid by the Covered Person. Coinsurance reflects the percentage amount of Covered Expenses to be paid by the Plan after any applicable Deductible or Copayment.*

———————————— Marietta Memorial Hospital Employee Health Benefit Plan Summary Plan Description

| | Marietta Memorial PHO/ Tier I | | Other Preferred Provider/ Tier II | | Non-Preferred Provider/ Tier III | |
|---|---|---|---|---|---|---|
| | Copayment | Coinsurance | Deductible | Coinsurance | Deductible | Coinsurance |
| **Tobacco Cessation Services, including Counseling ①④** | None | 100% | Applies | 70% | Applies | 50% |
| **Rental, or Purchase if Less Expensive, of Breast Feeding Equipment, including Related Counseling and Supplies ④** | None | 100% | Applies | 70% | Applies | 50% |
| **Elective Sterilization** | | | | | | |
| Female Participant/Spouse④ | None | 100% | Applies | 70% | Applies | 50% |
| Male Participant/Spouse | None | 100% | Applies | 70% | Applies | 50% |
| Female Dependent Child④ | None | 100% | Not Covered | | Not Covered | |
| **Other Wellness Services** | | | | | | |
| Testing and other Services included in the Recommended Wellness Services④ | None | 100% | Applies | 70% | Applies | 50% |
| Office Visit/Examination | None | 100% | Applies | 70% | Applies | 50% |
| Routine Eye Examinations not included in the Recommended Wellness Services | $20.00 | 90% | Applies | 70% | Applies | 50% |
| Other Wellness Services | None | 100% | Applies | 70% | Applies | 50% |
| **Outpatient - Diagnostic Services** *(per date of service)* | | | | | | |
| MRIs performed at First Settlement Orthopaedics, Inc. | *Paid at Tier III level* | | *Paid at Tier III level* | | Applies | 50% |
| Sleep Studies | $100.00 | 90% | Applies | 70% | Applies | 50% |
| Hospital-Based Endoscopic Procedures, including Diagnostic Colonoscopies, and Related Physicians | $250.00 | 90% | Applies | 70% | Applies | 50% |
| Hospital-Based Cardiac Catheterizations, including Physicians | $250.00 | 90% | Applies | 70% | Applies | 50% |
| Other, including Preadmission Testing | None | 90% | Applies | 70% | Applies | 50% |
| **Health Education not included in the Recommended Wellness Services, including Diabetic Education/Counseling** *(per date of service)* | $20.00 | 90% | Applies | 70% | Applies | 50% |

13

Marietta Memorial Hospital Employee Health Benefit Plan Summary Plan Description————————

| | Marietta Memorial PHO/ Tier I | | Other Preferred Provider/ Tier II | | Non-Preferred Provider/ Tier III | |
|---|---|---|---|---|---|---|
| | Copayment | Coinsurance | Deductible | Coinsurance | Deductible | Coinsurance |
| **Medically Necessary Foot Care** *(per date of service)* | $20.00 | 90% | Applies | 70% | Applies | 50% |
| **Second Surgical Opinion** | $20.00 | 90% | Applies | 70% | Applies | 50% |
| **Dental Procedures under the Medical Plan** *(per date of service)* | $20.00 | 90% | Applies | 70% | Applies | 50% |
| **Infertility Treatment, including Visits** | None | 90% | Applies | 70% | Applies | 50% |
| **Treatment of Temporomandibular Joint Disorders (TMJ)** | | | | | | |
| Visits *(per date of service)* | $20.00 | 90% | Applies | 50% | Applies | 50% |
| Other Related Services/ Supplies | None | 90% | Applies | 50% | Applies | 50% |
| **Epidural Pain Injections** *(per date of service)* | | | | | | |
| Office Based | $20.00 | 90% | Applies | 70% | Applies | 50% |
| Hospital Based | $250.00 | 90% | Applies | 70% | Applies | 50% |
| **Dialysis Services** | | | | | | |
| Inpatient | None | 90% | Applies | 70% | Applies | 50% |
| Outpatient⑤ | *Paid at Tier II level* | | Applies | 70% | *Paid at Tier II level* | |
| **Maternity Related Charges** | | | | | | |
| First Visit, Per Pregnancy | $20.00 | 90% | Applies | 70% | Applies | 50% |
| Other Physician's Charges, Same Pregnancy | None | 90% | Applies | 70% | Applies | 50% |
| Inpatient Hospital – Mother | $100.00③ | 90% | Applies | 70% | Applies | 50% |
| Inpatient Well Newborn | None | 90% | Applies | 70% | Applies | 50% |
| Birthing Centers | *Not Applicable* | | Applies | 70% | Applies | 50% |
| **Other Office Based Services,** | | | | | | |
| Visits not Listed Elsewhere *(per date of service)* | $20.00 | 90% | Applies | 70% | Applies | 50% |
| Other Office-Based Services/Supplies | None | 90% | Applies | 70% | Applies | 50% |
| **Hospital or Facility-Based Outpatient Surgery** | | | | | | |
| Facility *(per date of service)* | $250.00 | 90% | Applies | 70% | Applies | 50% |
| Physician and Other Related Services/Supplies | None | 90% | Applies | 70% | Applies | 50% |
| **Wound Care through Hospital Clinic** *(per date of service)* | $20.00 | 90% | Applies | 70% | Applies | 50% |
| **Outpatient Hospital Services/ Supplies not Listed Elsewhere** | None | 90% | Applies | 70% | Applies | 50% |

14

—————————————— Marietta Memorial Hospital Employee Health Benefit Plan Summary Plan Description

| | Marietta Memorial PHO/ Tier I | | Other Preferred Provider/ Tier II | | Non-Preferred Provider/ Tier III | |
|---|---|---|---|---|---|---|
| | Copayment | Coinsurance | Deductible | Coinsurance | Deductible | Coinsurance |
| **Physical Therapy, Speech Therapy & Occupational Therapy** *(per date of service)*① | $20.00 | 90% | Applies | 70% | Applies | 50% |
| **Cardiac and Pulmonary Rehabilitation** *(per date of service)*① | $20.00 | 90% | Applies | 70% | Applies | 50% |
| **Spinal Manipulation, including Related Visits and Diagnostics**① | | | | | | |
| Services provided by a Doctor of Osteopathy (D.O.) *(per date of service)* | $20.00 | 90% | Applies | 70% | Applies | 50% |
| Services provided by a Chiropractor | *Not Applicable* | | Applies | 70% | Applies | 50% |
| **Acupuncture** *(per date of service)* | $20.00 | 90% | *Not Covered* | | *Not Covered* | |
| **Ambulance** *(per trip)* | $100.00 | 90% | Applies | 70% | Applies | 50% |
| **Durable Medical Equipment**© | None | 90% | Applies | 70% | Applies | 50% |
| **Urgent Care Facility** | | | | | | |
| Facility *(per date of service)* | $20.00 | 90% | Applies | 70% | Applies | 50% |
| Physician and Other Services/Supplies during Visit | None | 90% | Applies | 70% | Applies | 50% |
| **Emergency Room** *(per visit, if not admitted)* | | | | | | |
| True Emergency | | | | | | |
| Facility | $100.00 | 90% | *Paid at Tier I level* | | *Paid at Tier I level* | |
| Physician and All Services and Supplies during Visit | None | 90% | *Paid at Tier I level* | | *Paid at Tier I level* | |
| Non-Emergency | | | | | | |
| Facility | $100.00 | 90% | Applies | 70% | Applies | 50% |
| Physician and All Services and Supplies during Visit | None | 90% | Applies | 70% | Applies | 50% |
| **Other Outpatient Hospital** | None | 90% | Applies | 70% | Applies | 50% |
| **Inpatient Hospital, including Room & Board and Hospital Observation** *(per date of service)*② | $100.00 | 90% | Applies | 70% | Applies | 50% |

15

Marietta Memorial Hospital Employee Health Benefit Plan Summary Plan Description————————————

| | Marietta Memorial PHO/ Tier I | | Other Preferred Provider/ Tier II | | Non-Preferred Provider/ Tier III | |
|---|---|---|---|---|---|---|
| | Copayment | Coinsurance | Deductible | Coinsurance | Deductible | Coinsurance |
| **Treatment of Mental/Nervous Disorders, Alcoholism & Substance Abuse** | | | | | | |
| Visits, Counseling and Other Office-Based Services *(per date of service)* | $20.00 | 90% | Applies | 70% | Applies | 50% |
| Occupational Therapy ① | None | 90% | Applies | 70% | Applies | 50% |
| Intensive Outpatient Therapy *(per date of service)* | $50.00 | 90% | Applies | 70% | Applies | 50% |
| Partial Hospitalization | None | 90% | Applies | 70% | Applies | 50% |
| Other Related Services/Supplies | *Paid like other Conditions* | | Applies | 70% | Applies | 50% |
| **Treatment Related to Weight Loss** | | | | | | |
| Outpatient Facility/Hospital Charges Related to Surgical Treatment for Morbid Obesity | $250.00 | 90% | *Not Covered* | | *Not Covered* | |
| Inpatient Charges *(per date of service)* ② | $100.00 | 90% | *Not Covered* | | *Not Covered* | |
| Other Covered Services, including Office Visits, Diagnostics and Therapy | None | 90% | *Not Covered* | | *Not Covered* | |
| **Human Organ/Tissue Transplants** *(not covered under policy described in Section 10.1)* | | | | | | |
| Special Transplant Network | *Not Applicable* | | Applies | 70% | *Not Applicable* | |
| All Other | *Not Covered* | | *Not Covered* | | *Not Covered* | |
| **Genetic Testing** *(except as covered under wellness)* | | | | | | |
| Counseling and Specimen Collection *(per date of service)* | $20.00 | 90% | *Not Covered* | | *Not Covered* | |
| Laboratory Services *(not including specimen collection)* | None | 90% | Applies | 70% | Applies | 50% |
| Surgery Performed as a Result of Testing | $250.00 | 90% | *Not Covered* | | *Not Covered* | |

16

———————————————— Marietta Memorial Hospital Employee Health Benefit Plan Summary Plan Description

| | Marietta Memorial PHO/ Tier I | | Other Preferred Provider/ Tier II | | Non-Preferred Provider/ Tier III | |
|---|---|---|---|---|---|---|
| | Copayment | Coinsurance | Deductible | Coinsurance | Deductible | Coinsurance |
| **Hearing Related Services/ Supplies①** | | | | | | |
| Routine Hearing Examinations not included in the Recommended Wellness Services and Audiology/ Hearing Tests, Regardless of Diagnosis *(per date of service)* | $20.00 | 90% | Applies | 70% | Applies | 50% |
| Hearing Aids | None | 90% | *Not Covered* | | *Not Covered* | |
| Ear Molds | None | 90% | *Not Covered* | | *Not Covered* | |
| **Other Covered Services & Supplies①** | None | 90% | Applies | 70% | Applies | 50% |

## EXPLANATION

①  Please see additional limitations in Section 2.7, Medical Plan Benefit Maximums.

②  Charges for Hospital Room & Board will be considered at the Hospital's daily Semi-Private room rate. Private rooms will be covered when authorized as Medically Necessary by the Plan. Charges for Intensive Care Units will be considered at the Reasonable and Customary charge for such a unit.

③  The $100.00 per day Copayment applies if the Covered Person is in regular observation or is sent to observation from the Emergency Department. This Copayment will be combined with any Inpatient Copayment applicable for the same confinement if the Covered Person is transferred between two (2) or more different Marietta Memorial PHO facilities.

④  If determined by the Covered Person's Physician that it is medically inadvisable for a Covered Person to have a preventive service performed by a Marietta Memorial PHO/Tier I Provider, the Covered Person may obtain the service by a Provider at the Other Preferred Provider/Tier II level of benefits and the charges will be considered at the Marietta Memorial PHO/Tier I level of benefits.

⑤  There is no network for these services. The Reasonable and Customary amount which, at the Plan Administrator's sole discretion and if applicable, will not exceed the maximum payable amount applicable to the treatment, supplies, and/or services, which typically is one hundred twenty-five percent (125%) of the current Medicare allowable fee for the appropriate area.. Dialysis services include kidney dialysis and dialysis related claims.

⑥  Covered Expenses for Durable Medical Equipment under Tier I will be based on one hundred forty percent (140%) of the current Medicare allowable rate for the area, rather than the Reasonable and Customary charge or the network rate.

## 2.7 MEDICAL PLAN BENEFIT MAXIMUMS

**The medical plan maximum benefits and limitations are shown below. A daily, per visit or per accident maximum indicates the total Covered Expenses which will be payable at the appropriate Coinsurance percentages shown in the "Medical Coinsurance and Copayment**

Amounts" section above. Both Calendar Year and Lifetime maximums indicate the actual benefits payable under the Plan.

| | |
|---|---|
| **Skilled Nursing Facility** | Sixty (60) days per Calendar Year maximum |
| **Home Health Care** | Thirty (30) days per Calendar Year maximum |
| **Physical Therapy, Occupational Therapy & Speech Therapy, combined** | Ninety (90) visits per Calendar Year maximum |
| **Inpatient or Partial Hospitalization for Short Term Rehabilitation** | Sixty (60) days per Calendar Year maximum |
| **Total Parenteral Nutrition** | Sixty (60) days per Calendar Year maximum |
| **Manipulations by Chiropractors (D.C.) or Osteopaths (D.O.)** | Twenty (20) visits per Calendar Year maximum |
| **Travel, Transportation, Meals & Lodging in Connection with Organ/Tissue Transplants Not Covered Through the Separate Organ and Tissue Transplant Policy described in Section 10.1** | Ten thousand dollars ($10,000.00) per transplant maximum |
| Meals & Lodging | Seventy-five dollars ($75.00) per day maximum |
| **Hearing Related Supplies** (*Marietta Memorial PHO/Tier I Providers Only*) | |
| Hearing Aids | |
| *Under Age 18* | One thousand four hundred dollars ($1,400.00) maximum per ear per four (4) year period |
| *Age 18 and Older* | One thousand four hundred dollars ($1,400.00) maximum per ear per Lifetime |
| Ear Molds | One (1) per ear per six (6) month period Under age eighteen (18) only |
| **Tobacco Cessation Counseling** | Limited to two (2) attempts to stop tobacco use per Calendar Year, with up to four (4) counseling sessions, per attempt |

## 2.8 SCHEDULE OF DENTAL BENEFITS

*In order to be eligible for any of the benefits described in Section 2.8 through Section 2.12 ,the Covered Person must actually be enrolled in the dental coverage as described in Article V.*

**This Schedule of Dental Benefits is intended to provide only a general description of the dental benefits under this Plan. This Plan contains limitations and restrictions which are described later in this document and could affect any benefits which may be payable.**

## 2.9 DENTAL DEDUCTIBLE

| | |
|---|---|
| **Individual Calendar Year Deductible (CYD)** | $25.00 |
| **Family Calendar Year Deductible** | $75.00 |

This Calendar Year Deductible applies to Class II, Class III and Class IV services. Any amount applied to an individual's dental Deductible in the last three (3) months of the prior Calendar Year may be carried over and applied to such individual's Deductible in the current Calendar Year. Many times claims for Covered Expenses are not submitted in the same order in which they

—————————————— Marietta Memorial Hospital Employee Health Benefit Plan Summary Plan Description

were incurred. Regardless of the order in which the claims were submitted to the Plan for payment, eligibility for any Deductible carryover will be based on the date the expense was incurred.

## 2.10 DENTAL COINSURANCE AMOUNTS

| Class | Deductible | Coinsurance |
|---|---|---|
| **Class I** (Diagnostic and Preventive Services) | None | 100% |
| **Class II** (Minor Services) | Applies | 80% |
| **Class III** (Major Services) | Applies | 50% |
| **Class IV** (Orthodontic Services) | Applies | 50% |

## 2.11 DENTAL PLAN BENEFIT MAXIMUMS

| | |
|---|---|
| **Class I, Class II and Class III, combined** | $2,500.00 per Calendar Year maximum |
| **Class IV Orthodontic Services** | $1,000.00 per Lifetime maximum<br>Limited to covered Dependent children through age nineteen (19) |

## 2.12 PREDETERMINATION OF BENEFITS

Before starting a course of treatment for which the charge is expected to be seven hundred fifty dollars ($750.00) or more, a Dental Treatment Plan must be submitted in an acceptable form to the Benefit Manager. A Predetermination of Benefits payable under this Plan will then be provided. This requirement does not apply to emergency treatment, routine oral examinations, x-rays, Prophylaxis and Fluoride treatments.

For more information about Predetermination of Benefits, see Section 11.3.

## 2.13 SCHEDULE OF VISION BENEFITS

*In order to be eligible for any of the benefits described in Section 2.13 through Section 2.16 , the Covered Person must actually be enrolled in the vision coverage as described in Article XII.*

**The Schedule of Vision Benefits is intended to provide only a general description of the vision benefits under this Plan. This Plan contains limitations and restrictions which are described later in this document and could affect any benefits which may be payable.**

## 2.14 PARTICIPATING PROVIDER VISION COPAYMENTS

| | |
|---|---|
| **Professional Services** | $15.00 Copayment per benefit period |
| **Lenses and/or Frames or Contact Lenses** | $25.00 Copayment per date of service |

## 2.15 VISION FREQUENCY LIMITATIONS

| Type of Service | Frequency Limitation/Benefit Period |
|---|---|
| **Professional Services** | One (1) examination every twelve (12) months |
| **Lenses** | One (1) pair every twelve (12) months |
| **Frames** | One (1) every twenty-four (24) months |
| **Contact Lenses (Elective or Medically Necessary)** | Allowance every twelve (12) months<br>The Plan benefits for contact lenses are provided in lieu of any vision benefits for lenses or frames for those benefit periods. |

19

Marietta Memorial Hospital Employee Health Benefit Plan Summary Plan Description————————————

## 2.16    VISION BENEFIT MAXIMUMS AND LIMITATIONS

The following maximums shall apply to the applicable expenses, per benefit period, as indicated in Section 12.2. The Plan benefits for contact lenses are provided in lieu of any vision benefits for lenses or frames for that benefit period. Amounts listed are covered allowances before any applicable Copayments are taken. Only one (1) Copayment for lenses/frames applies per visit.

| Type of Service | Copayment | Participating Provider Maximum | Non-Participating Provider Maximum |
|---|---|---|---|
| **Professional Services:** | | | |
| Examination | Applies | Covered in full after Copayment | $35.00 |
| **Lenses** (per pair): | | | |
| Single Vision Lenses | Applies | Covered in full after Copayment | $35.00 |
| Bifocal Lenses | Applies | Covered in full after Copayment | $40.00 |
| Trifocal Lenses | Applies | Covered in full after Copayment | $55.00 |
| Lenticular Lenses | Applies | Covered in full after Copayment | $80.00 |
| **Frame** | Applies | $100.00 | $35.00 |
| **Contact Lenses** (per pair): | | | |
| Elective | Applies | $105.00 | $105.00 |
| Medically Necessary (*requires prior authorization from vision Benefit Manager*) | Applies | Covered in full after Copayment | $210.00 |

20

# ARTICLE III
## DEFINITIONS

*All terms that are defined in this Article III are capitalized wherever they appear in context in this Plan.*

## 3.1 GENERAL PLAN DEFINITIONS

*The definitions listed in this Section apply generally to all coverages under this Plan.*

### ACTIVELY AT WORK OR ACTIVE WORK

The terms "Actively at Work" or "Active Work" mean the active expenditure of time and energy in the service of the Company. A Participant shall be deemed Actively at Work while working the full number of hours shown in Section 5.2 and while in a relationship with the Employer within the meaning of "employee" for federal tax withholding purposes. In addition, individuals acting as independent contractors; leased employees; consultants; a member of the Board of Directors; temporary, free lance, incidental, seasonal or occasional employees; individuals on retainers; or retirees are not considered Actively At Work unless each meets the requirements specified in Section 5.2. This term shall not apply to any provision of this Plan to the extent that such application would be deemed to violate the requirements of HIPAA.

### ADVERSE BENEFIT DETERMINATION

The term "Adverse Benefit Determination" means any of the following:

- A. a denial, reduction, or termination of, or a failure to provide or make payment (in whole or in part) for, a benefit, including any such denial, reduction, termination, or failure to provide or make payment that is based on a determination of a Covered Person's eligibility to participate in the Plan;

- B. a denial, reduction, or termination of, or a failure to provide or make payment (in whole or in part) for, a benefit resulting from the application of any utilization review, as well as a failure to cover an item or service for which benefits are otherwise provided because it is determined to be Experimental or Investigative or not Medically Necessary or appropriate;

- C. a reduction or termination by the Plan Administrator of a previously approved course of treatment, other than by Plan termination or amendment; or

- D. any retroactive rescission of coverage (other than due to the failure to make Participant Contributions, fraud or intentional misrepresentation of a material fact), whether or not there is an adverse effect on any particular benefit at that time.

### BENEFIT MANAGER

The term "Benefit Manager" means the individual or business entity, if any, appointed and retained by the Plan Administrator to supervise the management, consideration, investigation and settlement of claims, maintain records, submit reports and other such duties as may be set forth in a written agreement. If no Benefit Manager is appointed or retained (as a result of the termination or expiration of such agreement or other reason) or if the term is used in connection with a duty not expressly assigned to and assumed by the Benefit Manager in writing, the term will mean the Plan Administrator.

As of the Plan Effective Date of this revision of the Plan, the Benefit Manager for the medical and dental benefits is Medical Benefits Administrators, Inc. As of the Plan Effective Date of this revision of the Plan, the Benefit Manager for the vision benefits is VisionPlus of America, Inc.

### CALENDAR YEAR

The term "Calendar Year" means the period of time from January 1st, at 12:00 A.M. midnight, through the next December 31st.

21

Marietta Memorial Hospital Employee Health Benefit Plan Summary Plan Description————————————

## CLEAN CLAIM

The term "Clean Claim" means a billing for a service and/or supply that is submitted to the Plan by a Covered Person or Provider that has no defect, impropriety or special circumstance, including incomplete documentation, that delays timely payment. It must clearly identify the Covered Person receiving the services or supplies and the Plan to which it is being submitted, and be submitted on an appropriate form that has been properly and entirely completed, as described in Section 4.1 and Section 4.2, including all data elements required by the applicable form. If a claim that has been submitted to this Plan is determined by the Plan Administrator to not constitute a Clean Claim within this definition, the Covered Person and/or the Provider will be notified of the defects, and it will not be considered to have been received by the Plan until all required information is received.

## CLOSE RELATIVE

The term "Close Relative" means the Covered Person and the Covered Person's spouse, parent, brother, sister or child by blood or marriage.

## COBRA

The term "COBRA" means the Consolidated Omnibus Budget Reconciliation Act of 1985, as amended.

## COINSURANCE

The term "Coinsurance" means the specific percentage of the Covered Expenses that the Plan will pay, after any applicable Deductible or Copayments are taken. The Covered Person must pay the balance of the Covered Expenses after the Coinsurance has been applied, until the Out-of-Pocket limit, if any, has been satisfied.

## COMPANY

The term "Company" means Marietta Memorial Hospital, the Plan sponsor.

## COPAYMENT

The term "Copayment" means a specific dollar amount of the Covered Expenses that the Covered Person must pay before the Plan pays benefits for a particular service or supply. The Copayment does not apply to any Deductible. Under the medical coverage, Copayments are no longer payable once the Out-of-Pocket limit is reached for the year.

## COVERED EXPENSES

The term "Covered Expenses" means expenses incurred by a Covered Person for any Medically Necessary treatments, services or supplies that are not specifically excluded from coverage elsewhere in this Plan or other charges which are specifically listed as covered under this Plan.

## COVERED PERSON

The term "Covered Person" means any person meeting the eligibility requirements for coverage as specified in this Plan and who is properly enrolled in the Plan.

## CUSTOMARY

The term "Customary" refers to the designation of a charge as being the usual charge made by a Physician or other Provider of services and supplies, medication or equipment that does not exceed the general level of charges made by other Providers rendering or furnishing such care or treatment within the same general geographic area, taking into consideration differences in demographics of specific locations and using generally accepted standards of medical practice. The term "area" in this definition means a county or such other area as is necessary to obtain a representative cross section of such charges. Due consideration will be given to the nature and severity of the condition being treated and any medical complications or unusual circumstances that require additional time, skill or expertise. In regards to services or supplies provided by Preferred Providers, this term refers to the contracted rate for the service or supply in question, as determined by the agreement between the Plan and the network to which the Provider belongs.

22

———————————————— Marietta Memorial Hospital Employee Health Benefit Plan Summary Plan Description

## DEPENDENT

The term "Dependent" means:

    A. the Participant's legal spouse who is not eligible for coverage under a health plan sponsored by his or her employer that provides similar benefits. This requirement is waived if the spouse is either enrolled in the other coverage, or if the Plan Administrator, in its discretion, determines that the employee contribution for the other coverage is above that deemed reasonable under this Plan's criteria. Such relationship must have met all requirements of a valid marriage contract in the state in which such parties were married; or

    B. the Participant's child who meets all of the following conditions:

        1. is the Participant's or the Participant's spouse's natural child, adopted child, stepchild, a child for whom the Participant or the Participant's spouse has Legal Guardianship or is a child Placed For Adoption with the Participant; and

        2. is less than twenty-six (26) years of age. is less than twenty-six (26) years of age. The child will continue to be an eligible Dependent until the end of the month in which he or she reaches age twenty-six (26). The age requirement is waived for any mentally or physically handicapped child who is incapable of self-sustaining employment and is chiefly dependent upon the Participant for support and maintenance, provided the child suffered such incapacity prior to attaining nineteen (19) years of age. Proof of incapacity must be furnished to the Plan Administrator, or its designee, within thirty-one (31) days of the date the child's coverage would have ended due to age, and may be requested annually thereafter.

The Plan Administrator has the right to obtain sufficient proof of Dependent status from any Participant under the Plan who is requesting coverage of his or her Dependents.

This definition and all provisions of this Plan are intended to comply with state and federal law as both regard "Qualified Medical Child Support Orders" and "Medical Child Support Orders," as those terms are defined in the law. The Plan Administrator has established procedures governing "Qualified Medical Child Support Orders". Covered Persons under this Plan can receive upon request, free of charge, a copy of such procedures from the Plan Administrator.

The term "Dependent" excludes these situations:

    A. a spouse who is legally separated or divorced from the Participant. Such spouse must have met all the requirements of a valid separation agreement or divorce decree in the state granting such separation or divorce;

    B. any spouse on active military duty; or

    C. any person who is covered under this Plan as an individual Participant.

## DEPENDENT COVERAGE

The term "Dependent Coverage" means coverage under the Plan for benefits payable as a consequence of an Illness or Injury of a Dependent.

## EMPLOYER

The term "Employer" means the Company and any other entity that is affiliated with the Company within the meaning of Section 414(b), (c) or (m) of the Internal Revenue Code of 1986, as amended, that adopts this Plan for the benefit of its employees, whose participation in the Plan is approved by the President (or any duly authorized officer) of the Company. An employer may withdraw from the Plan by delivering to the Plan Administrator written notice of its withdrawal no later than thirty (30) days prior to the date withdrawal is to be effective. As of the Plan Effective Date of this revision of the Plan, Employer includes Marietta Memorial Hospital and Selby General Hospital.

## ERISA

The term "ERISA" refers to the Employee Retirement Income Security Act of 1974, as amended.

23

Marietta Memorial Hospital Employee Health Benefit Plan Summary Plan Description————————————

## EXPERIMENTAL or INVESTIGATIVE

The terms "Experimental" or "Investigative" mean medical, surgical, diagnostic, psychiatric, Alcoholism, Substance Abuse or other health care technologies, supplies, treatments, diagnostic procedures, drug therapies or devices that are determined by the Plan to be:

A. subject to review and approval by any Institutional Review Board for the proposed use and such approval has not been granted prior to the service being rendered;

B. the subject of an ongoing clinical trial that meets the definition of a Phase 1, 2 or 3 Clinical Trial set forth in the U.S. Food and Drug Administration regulations, regardless of whether the trial is actually subject to FDA oversight. This does not exclude coverage for Routine Patient Costs provided as part of an Approved Clinical Trial for the treatment of cancer or another Life Threatening Condition or disease for a Qualified Individual. Services for such Routine Patient Costs must be obtained from a Preferred Provider if the Approved Clinical Trial takes place within the Covered Person's state of residence; or

C. not demonstrated through prevailing peer-reviewed medical literature to be safe and effective for treating or diagnosing the condition, Illness or diagnosis for which it is proposed.

In regards to dental procedures, "Experimental" or "Investigative" means that the drug, device, equipment, facility, procedure, treatment or supply:

A. did not have government approval for marketing at the time when furnished for the purpose or the manner rendered; or

B. is not supported by reliable evidence which shows that the service:

1. is generally recognized as being safe and effective for treating the condition in question by those participating in the appropriate dental specialty;

2. has a definite positive effect on dental outcomes;

3. over time leads to improvement in dental outcomes under standard conditions of medical practice outside the clinical investigatory settings (i.e. the beneficial effects outweigh any harmful effects); and

4. is at least as effective as standard means of treatment in improving dental outcomes, or is usable in appropriate clinical contexts in which standard treatment means are not employable.

The Plan Administrator, in its sole discretion, shall determine whether or not health care technologies, supplies, treatments, diagnostic procedures, drug therapies or devices are Experimental or Investigative under the Plan.

## FAMILY

The term "Family" means a covered Participant and his or her covered Dependents.

## FDA

The term "FDA" means the United States Food and Drug Administration, an agency of the United States Department of Health and Human Services that is charged with the responsibility for regulation and supervision of food safety, tobacco products, dietary supplements, prescription and over-the-counter pharmaceutical drugs (medications), vaccines, biopharmaceuticals, blood transfusions, medical devices, electromagnetic radiation emitting devices (ERED), cosmetics, animal foods & feed and veterinary products within the United States.

## HEALTH CARE REFORM, PPACA, AFFORDABLE CARE ACT or ACA

The terms "Health Care Reform," "PPACA," Affordable Care Act" or "ACA" mean the Patient Protection and Affordable Care Act, as amended by the Health Care and Education Reconciliation Act of 2010, and as otherwise amended including all current final regulations that are issued regarding such acts.

24

## HEALTH INFORMATION

The term "Health Information" means information, whether oral or recorded in any form or medium that:

- A. is created or received by this Plan, or a Plan designee; and
- B. relates to any of the following:
  1. the past, present or future physical or mental health or condition of an individual;
  2. the provision of health care to an individual; or
  3. the past, present or future payment for the provision of health care to an individual.

## LEGAL GUARDIAN OR LEGAL GUARDIANSHIP

The terms "Legal Guardian" or "Legal Guardianship" mean a person, or the status of a person and his or her ward, who has been appointed by a state court with specific jurisdiction over guardianships and estates, to have the care and management of a minor child. The Legal Guardian must have guardianship of the person of the minor child, and not merely the estate of such child. An order granting a person legal custody of a minor child, without the appointment of the person as the child's Legal Guardian, does not create a Legal Guardianship.

## LIFETIME

The term "Lifetime" is a word used in the Plan in reference to benefit maximums and limitations. The term "Lifetime" means the total time period of a Covered Person's coverage under this Plan, regardless of the number of breaks in that coverage. Under no circumstances does the term "Lifetime" mean the duration of a Covered Person's life.

## MEASUREMENT PERIOD

The term "Measurement Period" means the look back period of time, as determined by the Plan Administrator, for use in determining whether new Variable Hour Employees and On-Going Employees who do not qualify for coverage under the provisions of Section 5.2A are employed for an average of at least thirty (30) hours per week and are therefore eligible for coverage under the Plan during the next Stability Period. The Employer sponsoring this Plan uses a twelve (12) month Measurement Period, starting on the date of hire for new Variable Hour Employees (and ending one (1) year later), or starting at the beginning of the second (2nd) full pay period in October and ending at the end of the first (1st) full pay period in the following October for On-Going Employees.

If an employee experiences a break in service during a Measurement Period, the existing Measurement Period will resume once he or she returns to active employment with the Employer if the break in service is less than the period of active employment prior to the break, and less than thirteen (13) weeks in length. If the break in service is more than either the employee's total employment before the break, or thirteen (13) weeks, a new initial Measurement Period will commence once he or she resumes employment. Any such break in service that is attributable to FMLA, Service in the Uniformed Services, jury duty, or any other statutory continuation will be disregarded for the purposes of determining what the average number of hours of employment were during the entire Measurement Period.

The Employer will notify all new Variable Hour Employees who become eligible for coverage under this Plan following the end of the initial Measurement Period, and prior to the beginning of the initial Stability Period. On-Going Employees will be notified by the next open enrollment period as to their eligibility during the next Stability Period.

## NAMED FIDUCIARY

The term "Named Fiduciary" means the individual or entity which has the ultimate authority to control and manage the overall operation of the Plan.

## NEWBORN

The term "Newborn" means an infant from the date of birth until the initial Hospital discharge following birth.

25

## ON-GOING EMPLOYEE

The term "On-Going Employee" means any employee of the Employer who has been employed for at least one (1) full standard Measurement Period.

## PARTICIPANT

The term "Participant" means a person who is directly employed and compensated for services by the Company, who meets the eligibility requirements and who is properly enrolled in the Plan.

## PARTICIPANT CONTRIBUTION

The term "Participant Contribution" means that amount which is due from an eligible employee in order for that employee to obtain Participant and/or Dependent coverage(s) under the Plan. The Company shall determine the amount of the Participant Contribution which may vary depending upon the type of coverage an eligible employee desires to obtain. Eligible Participants will be advised of any required Participant Contributions at the time each applies for Participant and/or Dependent coverage. Participants in the Plan will be notified by the Plan Administrator prior to an increase in the required Participant Contribution amount. Participants in the Plan that are not required to make Participant Contributions at the time of enrollment will be notified by the Plan Administrator prior to the date a Participant Contribution requirement is made effective.

## PLACED FOR ADOPTION OR PLACEMENT FOR ADOPTION

The terms "Placed For Adoption" or "Placement For Adoption" mean the assumption and retention by such Participant hereunder of a legal obligation for total or partial support of such child in anticipation of adoption of such child. The child's placement with such Participant terminates upon the termination of such legal obligation.

## PLAN

The term "Plan" means the sickness and accident plan, as described in and administered by the Marietta Memorial Hospital Employee Health Benefit Plan.

## PLAN ADMINISTRATOR

The term "Plan Administrator" means the entity responsible for the day-to-day functions and management of the Plan. The Plan Administrator may employ persons or firms to process claims and perform other Plan related services. Marietta Memorial Hospital is the Plan Administrator as of the Plan Effective Date of this revision of the Plan.

## PLAN YEAR

The term "Plan Year" means a period of time used for certain reporting and disclosure requirements of the Plan. The Plan Year will begin on August 1st and end on July 31st of the following year.

## PLAN EFFECTIVE DATE

This revision of the Plan is effective August 1, 2016. The original Plan Effective Date of the Plan was August 1, 2000.

## PROTECTED HEALTH INFORMATION

The term "Protected Health Information" means Health Information that either identifies an individual, or for which there is a reasonable basis to believe can be used to identify an individual and which is one (1) of the following:

A. transmitted by electronic media, including:

1. the internet;
2. an extranet;
3. leased lines;
4. dial-up lines;
5. private networks; and
6. those transmissions that are physically moved from one location to another using magnetic tape, disk, or compact disk media;

26

   B.  maintained in any electronic media; or

   C.  transmitted or maintained in any other form or medium.

## REASONABLE

The term "Reasonable" refers to the designation of a charge as being appropriate based on the services or supplies actually supplied by a Provider to a Covered Person. While the charge made for such service may be considered to be Customary within the general context of billing practices for similar services, the true circumstances of the case may warrant a lesser or higher charge than the Customary charge for the services and/or supplies that were, in fact, provided to the Covered Person. The Plan Administrator shall have the right to review Provider's records relative to the service or supply, and shall determine, in its absolute discretion, whether or not the charge made by the Provider for the service or supply is Reasonable. In making this determination, the Plan Administrator will take into consideration additional charges that were attributable to the errors, negligence or inefficiency of the Provider, and may consult with medical experts in the related fields to determine whether such charges would be considered Reasonable within the context in which they were provided.

## SERVICE IN THE UNIFORMED SERVICES

The term "Service in the Uniformed Services" means performance of duty in the Armed Forces or Uniformed Services for a period of five years or less, on a voluntary or involuntary basis, including active duty, active duty for training, initial active duty for training, inactive duty training, full-time National Guard duty in the Armed Forces, the Army National Guard, Air National Guard, the commissioned corps of the Public Health Service, or any other category of persons designated by the President of the United States in time of war or emergency. Service in the Uniformed Services also includes a period for which an individual is absent from a position of employment for the purpose of an examination to determine the fitness of the person for duty in the Armed Forces or the commissioned corps of the Public Health Service.

## STABILITY PERIOD

The term "Stability Period" means the period of time, as determined by the Plan Administrator, for which new Variable Hour Employees and On-Going Employees are eligible for coverage under the Plan, as determined during the latest prior Measurement Period. The Employer sponsoring this Plan uses a twelve (12) month Stability Period, starting thirteen (13) months from the date of hire for new Variable Hour Employees (and ending one (1) year later), or on January 1st and ending December 31st of the same Calendar Year for On-Going Employees. If a Variable Hour Employee is determined to work an average of at least thirty (30) hours per week during his or her initial Measurement Period following his or her date of hire, he or she will continue to be eligible for coverage during the current ongoing Stability Period from the end of such employees initial Measurement Period to the end of the current Stability Period (provided he or she is still employed by the Employer during such Stability Period), even if determined to be ineligible during a subsequent overlapping Measurement Period.

If an employee becomes ineligible for coverage due to a break in service that occurs during a Stability Period for which coverage is being provided under this Plan, but returns to active employment with the Employer within thirteen (13) weeks and prior to the end of the same Stability Period, he or she will once again become eligible for coverage from the date he or she resumes active employment until the end of such Stability Period established standards of care for a particular diagnosis.

## SUMMARY HEALTH INFORMATION

The term "Summary Health Information" means information that may be individually identifiable Health Information that:

   A.  summarizes the claims history, claims expenses or type of claims experienced by Covered Persons under this Plan; and

   B.  from which the following information has been removed:

Marietta Memorial Hospital Employee Health Benefit Plan Summary Plan Description————————————

1. names;
2. geographic subdivisions smaller than the level of a five (5) digit zip code, including, but not limited to, street addresses;
3. all elements of dates (except year) for dates directly related to an individual, including, but not limited to, birth dates and dates of admission and discharge;
4. telephone numbers;
5. fax numbers;
6. electronic mail addresses;
7. social security numbers;
8. medical record numbers;
9. Plan identification numbers; or
10. Other identifiers as listed in 45 C.F.R. § 164.514(b)(2)(i).

## USERRA

The term "USERRA" means the Uniformed Services Employment and Reemployment Rights Act of 1994, as amended.

## VARIABLE HOUR EMPLOYEE

The term "Variable Hour Employee" means any employee who, as of his or her date of hire:

A. is expected to work less than thirty (30) hours a week as of their date of hire, or, on average, does not qualify under the provisions of Section 5.2A; or

B. for whom, on the date of hire, it cannot reasonably be determined whether or not the employee will work at least thirty (30) hours per week (or one hundred thirty (130) hours per month) as his or her hours vary from week to week for an indefinite period of time.

Variable Hour Employees include employees whose hours routinely vary from week to week, or employees whose hours vary depending on the season or time of year.

## 3.2 MEDICAL PLAN DEFINITIONS

### ALCOHOLISM

The term "Alcoholism" means the taking of alcohol at dosages that place a Covered Person's welfare at risk, cause the Covered Person to endanger the public welfare and which constitutes alcohol dependence.

In making the determination as to whether the Covered Person's condition meets the definition of Alcoholism under this Plan, the Plan Administrator shall use recognized authorities, including designations contained in the most current edition of the *International Classification of Diseases* (ICD) of the World Health Organization.

### APPROVED CLINICAL TRIAL

The term "Approved Clinical Trial" means a phase I, phase II, phase III or phase IV clinical trial that is conducted in relation to the prevention, detection or treatment of cancer or other Life Threatening Condition and is one of the following:

A. a federally funded trial that is approved or funded, including in-kind contributions, by one (1) or more of the following entities:

1. the Centers for Disease Control and Prevention;
2. the Agency for Health Care Research and Quality;
3. the Centers for Medicare & Medicaid Services;
4. the National Institutes of Health;
5. the United States Department of Defense;
6. the United States Department of Veterans' Affairs;

28

7. cooperative group or center of any of the above entities;

8. the United States Department of Energy; and

9. a qualified non-governmental research entity identified in the guidelines issued by the National Institutes of Health for center support grants;

B. a clinical trial conducted under an FDA investigational new drug application; or

C. a drug trial that is exempt from the requirement of an FDA investigation new drug application.

## COSMETIC SERVICES

The term "Cosmetic Services" means services rendered solely for the purpose of altering appearance, with no evidence that the service is Medically Necessary.

## DEDUCTIBLE

The term "Deductible" means the amount of Other Preferred Provider or non-Preferred Provider Covered Expenses incurred by a Covered Person in a Calendar Year before any other such Covered Expenses can be considered for payment at the percentages stated in the Schedule of Benefits and this Plan.

An Individual Deductible is the amount that each individual Covered Person must pay during a Calendar Year before the Plan begins paying benefits for that person.

A Family Deductible is the maximum amount that two (2) or more Family members covered under the same Participant must pay in Deductible expense in a Calendar Year. Once this cumulative Family Deductible is reached, the Deductible will be considered satisfied for all Family members covered under the Plan during the remainder of the Calendar Year.

## DURABLE MEDICAL EQUIPMENT

The term "Durable Medical Equipment" means equipment meeting the following criteria:

A. it can stand repeated use;

B. it is primarily and customarily used to serve a medical purpose;

C. it is appropriate for use in the patient's home; and

D. it is generally not useful to a person in the absence of Illness or Injury.

## EMERGENCY

The term "Emergency" means a medical condition manifesting itself by acute symptoms of sufficient severity (including severe pain) so that a prudent layperson, who possesses an average knowledge of health and medicine, could reasonably expect the absence of immediate medical attention to result in:

A. placing the health of the individual (or, with respect to a pregnant woman, the health of the woman or her unborn child) in serious jeopardy;

B. serious impairment to bodily functions; or

C. serious dysfunction of any bodily organ or part.

## HEALTH CARE SERVICES

The term "Health Care Services" means any treatment, procedure, drug, device, equipment, facility and/or supplies furnished to a Covered Person in the evaluation, diagnosis and treatment of Pregnancy, Illness or Injury.

## HOSPITAL

The term "Hospital" means an institution which meets all of the following conditions:

A. it is engaged primarily in providing Health Care Services and treatment to ill and injured persons on an Inpatient basis at the patient's expense;

B. it is constituted, licensed and operated in accordance with the laws of the jurisdiction in which it is located and which pertain to Hospitals;

29

C. it maintains, on its premises, all the facilities necessary to provide for the diagnosis and medical and surgical treatment of an Illness or Injury;

D. such treatment is provided for compensation, and is under the supervision of Physicians, with continuous twenty-four (24) hour nursing services by registered nurses; and

E. it qualifies as a Hospital, a psychiatric Hospital, or a tuberculosis Hospital and is accredited by the Joint Commission and/or the American Osteopathic Association (AOA).

It is not, other than incidentally, a place for rest, a place for the aged, a place for drug addicts, a place for alcoholics, or a nursing home.

**INJURY**
The term "Injury" means an accidental bodily Injury to a Covered Employee or Covered Dependent.

**ILLNESS**
The term "Illness" means a sickness or a disease of a Covered Employee or Covered Dependent. Illness will include congenital defects or birth abnormalities.

**INPATIENT**
The term "Inpatient" refers to the classification of a Covered Person when that person is admitted to a Hospital, hospice, Skilled Nursing Facility or other covered facility for treatment and charges are made for Room and Board to the Covered Person as a result of such admission.

**JOINT COMMISSION**
The term "Joint Commission" means an independent commission that accredits and certifies health care organizations and programs in the United States, including Hospitals, Skilled Nursing Facilities, ambulatory facilities, behavioral health facilities, laboratories, home health care agencies and pharmacies. To receive and maintain accreditation from the Joint Commission, an organization must undergo an on-site survey by a Joint Commission survey team at least every three (3) years. (Laboratories must be surveyed every two (2) years.) Information about the accreditation status of an organization can be found on the Joint Commission website (www.qualitycheck.org/consumer/searchQCR.aspx).

The Joint Commission was formerly known as the Joint Commission on Accreditation of Healthcare Organizations.

**LIFE THREATENING CONDITION**
The term "Life Threatening Condition" means any disease or condition from which the likelihood of death is probable, unless the course of the disease or condition is interrupted.

**MEDICALLY NECESSARY OR MEDICAL NECESSITY**
The terms "Medically Necessary" or "Medical Necessity" mean Health Care Services that:

A. are appropriate and consistent with the diagnosis in accordance with generally accepted standards of medical practice recognized by the Plan. This may include, but is not limited to, guidelines under the Medicare program;

B. are not considered Experimental or Investigative;

C. could not have been omitted without adversely affecting the Covered Person's condition or quality of care;

D. are not primarily for the convenience of the Covered Person, the Provider or the caregiver;

E. necessary to meet the basic health needs of the Covered Person;

F. rendered in the most cost-efficient manner and type of setting appropriate for the delivery of the health service; and

G. of a consistent type, frequency and duration of treatment with scientifically based guidelines of national medical, research or health care coverage organizations or governmental agencies that are accepted by the Plan.

The fact that a Provider has performed or prescribed a procedure or treatment or the fact that it may be the only treatment for a particular Injury, sickness or Mental/Nervous Disorder does not mean that it is Medically Necessary. The Plan reserves the right to make the final determination of Medical Necessity on the basis of final diagnosis and supporting medical data. This determination will be based on, and consistent with, standards approved by the Plan's medical review consultants.

## MEDICARE

The term "Medicare" means the programs established by Title I of Public Law 89-98, as amended, entitled "Health Insurance for the Aged Act," and that includes parts A, B, C and D of Subchapter XVIII of the Social Security Act, as amended from time to time.

## MENTAL/NERVOUS DISORDER

The term "Mental/Nervous Disorder" means mental, psycho-neurotic or personality disorders. This includes conditions listed in the most recent edition of the *Diagnostic and Statistical Manual of Mental Disorders* (DSM).

## MORBID OBESITY

The term "Morbid Obesity" means that a Covered Person:

A. has a body mass index (BMI) of forty (40) or greater;

B. is a male who is one hundred (100) pounds over his ideal body weight;

C. is a female who is eighty (80) pounds over her ideal body weight; or

D. has a BMI of thirty-five (35) to forty (40) and one (1) or more obesity related diseases, such as type II diabetes, high blood pressure, heart disease or sleep apnea.

## MULTIPLE SURGICAL PROCEDURES

The term "Multiple Surgical Procedures" means separate surgical procedures performed by a Physician on the same patient during the same operative session or during the same day. This term does not include procedures that are components of, or incidental to, a primary procedure, an intraoperative service or an incidental surgery.

For the purposes of determining Covered Expenses under this Plan, Multiple Surgical Procedures will be considered, as follows:

A. the Plan will consider as Covered Expenses up to one hundred percent (100%) of the Reasonable and Customary charge for the primary or highest valued procedure;

B. the Plan will consider as Covered Expenses up to fifty percent (50%) of the Reasonable and Customary charge for each additional procedure, for the second procedure through the fifth procedure; and

C. if more than five (5) procedures are performed in the same operative session/day, coverage of any additional procedures will be subject to the review and approval of the Plan Administrator, in its discretion. In order for any additional payment to be considered by the Plan under the provision, the operating Physician must submit the applicable operative notes.

Other restrictions and limitations may be applied to the payment of Multiple Surgical Procedures. Such restrictions and limitations will be consistent with the rules applied under the Medicare program, as listed in the most recent Medicare payment manuals.

## OUT-OF-POCKET

The term "Out-of-Pocket" means the amount of Covered Expenses that are the responsibility of the Covered Person and that accumulate towards the Plan's Out-of-Pocket maximum, not including amounts:

A. for expenses paid at the Out-of-Network/Tier III level;

B. for expenses that are not covered under this Plan;

C. for Deductible expenses carried over from the prior Calendar Year under the provision described in Section 8.1;

D. in excess of the Reasonable and Customary charge for a service or supply;

E. in excess of any maximum benefit listed in the Plan; or

F. attributable to any penalty.

## OUTPATIENT

The term "Outpatient" refers to the classification of a Covered Person when that Covered Person receives medical care, treatment, services or supplies at a clinic, a Physician's office, or at a Hospital, if not a registered bed patient at that Hospital or other covered facility.

## PHYSICIAN

The term "Physician" means an individual who is licensed to practice medicine (osteopathic or allopathic).

## PRACTITIONER

The term "Practitioner" means an individual licensed to practice the healing arts in the state in which services are performed, including Physicians.

## PREFERRED PROVIDER

The term "Preferred Provider" means a health care professional, group of professionals or medical facilities, which have agreed to provide medical services to a group of individuals for an agreed upon fee. The Plan will specify which professionals and/or facilities have Preferred Provider status. A list of Preferred Providers for this Plan will be provided by the Plan Administrator.

For the purposes of the organ and tissue transplant benefits (not provided through the policy described in Section 10.1), Preferred Provider includes Providers that are in this Plan's special transplant network. The specific amount of the benefits provided, and limitations applied, will be determined based on the terms of the specific contract with this network.

## PREGNANCY

The term "Pregnancy" means that physical state which results in childbirth, abortion or miscarriage, and any medical complications arising out of, or resulting from, such state.

## PROVIDER

The term "Provider" means a Hospital, Physician, or other supplier of Health Care Services.

## QUALIFIED INDIVIDUAL

The term "Qualified Individual" means an individual who is properly enrolled in the Plan and who is eligible to participate in an Approved Clinical Trial according to the trial protocol with respect to treatment of cancer or another Life Threatening Condition or disease. To be a Qualified Individual, there is an additional requirement that a determination be made that the individual's participation in the Approved Clinical Trial is appropriate to treat the disease or condition. That determination can be made based on the referring health care professional's conclusion or based on the provision of medical and scientific information by the individual.

## RECOMMENDED WELLNESS SERVICE

The term "Recommended Wellness Service" means a service or supply that is not intended to treat an existing medical condition, but rather is intended to detect or prevent potential future problems or assist the Covered Person in maintaining his or her health. They are recommended by recognized medical bodies, and are required to be covered without cost sharing by non-grandfathered health plans under the Affordable Care Act if received through a Preferred Provider. These recommendations include the following:

32

A. evidence-based preventive services with an A or B recommendation from the U.S. Preventive Services Task Force (www.uspreventiveservicestaskforce.org);

B. immunizations recommended by the Advisory Committee on Immunization Practices, as updated annually (www.cdc.gov/vaccines); and

C. guidelines supported by the Health Resources and Services Administration that are applicable to children and women, including:

1. services provided to children under the Bright Futures recommendations of the American Academy of Pediatrics (brightfutures.aap.org) and the Secretary's Advisory Committee on Heritable Disorders in Newborns and Children (SACHDNC) national recommendations on Newborn screening (www.hrsa.gov/advisorycommittees/mchbadvisory/heritabledisorders/recommendedpanel/index.html); and

2. women's health services recommendations developed by the Institute of Medicine (www.hrsa.gov/womensguidelines).

Any changes to the above recommendations will take effect for this Plan at the beginning of the first Plan Year beginning one (1) year after the issuance of such new recommendation or a change in the existing recommendations by the above entities, unless the change was prompted by safety or other concerns that make it inadvisable to continue to cover the service or supply.

## ROOM AND BOARD

The term "Room and Board" refers to all charges, by whatever name called, which are made by a Hospital, hospice or Skilled Nursing Facility as a condition of occupancy. Such charges do not include the professional services of Physicians or intensive nursing care by whatever name called.

## ROUTINE PATIENT COSTS

The term "Routine Patient Costs" means all items and services consistent with the coverage provided under the Plan that is typically covered for a Qualified Individual for treatment of cancer or another Life Threatening Condition or disease who is not enrolled in a clinical trial. However, costs associated with the following are excluded from that definition, and the Plan is not required under federal law to pay for the following:

A. the cost of the investigational item, device or service;

B. the cost of items and services provided solely to satisfy data collection and analysis needs and that are not used in direct clinical management; or

C. the cost for a service that is clearly inconsistent with widely accepted and established standards of care for a particular diagnosis.

## SEMI-PRIVATE

The term "Semi-Private" refers to a class of accommodations in a Hospital or other covered facility in which at least two (2) patient beds are available per room.

## SKILLED NURSING FACILITY

The term "Skilled Nursing Facility" means a facility which primarily provides continuous twenty-four (24) hour Inpatient skilled nursing care and related services to patients requiring convalescent and rehabilitative care. Such care must be given by, or under the supervision of, a Physician or one of the following performing under the supervision of a Physician:

A. registered nurse;

B. licensed practical nurse; or

C. physical therapist.

A Skilled Nursing Facility is not, other than incidentally, one that provides minimal custodial care, rest, ambulatory care, part-time care or that provides treatment for Mental/Nervous Disorders, Alcoholism, Substance Abuse or pulmonary tuberculosis. The Skilled Nursing Facility must be certified by the Medicare program.

33

Marietta Memorial Hospital Employee Health Benefit Plan Summary Plan Description

## SOUND NATURAL TEETH

The term "Sound Natural Teeth" means natural teeth that have no significant decay or defects, and have not been previously restored with fillings or crowns.

## SUBSTANCE ABUSE

The term "Substance Abuse" means the taking of drugs (except those taken under the direction of a Physician or through a valid prescription) at dosages that place a Covered Person's welfare at risk, cause the Covered Person to endanger the public welfare and which constitutes drug dependence.

In making the determination as to whether the Covered Person's condition meets the definition of Substance Abuse under this Plan, the Plan Administrator shall use recognized authorities, including designations contained in the most current edition of the *International Classification of Diseases* (ICD) of the World Health Organization.

## TRANSPLANT NETWORK FACILITY

The term "Transplant Network Facility" means a medical facility which is participating in the Plan's transplant network at the time of the admission for the transplant procedure.

## 3.3 GENERAL DENTAL PLAN DEFINITIONS

### DENTAL HYGIENIST

The term "Dental Hygienist" means a person who is licensed to practice dental hygiene and who is working under the supervision and direction of a Dentist.

### DENTIST

The term "Dentist" means a person who is licensed to practice dentistry.

## 3.4 COMMON DENTAL TERMS

### ABUTMENT

A tooth or root that retains or supports a fixed bridge or a removable prosthesis.

### ACID ETCH

The etching of a tooth with a mild acid to aid in the retention of composite filling material.

### ACRYLIC

Plastic material used in the fabrication of dentures and crowns and occasionally as a restorative filling material.

### AMALGAM

A metal alloy usually consisting of silver, tin, zinc and copper combined with liquid pure Mercury and used as restorative material in operative dentistry.

### ANESTHESIA

**Local** - The condition produced by the administration of specific agents to achieve the loss of pain sensation in a specific location or area of the body. **General** - The condition produced by the administration of specific agents to render the patient completely unconscious and without pain sensation.

### ANTERIOR TEETH

The central incisors, lateral incisors and cuspids.

### APICOECTOMY

The surgical removal of the apex or tip of the tooth root.

### APPLIANCE

A device used to provide function, therapeutic (healing) effect, space maintenance, or as an application of force to teeth to provide movement or growth changes as in Orthodontics. **Fixed** - One that is attached to the teeth by cement or by adhesive materials and cannot be removed by the

patient. **Removable** - One that can be taken in and out of the mouth by the patient. **Prosthetic** - Used to provide replacement for a missing tooth.

## BITEWING
A type of dental x-ray film that has a central tab or wing upon which the teeth close to hold the film in position. They are commonly called detecting x-rays because they show decay better than other x-rays.

## BRIDGE, BRIDGEWORK or PROSTHETIC APPLIANCE
**Fixed** - Pontics or replacement teeth retained with crowns or inlays cemented to the natural teeth, which are used as abutments. **Fixed, Removable** - One which the dentist can remove but the patient cannot. **Removable** - A partial denture retained by attachments which permit removal of the denture. Normally held by clasps.

## CARIES
A disease of progressive destruction of the teeth from bacterially produced acids on tooth surfaces.

## COMPOSITE
Tooth colored filling material primarily used in the anterior teeth.

## CROWN
A natural crown is the portion of a tooth covered by enamel. An artificial crown (cap) restores the anatomy, function and esthetics of the natural crown.

## DENTAL HYGIENIST
A person who has been trained to clean teeth, and provide additional services and information on the prevention of oral disease.

## DENTURE
A device replacing missing teeth. The term usually refers to full or partial dentures but it actually means any substitute for missing natural teeth.

## ENDODONTIC THERAPY
Treatment of diseases of the dental pulp and their sequelae.

## FLUORIDE
A solution of fluorine which is applied topically to the teeth for the purpose of preventing dental decay.

## GINGIVAL CURETTAGE
The removal of diseased gum tissue.

## GINGIVECTOMY
The removal of gum tissue around the necks of the teeth.

## GINGIVOPLASTY
The recontouring of gum tissue.

## IMPLANT
A device surgically inserted into or onto the jaw bone. It may support a crown or crowns, partial denture, complete denture or may be used as an abutment for a fixed bridge.

## IMPRESSION
A negative reproduction of a given area. It is made in order to produce a positive form or cast of the recorded teeth and/or soft tissues of the mouth.

## INLAY
A restoration usually of cast metal made to fit a prepared tooth cavity and then cemented into place.

**MALOCCLUSION**
An abnormal contact and/or position of the opposing teeth when brought together.

**OCCLUSION**
The contact relationship of the upper and lower teeth when they are brought together.

**ONLAY**
A cast restoration that covers the entire chewing surface of the tooth.

**PALLIATIVE**
An alleviating measure. To relieve, but not cure.

**PARTIAL DENTURE**
A prosthesis replacing one or more, but less than all, of the natural teeth and associated structures; may be removable or fixed, one side or two sides.

**PEDODONTICS**
The specialty of children's dentistry.

**PERIODONTICS**
The science of examination, diagnosis, and treatment of diseases affecting the supporting structures of the teeth.

**PONTIC**
The part of a fixed bridge which is suspended between the abutments and which replaces a missing tooth or teeth.

**POSTERIOR TEETH**
The bicuspids and molars.

**PROPHYLAXIS**
The removal of tarter and stains from the teeth. The cleaning of the teeth by a dentist or dental hygienist.

**REBASE**
A process of refitting a denture by the replacement of the entire denture-base material without changing the occlusal relations of the teeth.

**RELINE**
To resurface the tissue-borne areas of a denture with new material.

**RESTORATION**
A broad term applied to any inlay, crown, bridge, partial dentures, or complete denture that restores or replaces loss of tooth structure, teeth or oral tissue. The term applies to the end result of repairing and restoring or reforming the shape, form and function of part or all of a tooth or teeth.

**ROOT CANAL THERAPY**
The complete removal of the pulp tissues of a tooth, sterilization of the pulp chamber and root canals, and filling these spaces with a sealing material.

**SCALING**
The removal of calculus (tarter) and stains from teeth with special instruments.

**SEALANT**
A resinous agent applied to the grooves and pits of teeth to reduce decay.

**SILICATE**
A relatively hard and translucent restorative material that is used primarily in the anterior teeth.

**SPLINTING**
Stabilizing or immobilizing teeth to gain strength and/or facilitate healing.

———————————————— Marietta Memorial Hospital Employee Health Benefit Plan Summary Plan Description

## TOPICAL APPLICATION

Painting the surface of teeth, as in fluoride treatment or application of an anesthetic formula to the surface of the gum.

## VERTICAL DIMENSION

The degree of jaw separation when the teeth are in contact.

## 3.5 VISION PLAN DEFINITIONS

## COSMETIC CONTACT LENSES

The term "Cosmetic Contact Lenses" means contact lenses selected for reasons other than the Covered Person's medical welfare or which are not considered Medically Necessary.

## MEDICALLY NECESSARY CONTACT LENSES

The term "Medically Necessary Contact Lenses" means contact lenses dispensed under the following circumstances:

    A. following cataract surgery (aphakia);

    B. when visual acuity cannot be corrected to 20/70 in the better eye, except through the use of contact lenses (not including conditions caused by corneal distortion);

    C. in cases of Anisometropia of 4.0 departure or more, providing visual acuity improves to 20/60 or better in the poorer eye; or

    D. Keratoconus (the narrowing of visual fields due to high minus or plus corrections is not considered an authorized condition).

## PARTICIPATING PROVIDER

The term "Participating Provider" means any vision care Provider, including an optician, an Optometrist, or an ophthalmologist, who has entered into a contract with the Plan to provide vision services to Covered Persons. These Providers are listed in the Provider Directory available through the Plan Administrator.

Marietta Memorial Hospital Employee Health Benefit Plan Summary Plan Description——————————

# ARTICLE IV
# CLAIM AND APPEAL PROCEDURES

## 4.1 INITIAL FILING OF CLAIMS

A Clean Claim for benefits should be filed within ninety (90) days after the occurrence or commencement of any loss covered by this Plan. Failure to give such notice and proof within the time required will neither invalidate nor reduce any claim if it is shown that written notice and proof are given no later than one (1) year after the claim is incurred, unless the Covered Person is legally incapacitated.

Upon termination of the Plan, final claims must be received within ninety (90) days of termination. In any of the events described above, notice and proof of claim will be determined at the discretion of the Plan Administrator, subject to the requirements listed below.

Claims should be submitted to the appropriate address listed on the Covered Person's identification card, and can be submitted either by the Provider or the Covered Person. Such claim should be on any of the following appropriate forms (or their successor forms):

   A. for vision claims only, a precertified VisionPlus claim form. *Submission of a vision claim on other than a precertified VisionPlus claim form may result in reimbursement at the non-Participating Provider level. To obtain such a form, contact VisionPlus Customer Service at 800-252-3447 or order through the VisionPlus website at www.visplus.com. For more information, see Section 12.2;*

   B. CMS 1500;

   C. UB-92;

   D. UB-04 or CMS 1450;

   E. NCPDP Form 1983; or

   F. J512 claim forms.

A Clean Claim can be submitted by the Provider in electronic format if the Provider submits it in accordance with the electronic transaction requirements of the Health Insurance Portability and Accountability Act of 1996 (HIPAA) and subsequent laws.

In order to be considered a Clean Claim, such claim must use the most current CPT code in effect as published by the American Medical Association the *International Statistical Classification of Diseases and Related Health Problems* ("ICD") codes, including ICD-9 and ICD-10, published by the World Health Organization, the most current dental code in effect as published by the American Dental Association in the *Code for Dental Procedures or Nomenclature* or the most current HCPCS code in effect, as published by U.S. Department of Health and Human Services, Centers for Medicare and Medicaid Services.

If the Plan is not the primary carrier for a Covered Person who has, or had at the time the claim was incurred, more than one health plan that would provide benefits for the services or supplies for which the claim is being made, including, but not limited to Medicare, copies of the explanations of benefit payment from all carriers who would pay benefits before the Plan should be submitted with the claim. For more information regarding which plan pays first, see Section 14.1, or contact the Benefit Manager.

## 4.2 REQUESTS FOR ADDITIONAL INFORMATION

If the claim is not submitted in accordance with the procedures listed in Section 4.1, it will not be considered to be a Clean Claim, and the Participant or Covered Person will be notified of the claim deficiencies, and requested to refile it in the proper format.

If the Plan Administrator or the Benefit Manager needs more information to process the claim, a letter will be sent to the Participant, the Covered Person, the Provider or other parties requesting additional information. In some situations, information is needed on a periodic basis, including:

38

    A. information regarding other coverage. This may include providing copies of medical child support orders for children of divorced parents; and

    B. verification of handicapped status for overage Dependent children.

Other information may be requested on a case-by-case basis, including information pertaining to accident details or potential third-party liability.

The requested information must be provided within forty-five (45) days of the date the Participant or Covered Person receives notice of the required additional information. If the information is not received within this time period, the claim will be denied for failure to provide the needed information.

## 4.3 APPEALS OF ADVERSE BENEFIT DETERMINATIONS

The Covered Person can appeal a decision by the Plan that coverage for a service or supply is denied or reduced under the Plan, or any other eligibility issue, including a rescission of coverage for an individual, provided such appeal is made in writing within one hundred eighty (180) days of the Covered Person or Participant's receipt of the explanation of benefit payment, the precertification letter reflecting the denial or reduction or any other notification made by the Plan of an adverse decision involving the individual. Any individual other than the Covered Person who wishes to submit an appeal on the Covered Person's behalf (other than a parent or Legal Guardian filing an appeal for a minor child) must be designated by the Covered Person, in a writing signed by the Covered Person, as his or her authorized representative specifically for the purpose of the appeal. An assignment of benefits is not sufficient to designate another person as an "authorized representative" for the purpose of an appeal. These appeal procedures shall not apply to any contractual dispute between a Provider and the Plan as to amounts due the Provider, rather than the Covered Person, under the terms of any agreement between the Provider and the Plan that does not affect the amount payable by the Covered Person (i.e. balance billing issues in a Preferred Provider contract).

A request for review in which the Covered Person is requesting an expedited appeal of a pre-service claim as an "urgent care" case, as described in Section 6.4, can be submitted either orally or in writing and can be submitted by a Provider with knowledge of the Covered Person's condition without prior designation by the Covered Person. If a course of treatment has been previously approved by the Plan to be provided over a period of time or for a number of treatments, no reduction or termination of coverage for such treatment (other than termination of the individual's coverage under this Plan) will be made without allowing the Covered Person sufficient advance notification and the opportunity to appeal this termination or reduction.

The appeal request should be addressed as follows (unless the Adverse Benefit Determination notification indicates otherwise):

| **For Medical or Dental Appeals:** | **For Vision Appeals:** |
|---|---|
| Plan Administrator | Plan Administrator |
| Marietta Memorial Hospital Employee Health Benefit Plan | Marietta Memorial Hospital Employee Health Benefit Plan |
| c/o Benefit Manager | c/o Benefit Manager |
| Medical Benefits Administrators, Inc. | VisionPlus of America, Inc. |
| P.O. Box 1099 | P.O. Box 1260 |
| Newark, Ohio 43058-1099 | Newark, Ohio 43058-1260 |

The writing should clearly be identified as an appeal, and include the name of the Plan, the Covered Person whose claims are the subject of the appeal, the Participant's identification number, and the identity of the specific treatment, service or supply for which coverage was denied or limited under the Plan.

The Covered Person should submit with the appeal written comments, documents, records and other information relating to the claim for benefits, even if such information was not submitted as

part of the initial claim or request for preauthorization or precertification. The Covered Person will also have the right to present testimony as part of the appeal.

The Covered Person has the right to request information from the Plan Administrator as part of the appeals process, as described in Section 4.4.

Appeals submitted under this Plan will be adjudicated in a manner designed to ensure the independence and impartiality of the person making the decision. The Plan Administrator has the sole authority for the final decision on all Plan matters, including appeals.

## 4.4 ACCESS TO DOCUMENTS, RECORDS OR OTHER INFORMATION

A Covered Person is entitled to examine the claim file, and present testimony as part of the internal claims and review process. He or she will also receive, free of charge, copies of documents, records and other information relevant to his or her claim for benefits, including any new or additional information received during the appeals process, and the rationale behind the Plan's adverse decision. Such information will be provided within sufficient time to respond prior to the final decision of the appeal by the Plan Administrator. Such information is considered to be relevant if it:

A. was relied upon by the Plan Administrator in making the benefit determination;

B. was submitted, considered or generated in the course of making the benefit determination;

C. demonstrates compliance with the administrative processes required by ERISA;

D. constitutes a statement of policy or guidance with respect to the Plan concerning the denial of a treatment option or benefit; or

E. involves the identity of medical or vocational experts whose advice was obtained in connection with the claim.

In addition, if an Adverse Benefit Determination is based upon the Medical Necessity or Experimental nature of the service or supply, the Covered Person can request an explanation of the scientific or clinical judgment of the determination, free of charge.

## 4.5 EXTERNAL REVIEW RIGHTS AND PROCEDURES

If the Covered Person is not satisfied with the Plan Administrator's decision on his or her appeal of a medical issue, including issues involving Medical Necessity or the Experimental status of a medical procedure, or any coverage rescission, he or she may file a request for an external review with the Plan Administrator at the address listed above for submitting an appeal. The request must be filed within four (4) months after the date of receipt of the Plan Administrator's determination on his or her appeal. If there is no corresponding date four (4) months after the date of receipt of notice, then the request must be filed by the first (1st) day of the fifth (5th) month following the receipt of the Plan's determination on his or her appeal. The Covered Person can make a request for an expedited review of a precertification denial if the timeframe for completion of a standard review would seriously jeopardize the life or health of the Covered Person, or would jeopardize his or her ability to regain maximum function, or if the determination concerns an admission, availability of care, continued stay or health care item or service for which the Covered Person received Emergency services, but has not been discharged from a facility. A standard external review would generally be completed within fifty (50) days of the Plan's receipt of the request, while an expedited review must be completed by the independent review organization (IRO) within seventy-two (72) hours of the IRO's receipt of such request. The Plan Administrator will review the request and determine whether or not the request meets the criteria for external review or an expedited review, including whether or not the person was a Covered Person under the Plan at the time the claim arose, whether the person has exhausted the Plan's appeal process, and whether the sufficient information has been submitted to process the external review. A notification will be issued by the Plan Administrator regarding the Covered Person's incomplete request for an external review. If the request is incomplete, the Covered Person will be given additional time to complete the external review request. Once a determination has been made by

the Plan Administrator that the request qualifies for external review, it will be forwarded by the Plan Administrator to a qualified IRO. The IRO will notify the Covered Person if the request is accepted for review, and, if a standard review, that he or she can submit additional information that is relevant to the request within ten (10) days of the notification. The IRO may also request additional information from the Covered Person and/or the Plan. Additional information provided by the Covered Person will be provided to the Plan Administrator. If, based on this additional information, the Plan Administrator determines that the initial determination should be reversed, and that coverage should be provided under the Plan, all parties will be notified, and the external review will be closed. Otherwise, after the IRO has completed the review, the Covered Person and the Plan Administrator will be notified of the IRO's determination. If the IRO determines that coverage under the Plan should have been provided, the Plan will promptly pay any additional benefits deemed due on the Covered Person's behalf. However, either the Plan or the Covered Person has the right to appeal the decision, or utilize any other remedy available under any applicable state or federal law, if either disagrees with the decision of the IRO.

## 4.6 ADDITIONAL APPEAL RIGHTS

If, after the Covered Person has exhausted all appeal and review rights listed above, he or she is still not satisfied with the disposition of the claim, such Covered Person has the right to bring an action under section 502(a) of the Employee Retirement Income Security Act (ERISA).

No action at law or in equity shall be brought to recover benefits under the Plan prior to the exhaustion of all claims and appeals procedures described in this Article, nor shall such action be brought at all unless brought within three (3) years from the expiration of the time within which proof is required by the Plan.

## 4.7 EXAMINATION

The Plan Administrator shall have the right and opportunity to have the Covered Person examined whose Injury or Illness is the basis of a claim hereunder when and as often as it may reasonably require during the pending claim. The Plan Administrator shall also have the right and opportunity to have an autopsy performed in case of death, where it is not forbidden by law.

## 4.8 PLAN ADMINISTRATOR DISCRETION

Nothing in this Plan precludes the Plan Administrator from exercising full discretionary authority and responsibility with respect to all aspects of Plan administration and interpretation. The Plan Administrator shall have all powers necessary to carry out the purposes of the Plan, including supplying any omissions in accordance with the intent of the Plan and deciding all questions concerning eligibility for participation in the Plan and concerning the amount of benefits payable to a Covered Person.

## ARTICLE V
## COVERAGE AND ELIGIBILITY

### 5.1 COVERAGE UNDER THIS PLAN

Coverage provided under the Plan for a Participant shall be in accordance with the Participant Eligibility, Participant Effective Date and Participant Termination provisions included herein.

This Plan includes a medical coverage option, a dental coverage option and a vision coverage option. At the time of enrollment, a Participant must select which options, if any, in which such Participant and/or his or her Dependents should be enrolled. All Family members must be enrolled in the same options. A Participant can only change his or her plan options or enroll in coverage that was previously waived during this Plan's open enrollment period, as described in Section 5.8, unless he or she qualifies for a special enrollment, as described in Section 5.7.

### 5.2 PARTICIPANT ELIGIBILITY

Only employees of the Employer who meet all of the conditions of one (1) of the following categories shall be deemed eligible for coverage as a Participant under the Plan:

A. the employee is expected by the Employer as of the date of his or her hire to be employed on a full-time basis for an average of twenty (20) hours per week or one thousand forty (1,040) hours per year; or

B. the employee who does not meet the requirements listed in A, above, but is a new Variable Hour Employee, or an On-Going Employee who has been employed for at least one (1) standard Measurement Period, who has been determined during the most recent Measurement Period that is applicable to such employee to work an average of at least thirty (30) hours per week during such Measurement Period. Coverage for such employee will become effective (or be continued) as of the first day of the next Stability Period that applies to such employee, as long as such employee is still employed on that date.

A new Variable Hour Employee who has a Change in Employment Status during an initial Measurement Period will be treated as a Full-Time Employee as of the earlier of:

1. the first of the month following the date of the Change in Employment Status; or

2. the first day of the first month following the end of the initial Measurement Period (provided the employee averages more than thirty (30) hours of service per week during the initial Measurement Period.

A Change in Employment Status for an On-Going Employee does not change the employee's status as a full-time Employee or non full-time employee during the Stability Period.

For purposes of this Plan, Change in Employment Status means a material change in the employee's position of employment or other employment status that, had the employee begun employment in the new position or status, the employee would have reasonably been expected to work thirty (30) or more hours of service per week.

Participants must agree to any applicable Participant Contribution for such coverage.

### 5.3 DEPENDENT COVERAGES

A Participant eligible to elect Dependent Coverage shall be any Participant whose Dependents meet the definition of a Dependent, set forth in Article III of the Plan. A Participant must make written request for Dependent Coverage and agree to any applicable Participant Contribution for such coverage. Each Participant will become eligible to elect Dependent Coverage on the latest of the following:

A. the date he or she becomes eligible for Participant coverage; or

B. the date on which he or she first acquires a Dependent.

42

If both spouses are employed by the Employer, and both are eligible to elect Dependent coverage, either spouse, but not both, may elect Dependent Coverage for the eligible Dependents. In addition, a person cannot be covered as a Dependent of more than one Participant under this Plan.

## 5.4 PARTICIPANT EFFECTIVE DATE

Each eligible employee who makes written request for Participant coverage hereunder, on a form approved by the Plan Administrator and who agrees to the applicable Participant Contribution for such coverage, shall become effective on the first of the month following the date he or she becomes eligible, provided the written application for such coverage is made within thirty (30) days of such date.

If an eligible person makes an application for Participant coverage other than as described above, or as described in Section 5.7, such application can only be made during this Plan's open enrollment period, as described in Section 5.8.

## 5.5 DEPENDENT EFFECTIVE DATE

Each Participant who makes written request for Dependent Coverage hereunder within the thirty (30) day period immediately following the first day on which he or she is eligible for Dependent Coverage, on a form approved by the Plan Administrator, subject to the provisions of this section and who agrees to the applicable Participant Contribution for such coverage, shall become eligible for Dependent Coverage on the later of the date he or she is eligible for Dependent Coverage or the date the Participant becomes covered.

If a Participant makes an application for Dependent Coverage other than as described above, or as described in Section 5.7, such application can only be made during this Plan's open enrollment period, as described in Section 5.8.

## 5.6 NEWBORN CHILDREN

If the Participant already has Family Dependent Coverage in effect as of the date of birth, the Participant's Newborn will be automatically covered. If the Participant does not have Dependent Coverage in effect as of the date of birth, application must be made for the Newborn within thirty (30) days after the birth. In either case, coverage will be effective on the date of birth. If application for coverage for the Newborn is not made within this thirty (30) day period, such application can only be made during this Plan's open enrollment period, as described in Section 5.8, unless he or she thereafter qualifies for a special enrollment period as described in Section 5.7.

## 5.7 SPECIAL ENROLLMENT PERIODS

An eligible person for whom written application for coverage is submitted under any of the circumstances listed below will be eligible for coverage on the date specified below, and will not be required to wait until the next Plan open enrollment period to apply for coverage under this Plan:

A. within thirty (30) days of the date of a Dependent child's birth. The eligible employee, the Newborn, the Dependent spouse, and any other eligible Dependent children are entitled to this special enrollment period. Coverage shall become effective on the date of the Dependent child's birth;

B. within thirty (30) days after the adoption of a Dependent child, or the Placement for Adoption with the employee of such a child. The eligible employee, the newly acquired Dependent child, the Dependent spouse, and any other eligible Dependent children are entitled to this special enrollment period. Coverage shall become effective on the date of the adoption or Placement for Adoption;

C. within thirty (30) days of the date of the eligible employee's marriage. The eligible employee, the new Dependent spouse, and any other eligible Dependent children are entitled to this special enrollment period. Coverage shall become effective on the date of the marriage;

Marietta Memorial Hospital Employee Health Benefit Plan Summary Plan Description———————————

D. within thirty (30) days of the entry of an order requiring the employee to provide medical coverage for a Dependent child. The eligible employee, the Dependent child or children who are the subject of the court order, the Dependent spouse, and any other eligible Dependent children are entitled to this special enrollment period. Coverage shall become effective on the date of the court order;

E. within thirty (30) days of the date the employee becomes the Legal Guardian of a Dependent child. The employee, the newly acquired Dependent child, the Dependent spouse, and any other eligible Dependent children shall be entitled to this special enrollment period. Coverage shall become effective on the date the Legal Guardianship is effective;

F. within thirty (30) days of the date a Dependent otherwise first becomes eligible for coverage or re-eligible after a period of ineligibility. The employee, the newly eligible/re-eligible Dependent, and all other then eligible Family members shall be entitled to this special enrollment period. Coverage shall become effective on the date the Dependent becomes eligible/re-eligible for coverage;

G. within thirty (30) days of the date the employee or spouse experiences a change in employment status, such as a change from full time to flex time hours, or vice versa. The employee and all then eligible Dependents shall be entitled to this special enrollment period. Coverage shall become effective on the first of the month following the status change;

H. within thirty (30) days of the date of any negative change in existing health coverage provided through a plan sponsored by the employee's spouse's employer, including changes in carriers, increases in employee contributions or changes in benefits which increase the Out-of-Pocket expenses. The employee and all then eligible Dependents shall be entitled to this special enrollment period. Coverage shall become effective on the date of the change in other coverage;

I. within sixty (60) days of the date an eligible employee and/or his or her Dependent(s) first become eligible for coverage under a state Medicaid or Children's Health Insurance Program (CHIP), or, if covered, becomes ineligible for coverage through such programs. The eligible employee, the Dependent spouse and any Dependent child or children are eligible to enroll during this special enrollment period. Coverage shall become effective on the date of eligibility/ineligibility; or

J. within thirty (30) days of the date coverage under another group health plan or health insurance coverage was lost, if:

  1. the reason the eligible employee and/or Dependent did not enroll for coverage under this Plan when initially eligible was the existence of the other coverage; and

  2. the person lost coverage under the other plan due to one (1) of the following:

     a. if covered under a COBRA continuation provision, the exhaustion of COBRA continuation coverage under the other plan;

     b. the loss of eligibility for coverage due to legal separation, divorce, death, termination of employment, reduction in hours of employment or other involuntary loss of eligibility (with the exception of terminations due to fraud or failure to pay premiums);

     c. the overall Lifetime maximum benefit under the other coverage has been exhausted so that no further expenses will be payable under such coverage; or

     d. the termination of employer contributions towards such other coverage.

  Coverage for which a person is eligible under this provision shall become effective on the day following the last day the person is covered under the other plan.

In no event shall any person become covered under this Plan prior to the date the Participant becomes a Covered Person.

44

## 5.8 OPEN ENROLLMENT

The Plan will have an annual open enrollment period during which otherwise eligible persons who were not enrolled when initially eligible (or who previously terminated coverage) and do not qualify for one of the special enrollment periods described in Section 5.7 can be enrolled in the Plan. Participants can also change plan options during this time. The specific dates for the annual open enrollment will be communicated to employees prior to October 1st of each Calendar Year. Coverage for any person for whom application for coverage under this Plan was submitted pursuant to this provision shall be effective on January 1st of the year following the Calendar Year in which the application was submitted. For more information regarding open enrollments, contact the Plan Administrator.

## 5.9 PARTICIPANT TERMINATION

Participant coverage terminates immediately upon the earliest of the following dates:

A. if covered under the provisions of Section 5.2A, the last day of the month in which the Participant is no longer paid for working the number of hours listed in Section 5.2, or otherwise fails to meet the eligibility requirements listed in such Section;

B. if covered under the provisions of Section 5.2B, the earlier of the last day of the last Stability Period during which the employee was eligible if the employee failed to average thirty (30) hours per week during the latest Measurement Period that applies to such employee, or the date such employee's employment with the Employer is terminated. This will be considered a reduction in hours Qualifying Event for the purposes of this Plan's COBRA continuation provision;

C. the last day of the period for which a Participant Contribution was made following the date the Participant fails to make any required Participant Contribution for coverage;

D. the date the Plan is terminated or, with respect to any benefit of the Plan, the date of termination of any such benefit; or

E. the end of the month of the date the Participant exhausts FMLA, as described in Section 5.13, and does not elect COBRA, as described in Article VII.

In addition, coverage may continue under the Plan, under certain circumstances and in accordance with applicable federal laws. Such continuation may be at the Participant's or Dependent's own expense. For further clarification, refer to the Family and Medical Leave provisions as described in Section 5.13, and COBRA continuation coverage as described in Article VII. This Plan will also comply with the continuation provisions contained in the Uniformed Services Employment and Re-employment Rights Act of 1994 (USERRA) as they apply to Participants entering Service in the Uniformed Services.

## 5.10   DEPENDENT TERMINATION

Dependent Coverage terminates immediately upon the earliest of the following dates:

A. the date the Participant's coverage ceases under this Plan;

B. if a Dependent child who meets the limiting age, the end of the month following the date he or she reaches age twenty-six (26);

C. if covered as a Dependent spouse, the date he or she becomes eligible to enroll in similar health coverage available through his or her own employer, and fails to do so, unless the Plan Administrator has approved, in writing, an exception from this requirement;

D. otherwise, the date the Dependent ceases to be a Dependent, as defined in the Plan;

E. the last day of the period for which a Participant Contribution for Dependent Coverage was made following the date the Participant fails to make any required Participant Contribution for Dependent Coverage; or

E. the date of cancellation of Dependent benefits under this Plan.

45

Marietta Memorial Hospital Employee Health Benefit Plan Summary Plan Description—————————————

In addition, coverage may continue under the Plan, under certain circumstances and in accordance with applicable federal laws. Such continuation may be at the Participant's or Dependent's own expense. For further clarification, refer to the COBRA continuation coverage as described in Article VII.

## 5.11   CONTINUATION OF COVERAGE DURING DISABILITY

If the Participant is no longer Actively at Work due to a disability for which he or she is receiving short term disability benefits or long term disability benefits under the Employer's disability plan, coverage under this Plan for the Participant and any eligible Dependents can be continued until the earliest of the following applicable dates:

A. the date the Participant is required to return to work, but does not;

B. if receiving short term disability benefits, the date that such benefits are exhausted, including any period covered under the Family and Medical Leave Act of 1993 (FMLA), unless he or she is otherwise eligible under Subsection C;

C. if receiving long term disability benefits, the earlier of:

 1. the end of the twelfth (12th) month following the date the Participant has exhausted any continuation under Subsection B above; or

 2. the date the Participant no longer qualifies for long term disability benefits under the Employer's plan;

D. the date the Participant first becomes eligible for Medicare;

E. the date the Participant elects to drop this coverage, or, in regards to any Dependent, the date such Dependent becomes ineligible or coverage is voluntarily terminated for such Dependent (once such coverage is terminated, it cannot be reinstated);

F. the date the Participant fails to make any required Participant Contribution for such coverage; or

G. the date this Plan is terminated for all Participants.

Continuation as described above is limited to the Participant and any covered Family members who were covered as of the date the Participant became eligible for continuation. Any period of time for which coverage is continued under this provision shall not be applied to the total period for which a Covered Person may be eligible for continuation under the provisions of COBRA.

## 5.12   CONTINUATION OF MEDICAL COVERAGE TO EARLY RETIREES WITH SEVERANCE PACKAGES

Medical coverage may be continued under this Plan for retired Participants and their spouses who were covered under this Plan at the time of retirement, if included in a written severance agreement with the Employer. No continuation will be offered for the dental or vision coverage. The coverage will continue until the earliest of the following dates:

A. the date the Participant fails to make any required Participant Contribution for this coverage;

B. the date the Participant turns age sixty-five (65);

C. for the Dependent spouse, the date he or she attains age sixty-five (65);

D. the date the Participant elects to drop this coverage, or, in regards to any spouse, the date such spouse becomes ineligible or coverage is voluntarily terminated for such Dependent (once such coverage is terminated, it cannot be reinstated);

E. the date the Participant becomes eligible for coverage as an employee under any other similar health plan sponsored by another employer;

F. the date specified in the written severance agreement that coverage should terminate; or

G. the date that this Plan is terminated.

46

Continuation as described above is limited to the Participant and any covered Family members who were covered as of the date the Participant became eligible for continuation. Any continuation rights that the Participant may be entitled to under the provisions of COBRA, as described in Article VII, shall begin after the period of continuation described above for any Dependent spouse under age sixty-five (65). Any individual who is terminated due to attaining age sixty-five (65) shall not be eligible for COBRA.

## 5.13    FAMILY AND MEDICAL LEAVE PROVISIONS

This Plan intends to comply with the Family and Medical Leave Act of 1993 (FMLA) regarding the maintenance of health benefits during any period that an eligible employee takes a leave of absence in accordance with the Company's FMLA policy, if the Company is subject to such law. In applicable situations, FMLA allows an eligible employee to maintain group health plan coverage at the level and under the conditions coverage would have been provided if the employee had continued in employment continuously for the duration of such leave. Employee eligibility requirements, the obligations of the Company and employees concerning conditions of leave, and notification and reporting requirements are specified in the Company's FMLA policy. If the Company is subject to FMLA, any Plan provision which conflicts with FMLA is superseded by FMLA to the extent such provision conflicts with FMLA. Questions regarding rights and/or obligations under FMLA should be directed to a Company representative or the Plan Administrator.

## 5.14    USERRA RIGHTS

A Participant under this Plan who is no longer Actively At Work due to his or her Service in the Uniformed Services can elect, under the provisions of the Uniformed Services Employment and Reemployment Rights Act of 1994 (USERRA) to continue Participant and Dependent Coverage under this Plan for up to twenty-four (24) months after such coverage would otherwise have terminated. This period of continued coverage shall run concurrently with any continuation for which any Covered Person would have been entitled to under the provisions of COBRA due to the Participant's termination or reduction in hours of employment. If the Service in the Uniformed Services is for thirty-one (31) days or more, the Participant Contribution for such coverage will be one hundred two percent (102%) of the full cost of the coverage, without any Employer contribution. If the Service in the Uniformed Service is less than thirty-one (31) days, the Participant Contribution shall be the same as would have applied if the Participant were still an active employee.

If coverage is not continued as described above, or the Service in the Uniformed Services exceeds the time limit listed above, upon release from his or her Service in the Uniformed Services, coverage will be reinstated in the Plan effective the date the employee is reemployed by the Employer, provided the employee reapplies for employment or reports back to work within the following applicable time:

A.  if the period of service was less than thirty-one (31) days, the beginning of the next regularly scheduled work period on the first full day after release from Service in the Uniformed Services, taking into account safe travel home plus an eight (8) hour rest period;

B.  if the period of service was more than thirty (30) days, but less than one hundred eighty-one (181) days, within fourteen (14) days of release from Service in the Uniformed Services; and

C.  if the period of service was more than one hundred eighty (180) days, but less than five (5) years, within ninety (90) days of the release from Service in the Uniformed Services.

The Plan Administrator reserves the right to request verification of any Service in the Uniformed Services, including copies of military orders or the applicable Form DD 214.

**Marietta Memorial Hospital Employee Health Benefit Plan Summary Plan Description**

This period may be extended for up to two (2) years from the date the Service in the Uniformed Services ended, under the provisions of USERRA, if the person is unable to return to active employment due to a disability incurred while performing Service in the Uniformed Services.

# ARTICLE VI
# COST MANAGEMENT SERVICES

## 6.1 UTILIZATION REVIEW

The Plan has a utilization pre-certification provision. Pre-admission certification must be obtained for every Inpatient admission to a covered facility, including, but not limited to Hospitals, Skilled Nursing Facilities, Hospices, psychiatric treatment facilities and Alcoholism and Substance Abuse treatment facilities, except Emergency admissions, Urgent Care admissions, and minimum stays following childbirth. ("Emergency" and "Urgent Care" admissions are defined below). A "minimum stay following childbirth" is either:

A.  a stay following a normal vaginal delivery which is forty-eight (48) hours or less; or

B.  a stay following a cesarean section which is ninety-six (96) hours or less.

If a Hospital stay following childbirth will exceed the limitations listed above, the Pre-Certification Center must be notified as soon as the Covered Person and/or her Provider have determined that the hospitalization will exceed such limitations, but not later than the end of the applicable period listed above.

Pre-admission certification may be made through the Utilization Review Service. The telephone number for the Utilization Review Service is listed in Article I, Plan Information, and on the medical identification card. A Covered Person may inform his or her health care Provider that he or she participates in a program which has pre-admission certification provisions. In order to obtain pre-admission certification:

A.  contact the Utilization Review Service and report the upcoming Hospital or other facility stay no later than forty-eight (48) hours prior to the admission;

B.  notice can be given by:

  1.  the Hospital or other covered facility;

  2.  the Covered Person's admitting Physician;

  3.  the Covered Person;

  4.  a family member of the Covered Person; or

  5.  a representative of the Employer; and

C.  the Utilization Review Service must be provided with information necessary to make a decision as to the Medical Necessity of the admission.

The utilization review service may request additional information that is necessary to make the determination from the Covered Person or a Provider. In the case of an urgent care request, such information must be provided within forty-eight (48) hours of the request. A decision will be made as soon as reasonably possible, but no later than seventy-two (72) hours of the Plan's receipt of all information necessary to make the determination. If the request does not involve urgent care, the information must be provided within forty-five (45) days of such request. An "urgent care" request is one that, if a determination is not made on an expedited basis, the life or health of the Covered Person, or the ability of the Covered Person to regain maximum function, could be seriously jeopardized, or, in the opinion of the attending Physician, the Covered Person would be subjected to severe pain that cannot be adequately managed without the care or treatment that is the subject of the request.

When pre-admission certification is provided to the Covered Person, a certain number of Inpatient days for the stay will be assigned. If the Utilization Review Service is not informed of the Covered Person's admission, there will be a penalty. Covered Expenses for Hospital or other facility services the Utilization Review Service, as the entity designated by the Plan Administrator to handle Utilization Review, would have approved for payment under the Pre-Admission Certification program will be paid at the non-Preferred Provider level described in

Marietta Memorial Hospital Employee Health Benefit Plan Summary Plan Description

Article IX. Charges for Inpatient days which are determined by the Utilization Review Service to not be Medically Necessary are not covered under this Plan.

The Plan Administrator shall have full discretionary authority and responsibility with respect to all aspects of Plan administration, including utilization review. If a Utilization Review Service is designated by the Plan Administrator, the Utilization Review Service agrees to recognize the ultimate authority of the Plan Administrator.

## 6.2 CONTINUED STAY REVIEW

During a Covered Person's Inpatient stay, a Continued Stay Review will be conducted. This review applies to all Hospital admissions. The purpose of Continued Stay Review is to:

A. provide the Utilization Review Service with an update as to the Covered Person's condition and/or progress; and, if necessary; and

B. enable the Utilization Review Service to re-evaluate the Medical Necessity of a continued Inpatient stay.

The Utilization Review Service has the right to initiate a Continued Stay Review for any Inpatient admission. The Utilization Review Service will always confirm the outcome of the Continued Stay Review by telephone or in writing. This notification will go to the Covered Person and/or the Covered Person's Physician. The notification always includes any newly authorized length of stay.

If a stay is longer than the specified number of Inpatient days that the Utilization Review Service considers to be Medically Necessary, Covered Expenses will be denied for any charges incurred for the days not Medically Necessary. This will occur if the Utilization Review Service is informed that the confinement is no longer Medically Necessary and the Covered Person knowingly chooses to remain in the Hospital or other facility.

If the Covered Person's Physician and the Covered Person disagree with the findings of the Utilization Review Service, the Covered Person may file an appeal, in accordance with the procedures described in Article IV, with the Plan Administrator. The Plan Administrator has final authority over any such decisions.

## 6.3 WEEKEND ADMISSION REVIEW

All weekend (Friday, Saturday, and Sunday) Hospital admissions will be reviewed. Coverage is limited to Medically Necessary admissions.

## 6.4 EMERGENCY AND URGENT CARE REVIEW

If a Covered Person is admitted to a Hospital or other covered facility for an Emergency or Urgent Care admission, notice of the admission may be provided to the Utilization Review Service no later than forty-eight (48) hours (**2 business days**) after the admission or as soon as reasonably possible. Notice may be given to the Utilization Review Service by:

A. the Hospital or other facility;

B. the Covered Person's admitting Physician;

C. the Covered Person;

D. a family member of the Covered Person; or

E. a representative of the Employer.

The Utilization Review Service will review the case with the Covered Person's Physician to determine if a continued Inpatient stay is Medically Necessary. Charges for Inpatient days which are determined by the Utilization Review Service to not be Medically Necessary are not covered under this Plan.

An Emergency admission is an admission to a Hospital through the emergency room of that facility for treatment of a life threatening Illness or Injury. An Urgent Care admission is an unplanned admission or an admission scheduled less than forty-eight (48) hours prior, for a

condition requiring prompt medical attention. An Urgent Care admission is not an admission through the emergency room."

## 6.5 DISCHARGE PLANNING

Review for Discharge Planning occurs during hospitalization review. The purpose is to:

    A.  identify patients requiring extended care following discharge; and

    B.  determine the most appropriate setting for continued care.

## 6.6 INDIVIDUAL BENEFITS MANAGEMENT

Individual Benefits Management is designed to inform Covered Persons of more cost effective settings for treatment. On an exception basis and subject to approval, the Utilization Review Service may provide benefits for settings not expressly provided for under the Plan, but which are not prohibited by law, rule or federal policy. All requests for Individual Benefits Management will be individually reviewed by the Utilization Review Service.

Services and Supplies provided in connection with Individual Benefits Management must be:

    A.  for an acute level of care;

    B.  Medically Necessary; and

    C.  provided in a more cost effective setting.

Under Individual Benefits Management, the Utilization Review Service may waive the Deductible or Coinsurance amount for certain services.

The Utilization Review Service has the right to deny an extension of benefits under Individual Benefits Management. The Utilization Review Service also has the right to administer benefits pursuant to the terms of the Plan, exclusive of this provision. If benefits are provided to a Covered Person, under this provision for individual benefits management, which are outside of the conditions, limitations and/or exclusions of this Plan, the Covered Person has no right to expect that the same or similar benefits (provided outside of the conditions, limitations and/or exclusions of this Plan) will be provided to that Covered Person in the future.

The Plan Administrator shall have full discretionary authority and responsibility with respect to all aspects of Plan administration, including utilization review. If a Utilization Review Service is designated by the Plan Administrator, the Utilization Review Service agrees to recognize the ultimate authority of the Plan Administrator.

## 6.7 SECOND SURGICAL OPINION

The Plan will cover a second surgical opinion prior to any otherwise covered elective surgery. Covered Expenses include the examination and all related testing. Charges for a second surgical opinion will be paid as described in Section 2.6.

The Physician providing the second surgical opinion must be qualified to render such an opinion through experience or training in the field related to the surgical procedure, and must not be financially associated with the Physician who recommended and/or will perform the surgery.

The Plan Administrator and the Utilization Review Service reserve the right to direct a Covered Person to a Physician of the Plan's choosing for a second surgical opinion.

## ARTICLE VII

## CONTINUATION COVERAGE UNDER COBRA

### 7.1 RIGHT TO ELECT CONTINUATION COVERAGE

If a Qualified Beneficiary loses coverage under the Group Health Plan due to a Qualifying Event, he or she may elect to continue coverage under the Group Health Plan in accordance with COBRA upon payment of the monthly contribution specified from time to time by the Company. A Qualified Beneficiary must elect the coverage within the 60-day period beginning on the later of:

    A. the date of the Qualifying Event; or

    B. the date the Qualified Beneficiary was notified of his or her right to continue coverage.

If a Covered Employee has been determined to be an Eligible TAA Recipient or an Eligible Alternative TAA Recipient, as those terms are defined in the Trade Act of 2002, such Covered Employee and his or her Dependents who lost coverage under the Plan due to a job loss which qualified such employee for TAA assistance shall be entitled to a second sixty (60) day election period (if continuation coverage was not elected during the period described above) beginning on the first day of the month in which the Covered Employee is determined to be TAA eligible, provided such election is made within six (6) months of the original loss of coverage. If elected under this provision, coverage shall begin on the first day of the month in which the Covered Employee is determined to be TAA eligible.

### 7.2 NOTIFICATION OF QUALIFYING EVENT

If the Qualifying Event is divorce, legal separation or a Dependent child's ineligibility under a Group Health Plan, the Qualified Beneficiary must notify the Company, in writing addressed to the Plan Administrator, of the Qualifying Event within sixty (60) days of the event, or sixty (60) days of the date the Qualified Beneficiary would lose coverage because of the event, in order for coverage to continue. Appropriate documentation of the Qualifying Event must be submitted, including, as appropriate, final divorce and legal separation decrees issued and properly signed by the court. In addition, a Totally Disabled Qualified Beneficiary must notify the Company in accordance with the section below entitled "Total Disability" in order for coverage to continue.

### 7.3 LENGTH OF CONTINUATION COVERAGE

A Qualified Beneficiary who loses coverage due to the reduction in hours or termination of employment (other than for gross misconduct) of a Covered Employee may continue coverage under the Group Health Plan for:

    A. up to eighteen (18) months from the date of the Qualifying Event;

    B. a Qualified Beneficiary who loses coverage due to the Covered Employee's death, divorce or entitlement to Medicare, and Dependent children who have become ineligible for coverage may continue under the Group Health Plan for up to thirty-six (36) months from the date of the Qualifying Event; or

    C. if a Qualified Beneficiary is Totally Disabled at any time during the first sixty (60) days of Continuation Coverage, he or she may continue coverage for up to twenty-nine (29) months from the date of the Qualifying Event, provided the Qualified Beneficiary notifies the Company of the determination of his or her Total Disability under the Social Security Act:

        1. before the end of the original eighteen (18) month continuation period; and

        2. within sixty (60) days following the date of such determination.

### 7.4 TERMINATION OF CONTINUATION OF COVERAGE

Continuation Coverage will automatically end earlier than the applicable eighteen (18) or thirty-six (36)-month period for a Qualified Beneficiary if:

A. the required monthly contribution for coverage is not received by the Company within thirty (30) days following the date it is due;

B. the Qualified Beneficiary becomes covered under any other Group Health Plan containing an exclusion or limitation relating to a pre-existing condition, and such exclusion or limitation applies to the Qualified Beneficiary, then the Qualified Beneficiary shall be eligible for Continuation Coverage as long as the exclusion or limitation relating to the pre-existing condition applies to the Qualified Beneficiary;

C. for Totally Disabled Qualified Beneficiaries continuing coverage for up to twenty-nine (29) months, the last day of the month coincident with or following thirty (30) days from the date of a final determination by the Social Security Administration that such Qualified Beneficiary is no longer Totally Disabled;

D. the Qualified Beneficiary becomes entitled to Medicare benefits; or

E. the Company ceases to offer any Group Health Plans.

## 7.5 MULTIPLE QUALIFYING EVENTS

If a Qualified Beneficiary is continuing coverage due to a Qualifying Event for which the maximum Continuation Coverage is eighteen (18) months, and a second Qualifying Event occurs during the 18-month period, the Qualified Beneficiary may elect, in accordance with the section entitled "Right to Elect Continuation Coverage," to continue coverage under the Group Health Plan for up to 36 months from the date of the first Qualifying Event.

## 7.6 TOTAL DISABILITY

In the case of a Qualified Beneficiary who is determined under Title II or XVI of the Social Security Act (hereinafter the "Act") to have been Totally Disabled at the time of a Qualifying Event or at any time during the first sixty (60) days of the Qualified Beneficiary's Continuation Coverage (if the Qualifying Event is termination of employment or reduction in hours), that Qualified Beneficiary may continue coverage (including coverage for Dependents who were covered under the Continuation Coverage) for a total of twenty-nine (29) months as long as the Qualified Beneficiary notifies the Employer, in writing addressed to the Plan Administrator:

A. prior to the end of eighteen (18) months of Continuation Coverage that he or she was disabled as of the date of the Qualifying Event; and

B. within sixty (60) days of the determination of Total Disability under the Act.

A copy of the determination letter from Social Security must be submitted with the notification.

The Employer will charge the Qualified Beneficiary an increased contribution for Continuation Coverage extended beyond eighteen (18) months pursuant to this Section.

If during the period of extended coverage for Total Disability (Continuation Coverage months nineteen (19) through twenty-nine (29)) a Qualified Beneficiary is determined to be no longer Totally Disabled under the Act:

A. the Qualified Beneficiary shall notify the Employer of this determination within thirty (30) days; and

B. Continuation Coverage shall terminate the last day of the month following thirty (30) days from the date of the final determination under the Act that the Qualified Beneficiary is no longer Totally Disabled.

## 7.7 CARRYOVER OF DEDUCTIBLES AND PLAN MAXIMUMS

If Continuation Coverage under the Group Health Plan is elected by a Qualified Beneficiary under COBRA, expenses already credited to the Plan's applicable Deductible and Copayment features for the year will be carried forward into the Continuation Coverage elected for that year.

Similarly, amounts applied toward any maximum payments under the Plan will also be carried forward into the Continuation Coverage. Coverage will not be continued for any benefits for which Plan maximums have been reached.

## 7.8 PAYMENTS OF PREMIUM

The Group Health Plan will determine the amount of premium to be charged for Continuation Coverage for any period, which will be a reasonable estimate of the cost of providing coverage for such period for similarly situated individuals, determined on an actuarial basis and considering such factors as the Secretary of Labor may prescribe.

The Group Health Plan may require a Qualified Beneficiary to pay a contribution for coverage that does not exceed one hundred two percent (102%) of the applicable premium for that period.

For Qualified Beneficiaries whose coverage is continued pursuant to the Section entitled "Total Disability" of this provision, the Group Health Plan may require the Qualified Beneficiary to pay a contribution for coverage that does not exceed one hundred fifty percent (150%) of the applicable premium for continuation coverage months nineteen (19) through twenty-nine (29).

Contributions for coverage may, at the election of the payer, be paid in monthly installments.

If Continuation Coverage is elected, the first monthly contribution for coverage must be made within forty-five (45) days of the date of election.

Without further notice from the Company, the Qualified Beneficiary must pay the monthly contribution for coverage by the first day of the month for which coverage is to be effective. If payment is not received by the Company within thirty (30) days of the payment's due date, Continuation Coverage will terminate in accordance with the section entitled "Termination of Continuation Coverage," Subsection A.

No claim will be payable under this provision for any period for which the contribution for coverage is not received from or on behalf of the Qualified Beneficiary.

## 7.9 DEFINITIONS

For purposes of this Article VII, unless specifically stated otherwise, the following definitions apply:

A. "COBRA" means the Consolidated Omnibus Budget Reconciliation Act of 1985, as amended.

B. "Code" means the Internal Revenue Code of 1986, as amended.

C. "Company" means the Employer, as defined in Article III.

D. "Continuation Coverage" means the Group Health Plan coverage elected by a Qualified Beneficiary under COBRA.

E. "Covered Employee" has the same meaning as that term is defined in COBRA and the regulations thereunder.

F. "Group Health Plan" has the same meaning as that term is defined in COBRA and the regulations thereunder.

G. "Qualified Beneficiary" means:

1. a Covered Employee whose employment terminates (other than for gross misconduct) or whose hours are reduced, rendering the Covered Employee ineligible for coverage under the Plan; and

2. a covered spouse or dependent who becomes eligible for coverage under the Plan due to a Qualifying Event, as defined below. Qualified Beneficiary also includes any child who is born to or Placed for Adoption with the Covered Employee during the period of Continuation Coverage.

H. "Qualifying Event" means the following events which, but for Continuation Coverage, would result in the loss of coverage of a Qualified Beneficiary:

1. termination of a Covered Employee's employment (other than gross misconduct) or reduction in the Covered Employee's hours of employment;

2. the death of the Covered Employee;

54

   3.  the divorce or legal separation of the Covered Employee from his or her spouse;

   4.  the Covered Employee becoming entitled to Medicare coverage; or

   5.  a child ceasing to be eligible as a dependent child under the terms of the Group Health Plan.

I.  "Totally Disabled" or "Total Disability" means totally disabled as determined under Title II or Title XVI of the Social Security Act.

## 7.10   COBRA BANKRUPTCY PROVISIONS UNDER TITLE XI

For purposes of this subsection only:

A.  "Qualified Beneficiary" means:

   1.  a Covered Employee who retired on or before the date of the Qualifying Event and who was covered as a retiree under the Group Health Plan;

   2.  an individual who was covered under the Group Health Plan as a surviving spouse of a deceased retiree on the day before the date of the Qualifying Event; and

   3.  a Dependent of either of the above described individuals who was covered under the Group Health Plan on the day before the date of the Qualifying Event.

B.  "Qualifying Event" means the substantial elimination of coverage under the Group Health Plan within one (1) year before or after the Company files a petition in bankruptcy under Title XI of the United States Code.

If a Qualified Beneficiary experiences a Qualifying Event, as defined in this provision, he or she may elect to continue coverage under the Group Health Plan if he or she pays the monthly contribution specified from time to time by the Company and makes his or her election in accordance with the provision above entitled "Right to Elect Continuation Coverage."

Continuation Coverage for a Qualified Beneficiary who is a retiree and his or her Dependents who are Qualified Beneficiaries will continue for the life of the retiree. When the retiree dies, his or her Qualified Beneficiaries may elect to continue coverage for up to thirty-six (36) additional months.

If a surviving spouse and Dependent children are covered as beneficiaries of a deceased retiree when the loss of coverage due to bankruptcy occurs, they may elect to continue coverage until the death of the surviving spouse. Upon the death of the surviving spouse, the Continuation Coverage terminates.

Continuation Coverage elected under this provision will automatically end earlier than the periods specified above if the required contribution for coverage is not paid on a timely basis or if the Company ceases to offer any Group Health Plans.

Marietta Memorial Hospital Employee Health Benefit Plan Summary Plan Description————————————

## ARTICLE VIII
## MAJOR MEDICAL EXPENSE BENEFITS

### 8.1 COINSURANCE PERCENTAGE AND DEDUCTIBLE

Each Covered Person must pay the Deductible amount stated in Section 2.3 for Other Preferred Provider/Tier II and non-Preferred Provider/Tier III Covered Expenses, or the Copayment amount stated in Section 2.4 or Section 2.6 for Marietta Memorial PHO/Tier I Provider expenses before the Plan begins paying benefits. The Plan will pay the Coinsurance percentage stated in Section 2.5 to the limits shown.

The Deductible applies to Other Preferred Provider and non-Preferred Provider Covered Expenses for each Calendar Year. The Deductible will be applied as explained in the definition of Deductible set forth in Article III. Amounts paid to satisfy any individual Deductible during the last three (3) months of a Calendar Year will be applied toward the satisfaction of the individual Deductible for the next Calendar Year on claims incurred once this Plan is in effect. Any portion of the individual Deductible carried over from the previous Calendar Year will not apply toward the Family Deductible, or to any Out-of-Pocket limit in the current Calendar Year.

### 8.2 ALLOCATION AND APPORTIONMENT OF BENEFITS

The Plan Administrator may allocate the Deductible amounts to any eligible charges and apportion the benefits to the Covered Person and any assignees. Such allocation and apportionment shall be conclusive and shall be binding upon the Covered Person and all assignees. Eligibility for any Deductible carryover, however, will be based on the date the expense was incurred.

56

## ARTICLE IX
## DESCRIPTION OF MEDICAL BENEFITS

### 9.1 MEDICAL BENEFITS -- COVERED EXPENSES

In order to be eligible for benefits under this section of the Plan, charges actually incurred by a Covered Person must be administered or ordered by a Physician and be Medically Necessary for the diagnosis and treatment of an Illness or Injury unless otherwise specifically covered. In addition, such charges will only be covered to the extent that they do not exceed the Reasonable and Customary charge for the service or supply in question.

Covered Expenses include the following:

A. **Acupuncture:** Charges for acupuncture services, but only if performed by a Marietta Memorial PHO/Tier I Provider.

B. **Allergy Testing and Treatment:** Charges for allergy testing and treatment, including injections and serum.

C. **Ambulance:** Charges for transportation by professional ground ambulance or air ambulance, including volunteer ambulance organizations, when such transportation is Medically Necessary.

D. **Contraceptives:** Charges for contraceptives, including:

1. FDA approved contraceptives prescribed for females, including but not limited to, injections, implants, devices, including intrauterine devices if not available through a pharmacy, and medical services in connection with such contraceptives when obtained from a Marietta Memorial PHO/Tier I Provider; and

2. the following services when obtained from another Preferred Provider/Tier II or an Out-of-Network/Tier III Provider, or contraceptive services for males from any Provider:

   a. implants;

   b. injections; and

   c. related Physician's services.

Coverage of other contraceptives, including oral contraceptives and intrauterine devices (IUD), may be provided through the Employer's separate prescription drug plan.

E. **Dental Treatment for Injury/Cancer/Impactions:** Charges for services required due to accidental Injury or cancer that damages Sound Natural Teeth, jaws or bones surrounding the jaw. In order to be covered under this Plan, all services must be performed within twelve (12) months of the accident or loss due to cancer, as applicable. This Plan will also provide benefits for the surgical removal of impacted teeth. General dental services including, but not limited to, replacement of lost teeth and gums, root canal treatments, periodontal disease treatments, removal of teeth (except impacted teeth) or orthognathics are not covered under the medical provisions of this Plan.

F. **Diabetic Education/Counseling:** Charges for diabetic education/counseling are covered under this Plan.

G. **Dialysis:** Charges for Outpatient or home dialysis for renal disease, including equipment, training and medical supplies required for effective home dialysis care, subject to the provisions set forth in Section 2.6 of the Plan. Coverage includes the daily cost of dialysis services, diagnostic testing, laboratory tests, equipment and supplies under the Plan to the extent they are Medically Necessary.

Dialysis services, diagnostic testing, lab expenses, equipment and supplies are those services and items used in the treatment of acute renal failure and/or chronic renal

57

insufficiency (treatment of anemia and other diagnoses related to renal failure). This also includes injectable and intravenous medications including but not limited to Heparin, Epogen, Procrit and other medications administered directly before, during or after a dialysis procedure. Dialysis procedures are for the removal of waste materials from the body, including hemodialysis and peritoneal dialysis regardless of whether they are provided on an Inpatient or Outpatient basis.

As outlined within Section 2.6, the Plan provides an alternative basis for payment of claims associated with Outpatient dialysis-related services and products. This alternative basis may be applied to Outpatient claims by any healthcare Provider, regardless of the healthcare Provider's participation in the Preferred Provider organization (PPO).

All eligible Participants and their Dependents requiring dialysis are subject to cost containment review, claim audit and/or review, negotiation and/or other related administrative services which the Plan Administrator may elect to apply in the exercise of the Plan Administrator's discretion.

Covered Persons that are diagnosed with a condition requiring dialysis may be able to enroll in Medicare. The Plan will not enroll any Covered Person in Medicare; it is the Covered Person's decision and responsibility to enroll in Medicare, if applicable.

H. **Durable Medical Equipment/Prosthetic Devices:** Charges for Durable Medical Equipment and prosthetic devices. The Plan will use Medicare guidelines to determine coverage for Durable Medical Equipment or prosthetic devices. Equipment may be purchased or rented at the Plan's option. Repair and maintenance of purchased Durable Medical Equipment and prosthetic devices is also covered under this Plan. Unless required for life support or due to the Covered Person's growth to maturity, only the initial equipment or device, which was purchased, is covered. Implantable prosthetic devices associated with surgical procedures must be pre-authorized by the Plan Administrator. Covered external prosthetic devices are limited to artificial limbs and eyes. Charges for the replacement of continuous positive airway pressure (CPAP) machines are covered if the Covered Person's current CPAP machine is unrepairable or if it is more cost effective to replace rather than to repair a machine. The Plan will also allow a Medically Necessary CPAP machine to be replaced due to a change in a Covered Person's medical condition. Covered expenses for Durable Medical Equipment include charges for a breast pump, regardless of Medical Necessity.

I. **Elective Sterilization:** Charges for elective sterilization procedures performed on a Participant, a Participant's spouse, or any female Dependent (if performed by a Marietta Memorial PHO/Tier III Provider). Sterilization procedures performed on a Dependent male child or the reversal of any sterilization procedure, are not covered under this Plan. Sterilization procedures performed on a Dependent female child are not covered when performed by an Other Preferred Provider/Tier II or an Out-of-Network/Tier III Provider.

J. **Formula**: Charges for Pediasure or a similar formula when Medically Necessary due to swallowing problems or gastro-intestinal problems. A Physician's prescription is required.

K. **Genetic Testing**: Charges for certain cancer related genetic testing, including BRCA analysis, COLARIS and MELARIS. Coverage for other types of genetic testing will be based on Medical Necessity and family history. Testing must meet the guidelines for genetic testing set by National Cancer Institute. Services for collection of samples for testing, genetic counseling and surgical procedures performed as a result of covered genetic testing (even if not Medically Necessary) are covered only if performed by a Marietta Memorial PHO/Tier 1 Provider. All services require a prior authorization. Contact the Benefit Manager for information on how to obtain a prior authorization.

58

L. **Health Education:** Charges for Medically Necessary health education services, including nutritional counseling and counseling to prevent Illness and Injury.

M. **Hearing:** Charges for hearing aids and ear molds, subject to the limitations listed in Section 2.7, if provided by a Marietta Memorial PHO/Tier I Provider. Replacements are covered for Covered Persons under age eighteen (18) if Medically Necessary due to growth. Hearing aids and molds are not covered if received from a Tier II or Tier III Provider.

N. **Home Health Care:** Charges for Physician supervised home care by health professionals provided or arranged for by a home health agency and prescribed in lieu of care in a Hospital or Skilled Nursing Facility, subject to the limitations listed in Section 2.7. Covered health professionals include registered nurses, licensed practical nurses, home health aides (for services provided in connection with other covered home health care services only), medical social workers, physical, respiratory, occupational and speech therapists, and registered dieticians. Covered Expenses include drugs, medications and supplies administered by the home health agency. Preparation and/or delivery of meals, custodial care or housekeeping services are not covered under this Plan.

O. **Hospice:** Charges for Inpatient or Outpatient hospice services. Family bereavement counseling is not covered under this Plan. Inpatient hospice care is subject to the Prior Authorization requirements described in Article XII.

P. **Hospital:** Charges for:

1. Inpatient Hospital care, including:

   a. Room and Board, subject to the limitations listed in Section 2.6; and

   b. all services, tests and supplies related to the diagnosis and treatment of the Illness or Injury while the Covered Person is an Inpatient.

   All Inpatient confinements are subject to the pre-certification requirements listed in Article VI; and

2. Outpatient care, including care at a Hospital or other licensed Outpatient facilities for:

   a. Outpatient surgery;

   b. physical therapy, speech therapy and occupational therapy, subject to the limitations listed in Section 2.7;

   c. radiation therapy, chemotherapy and inhalation therapy;

   d. cardiac rehabilitation, including exercise programs with cardiac monitoring; and

   e. other services, tests and supplies related to the Illness or Injury.

Q. **Infertility:** Charges for Medically Necessary services for infertility which enable a female/male to become fertile and to subsequently conceive through the normal process of sexual intercourse. Covered Expenses include Medically Necessary diagnostic procedures and surgical procedures to correct the medically diagnosed disease or condition of the reproductive organs, including, but not limited to:

1. endometriosis;

2. collapsed/clogged fallopian tubes; or

3. testicular failure.

R. **Maternity Care:** Charges for Hospital and medical services related to Pregnancy, including prenatal and postpartum care, delivery and care for complications of Pregnancy for all female Covered Persons. Inpatient care includes confinement for forty-eight (48) hours following a vaginal delivery, or ninety-six (96) hours following a cesarean delivery, unless the Covered Person's Physician determines it is not Medically Necessary

for the Covered Person to remain hospitalized. If the Physician discharges the mother prior to these times, the Plan will cover Medically Necessary home care provided within seventy-two (72) hours of discharge. Terminations of Pregnancy other than spontaneous abortions and abortions to save the life of the mother are not covered under this Plan.

Group health plans and health insurance issuers may not, under Federal law, restrict benefits for any Hospital length of stay in connection with childbirth for the mother or Newborn child to less than forty-eight (48) hours following a vaginal delivery, or less than ninety-six (96) hours following a cesarean section. However, Federal law generally does not prohibit the mother's or Newborn's attending Provider, after consulting with the mother, from discharging the mother or her Newborn earlier than forty-eight (48) hours (or ninety-six (96) hours as applicable). In any case, plans and issuers may not, under Federal law, require that a Provider obtain authorization from the Plan or the insurance issuer for prescribing a length of stay not in excess of forty-eight (48) hours (or ninety-six (96) hours).

S. **Medical Supplies:** Charges for Medically Necessary medical supplies which meet Medicare guidelines, such as ostomy supplies, casts, splints and trusses.

T. **Mental/Nervous Disorders, Alcoholism and Substance Abuse:** Charges for Inpatient services and Outpatient services furnished in a Hospital Outpatient department, licensed Outpatient treatment facility or medical offices for treatment of Mental/Nervous Disorders (including autism), Alcoholism and Substance Abuse, including partial hospitalization and necessary family interviews. Covered Expenses include services and supplies for the treatment of autism. Effective August 10, 2016, behavioral therapy, including applied behavioral analysis (AB therapy) will be covered for the treatment of autism only.

U. **Newborns:** Charges for services provided to a well Newborn from birth until the initial discharge from the Hospital following birth, including routine circumcisions. The Newborn must be an eligible Dependent and properly enrolled in the Plan as described in Article V.

V. **Organ and Tissue Transplants:** Charges for Covered Expenses incurred in conjunction with Medically Necessary, non-Experimental/Investigative organ transplants that are not covered through the separate Organ and Tissue Transplant Policy described in Section 10.1 due to any pre-existing conditions or other restrictions of such policy will be covered under this provision in accordance with all of the terms and exclusions of this Plan, subject to the following:

1. all organ transplants must be coordinated through the Plan Administrator to be eligible for benefits under the Plan. Once a Covered Person becomes aware of the possibility of an organ transplant, the Covered Person must contact the Plan Administrator. The Plan Administrator will provide the Covered Person with a list of Transplant Network Facilities, and will help to coordinate referral to a Transplant Network Facility. If one (1) of these facilities is not utilized, expenses related to the transplant will not be covered under this Plan;

2. the human organ or tissue transplants must be Medically Necessary and not Experimental or Investigative, and must be appropriate for the condition being treated. This does not include:

   a. non-human or artificial organs and their implantation; or

   b. bone marrow or peripheral stem cell rescue associated with high dose chemotherapy for solid tissue tumors (except for neuroblastoma in children and breast cancer);

This does include treatment, services or supplies otherwise covered under the Plan if furnished to a transplant donor. The donor does not have to be a Covered Person

60

under the Plan. However, the donor must be charged for the services and must not have coverage elsewhere;

3. the Plan is not responsible for any Covered Person's decision to receive treatment, services or supplies from a Transplant Network Facility, nor does the Plan make warrants or representations regarding the qualification of Providers of treatment, services or supplies provided by a Transplant Network Facility;

4. covered body organ or tissue transplants include:
   a. kidney;
   b. heart;
   c. heart and lung together;
   d. liver;
   e. pancreas (when the condition is not treatable by use of insulin therapy);
   f. bone marrow;
   g. cornea; and
   h. lung; and

5. when a Covered Person is receiving an organ transplant at a Transplant Network Facility and resides more than fifty (50) miles from the Transplant Network Facility site, associated travel expenses will be covered under the Plan. Associated travel expenses include:
   a. commercial transportation to and from the site of the organ transplant for the Covered Person receiving the organ transplant and one (1) companion; and
   b. Reasonable and necessary lodging and meals incurred by the Covered Person receiving the organ transplant and one (1) companion.

W. **Outpatient Health Care Services:** Charges for Health Care Services furnished at medical offices or other licensed Outpatient facilities by Physicians, including, but not limited to:
   1. general and routine care;
   2. emergency and specialty Medical Care;
   3. surgical procedures;
   4. anesthesia services; and
   5. consultations and treatment.

X. **Physician's Services:** Charges for Physician's services provided at a Hospital or other Inpatient facility, including surgical and anesthesia services, while the Covered Person is an Inpatient or Outpatient, including emergency room services.

Charges for multiple surgical procedures performed during the same operative session will be limited as described in the definition on page 31. Covered Expenses, including both Physician and facility expenses, for robotic surgical procedures and related expenses will be limited to the Reasonable and Customary charge for the same surgical procedure performed under standard methods.

Y. **Preventive Health Services:** Charges for the following routine wellness services:
   1. any Recommended Wellness Services (as defined on page 32);
   2. routine prostate examinations and testing; and
   3. routine hearing and eye examinations. Eye examinations are not covered under this provision for any person enrolled in the Vision coverage, unless included in the Recommended Wellness Services.

Examinations performed for employment, insurance, recreation, immigration, school acceptance or licenses are not covered under this Plan, except as specifically included in the covered Recommended Wellness Services.

Z. **Radiology and Laboratory Services:** Charges for radiology and laboratory services, including diagnostic x-rays, x-ray therapy, and therapeutic radiology services.

AA. **Reconstructive Surgery:** Charges for reconstructive surgery necessary to repair a dysfunction or disfigurement resulting from Injury, tumor or congenital anomaly which has resulted in a functional defect or deficit. Covered Expenses include breast reconstruction in connection with a mastectomy, including:

1. reconstruction of the breast on which the mastectomy was performed;
2. surgery and reconstruction of the other breast to produce a symmetrical appearance; and
3. prostheses and physical complications of all stages of mastectomy, including lymphedemas.

Such reconstruction must be performed in a manner determined in consultation with the attending Physician and the Covered Person.

AB. **Short Term Rehabilitation:** Charges for Medically Necessary short-term rehabilitation services, subject to the limitations listed in Section 2.7.

AC. **Sleep Studies:** Charges for sleep studies and other treatment of serious sleep disorders, such as obstructive sleep apnea. Prior authorization is required for sleep therapy.

AD. **Skilled Nursing Facility:** Charges for Semi-Private Room and Board and Medical Care and treatment in a Skilled Nursing Facility, subject to the limitations listed in Section 2.7. Private rooms are covered only if Medically Necessary. Drugs, medications and supplies administered by the Skilled Nursing Facility are covered while the Covered Person is an Inpatient. The Skilled Nursing Facility stay must be requested and authorized by the Covered Person's Physician, and precertification from the Plan must be obtained as described in Article VI. Skilled Nursing Facility benefits do not include custodial care or care for Alcoholism and Substance Abuse or Mental/Nervous Disorders.

AE. **Spinal Manipulation:** Charges for spinal manipulations are covered if performed by a Doctor of Osteopathy (DO) or a chiropractor.

AF. **Therapy Services:** Charges for physical therapy, occupational therapy or speech therapy, subject to the limitations listed in Section 2.7.

AG. **TMJ:** Charges for the treatment of temporomandibular joint (TMJ) dysfunction syndrome when Medically Necessary. TMJ services which are determined to be dental and splints and other orthotic devices are not covered under this Plan.

AH. **Tobacco Cessation:** Charges related to tobacco cessation programs for any of the following:

1. screening for tobacco use; and
2. the counseling services of a Physician, subject to the limitations listed in Section 2.7.

Products and drugs used in connection with tobacco cessation are covered under the Company's separate prescription plan.

AI. **Total Parenteral Nutrition:** Charges for total parenteral nutrition provided in lieu of care in a Hospital or Skilled Nursing Facility, subject to the limitations listed in Section 2.7.

AJ. **Weight Loss:** Charges for the Medically Necessary surgical or non-surgical treatment of weight loss, and any complications of such treatments, through a Marietta Memorial

Hospital PHO Provider only. Covered Persons seeking surgical treatment must be age eighteen (18) or older and meet the requirements set forth in the definition of Morbid Obesity, listed on page 31.

# ARTICLE X

## OTHER MEDICAL BENEFITS

### 10.1 ORGAN AND TISSUE TRANSPLANT BENEFITS

Human organ and tissue transplant benefits are provided according to the terms and conditions set forth in a separate Organ & Tissue Transplant Policy (Transplant Policy) that has been issued to the health plan. Transplant related benefits will be provided to each Covered Person during the transplant benefit period specified in the Transplant Policy. Once the transplant benefit period has elapsed, all-transplant related expenses will revert back to the health plan, subject to its terms and conditions.

Transplant related benefits are only available to individuals that:

    A.  are eligible for medical benefits under this health Plan; and

    B.  meet all the terms and conditions outlined in the Transplant Policy; and

    C.  have fulfilled the pre-existing condition waiting period (if applicable) as defined in the Transplant Policy.

Covered Persons that are subject to a pre-existing condition waiting period under the Transplant Policy will receive transplant benefits according to the terms and conditions of this Plan until the pre-existing condition waiting period under the Transplant Policy has elapsed.

# ARTICLE XI

## DESCRIPTION OF DENTAL BENEFITS

### 11.1 DENTAL BENEFITS – COVERED EXPENSES

Covered dental care services must be performed and billed by a Dentist, a Physician or a Dental Hygienist acting within the scope of his or her license. All services must be necessary based on accepted standards of dental practice as determined by the appropriate regulatory agency.

### 11.2 ALTERNATE COURSE OF TREATMENT

In some situations, there may be more than one (1) accepted method of dental practice to treat a condition. When there are two (2) or more acceptable methods of treating a condition, Covered Expenses will be based on the method which is the least expensive. The Plan Administrator will notify the Covered Person and his or her dentist of the benefits or treatment certified as payable on the course of treatment.

### 11.3 PREDETERMINATION OF BENEFITS

When the expected cost of a proposed treatment exceeds the amount listed in Section 2.12, the Covered Person's dentist should submit a treatment plan including the following to the Benefit Manager, as the designee of the Plan Administrator to handle claims, before the treatment begins:

    A. a list of the services to be done, using the American Dental Association (ADA) nomenclature and codes;

    B. the itemized cost of each service;

    C. the estimated length of treatment; and

    D. dental x-rays, study models and whatever else is needed to evaluate the treatment plan.

The Benefit Manager will review the treatment plan and estimate what will be considered as Covered Expenses under this Plan. The estimate will be sent to the Covered Person's Dentist. If the Benefit Manager does not agree with the treatment plan, or if one (1) is not sent in, the Plan has the right to base the Covered Expenses on treatment suited to the Covered Person's condition by accepted standards of dental practice.

Pre-determination of benefits is not a guarantee of payment. Final payment of benefits is based on:

    A. the work being done as proposed and while the individual is a Covered Person under this Plan; and

    B. the Deductible, maximums and all other terms of this Plan.

This requirement does not apply to treatment plans costing less than the amount listed in Section 2.12, emergency treatment, routine oral examinations, x-rays, Prophylaxis and Fluoride treatments.

### 11.4 CLASS I – DIAGNOSTIC AND PREVENTIVE DENTAL SERVICES - COVERED EXPENSES

The following services are covered as Class I services, subject to the Coinsurance listed in Section 2.10 and the Calendar Year maximum listed in Section 2.11, and the limitations listed below:

    A. initial and periodic oral examinations, supplementary Bitewing x-rays, Prophylaxis and Topical Application of Fluoride, all limited to twice for each service in any twelve (12) consecutive months. If both Bitewing and panorex x-rays are done, such services will be considered as full-mouth x-rays under Class II;

    B. emergency treatment for pain and emergency oral examinations;

65

C.  space maintainers that replace prematurely lost teeth for Dependent children under age nineteen (19);

D.  dental specialist examinations, limited to one (1) exam per specialty every thirty-six (36) months; and

E.  periapical x-rays.

## 11.5 CLASS II –PRIMARY DENTAL SERVICES - COVERED EXPENSES

The following services are covered as Class II services, subject to the Deductible listed in Section 2.9, the Coinsurance listed in Section 2.10 and the Calendar Year maximum listed in Section 2.11, and the limitations listed below:

A.  Maintenance services, including:

1.  x-ray examinations not covered under Class I services, including full mouth, limited to one (1) set per each consecutive thirty-six (36) month period;

2.  management of acute infections and oral lesions;

3.  routine fillings to restore diseased or accidentally broken teeth, including fillings made of any of the following:

    a.  Amalgam;

    b.  Silicate;

    c.  Acrylic;

    d.  synthetic porcelains; or

    e.  Composite materials;

4.  repair of removable Dentures;

5.  recementing of Crowns, Inlays, Onlays and Bridges;

6.  Denture adjustments and Relining performed at least six (6) months after the installation of the Denture, limited on once in each consecutive thirty-six (36) month period;

7.  fixed Bridge repairs; and

8.  pit and fissure Sealants on unrestored and non-decayed areas of posterior teeth for Dependent children under age nineteen (19), limited to once in each consecutive thirty-six (36) month period;

B.  Endodontic Therapy, including:

1.  Root Canal Therapy;

2.  direct pulp capping; and

3.  pulpotomy;

C.  oral surgical procedures, including:

1.  tooth extractions, including surgical extractions;

2.  Apicoectomy;

3.  removal of a root of a multi-rooted tooth and its related crown portion, or a root resection; or

4.  general Anesthesia in connection with the above services or with Periodontic services. General Anesthesia in connection with restorative services is paid under the applicable class of the services with which it is rendered; and

D.  Periodontic services, including:

1.  Gingivectomy;

2.  Gingivoplasty;

————————————— Marietta Memorial Hospital Employee Health Benefit Plan Summary Plan Description

    3.  Gingival Curettage;

    4.  Osseous Surgery;

    5.  mucogingivoplasty surgery; and

    6. periodontal Scaling and root planning.

## 11.6 CLASS III –PROSTHETIC AND COMPLEX RESTORATIVE DENTAL SERVICES - COVERED EXPENSES

The following services are covered as Class III services, subject to the Deductible listed in Section 2.9, the Coinsurance listed in Section 2.10 and the Calendar Year maximum listed in Section 2.11, and the limitations listed below:

A. complex restorative services, including:

    1.  Inlays, Onlays and Crown Restorations for diseased or accidentally broken teeth. Crown Restorations include post and care and/or Crown build-up when appropriate. These types of Restorations are covered only if regular fillings would not adequately restore the teeth (not part of a Bridge). Covered Expenses for porcelain or other veneer Crowns placed on molars will be limited to the Reasonable and Customary charge for a full cast gold Crown or cast gold Pontic;

    2.  bony and/or tissue impacted wisdom teeth; and

    3.  replacements for Inlays, Onlays and Crown Restorations which were originally installed while this coverage was in effect, but only if such Restoration cannot be repaired and is at least five (5) years old; and

B. prosthetic services, including:

    1.  initial installation of Dentures (full or partial) and the initial installation of Bridges; and

    2.  replacements for Dentures or Bridgework installed while coverage was in effect or the addition of false teeth to these Appliances, but only if one (1) of the following conditions exists:

        a.  the Denture or Bridgework cannot be repaired, and the Appliance is at least five (5) years old;

        b.  the existing Denture is an immediate temporary Denture which must be replaced within one (1) year; or

        c.  the Covered Person has had more teeth extracted.

## 11.7 CLASS IV – ORTHODONTIC COVERED EXPENSES

Eligibility for orthodontic coverage is limited to Dependent children through the age of nineteen (19). Orthodontic treatment is subject to the Coinsurance listed in Section 2.10 and the Lifetime maximum listed in Section 2.11.

Covered Expenses include:

A. office records, including cephalometric film;

B. comprehensive full banding of the permanent dentition;

C. initial retention;

D. Appliances and office visits for retention; and

E. Post treatment stabilization.

Benefits for Orthodontic services will be made over the entire course of the treatment and prorated, provided the person remains eligible for such benefits.

When oral exams, surgery, extractions and other covered services are rendered in connection with Orthodontic treatment, those services are considered to be part of the orthodontic course of

treatment and are paid as Class IV expenses, subject to the applicable Lifetime maximum listed in Section 15.3.

When a Covered Person is already receiving active or retention treatment on their effective date of coverage under this Plan, the prorated amount for the number of months of treatment provided before such effective date will be subtracted from the total benefits payable.

# ARTICLE XII
## DESCRIPTION OF VISION BENEFITS

### 12.1 VISION BENEFITS – COVERED EXPENSES

In order to be eligible for benefits under this section of the Plan, charges actually incurred by a Covered Person must be administered or ordered by an Optometrist or ophthalmologist or dispensed by an optician. Vision expenses are also subject to the maximums and frequency limitations listed in Sections 2.15 and 2.16.

Covered charges include the following:

    A. Vision examination - a comprehensive examination of the visual functions to determine the presence of visual problems or other abnormalities.

    B. Standard single vision or multifocal lenses in basic plastic or glass. The following extra items are covered only if obtained from a Participating Provider:

        1. Pink #1and #2 Solid Tints; and

        2. ground-in prisms.

    C. Frames.

    D. Cosmetic Contact Lenses. Benefits are provided, up to the limitations listed in Sections 2.15 and 2.16, for Cosmetic Contact Lenses in lieu of any other benefits for lenses or frames during the same benefit periods.

    E. Medically Necessary Contact Lenses. Benefits are provided, up to the limitations listed in Sections 2.15 and 2.16, for Medically Necessary Contact Lenses in lieu of any other benefits for lenses or frames during the same benefit periods. Medically Necessary Contact Lenses require pre-authorization from the Benefit Manager.

A Covered Person is not entitled to coverage for both Cosmetic Contact Lenses and Medically Necessary Contact Lenses during the same benefit period.

### 12.2 PARTICIPATING PROVIDER CLAIMS

To obtain services from a Participating Provider under the Plan, first the Covered Person should obtain a list of such Providers from the Plan Administrator. The Covered Person then selects a Participating Provider from this list, and makes an appointment to have an eye examination. The Participating Provider will call the Benefit Manager to determine the Covered Person's eligibility for benefits.

The Participating Provider will perform services and supply materials in accordance with the Plan benefits. The Participating Provider will bill the Covered Person for any excess amounts due for services above the scheduled amounts or for benefits not covered under the Plan.

Claims for services received from non-Participating Providers should be submitted in accordance with the claims procedures described in Section 4.1.

### 12.3 LIMITATIONS ON CHARGES BY PARTICIPATING PROVIDERS FOR NON-COVERED EXTRAS

The following items are not covered under the Plan. However, the contract made with the Participating Provider limits the amount such Provider can charge on the most commonly selected extras listed below. Because of this limitation, in most instances, the Participating Provider's charges on these non-covered extras will be at or below what the Covered Person would otherwise be required to pay for these materials. The Covered Person will be responsible for the costs of these non-covered items. The cost of these items is not controlled if they are purchased from non-Participating Providers. The extras include:

    A. photochromics, (glass and plastic);

    B. scratch resistant coatings;

C.  solid, sun and gradient tints, except as specifically listed as covered under this Plan;

D.  color coating;

E.  oversize lenses (61mm and over);

F.  rimless;

G.  polycarbonate lenses;

H.  progressive or blended lenses;

I.  ultraviolet coating;

J.  anti-reflective coating;

K.  high index lenses; and

L.  roll and polish and edge coating.

———————————————— Marietta Memorial Hospital Employee Health Benefit Plan Summary Plan Description

## ARTICLE XIII
## EXCLUSIONS AND LIMITATIONS

### 13.1    MEDICAL PLAN BENEFIT EXCLUSIONS AND LIMITATIONS

The following exclusions and limitations apply to all medical expenses incurred by all Covered Persons and to all medical benefits provided by this Plan. Any exclusion listed below shall not apply to the extent that coverage for the service or supply is specifically provided under this Plan, or that the exclusion is prohibited under any applicable law.

A. **Abortions:** Charges for services received in connection with non-medically indicated abortions.

B. **Alternative Treatments:** Charges for alternative methods of treatment, including, but not limited to:
1. accupressure;
2. acupuncture, unless performed by the Marietta Memorial PHO/Tier I Provider;
3. naturopathy;
4. psychosurgery;
5. massage therapy;
6. megavitamin therapy;
7. nutritionally based Alcoholism therapy;
8. holistic or homeopathic care, including drugs;
9. ecological or environmental medicine;
10. hypnotherapy or hypnotic anesthesia;
11. hippotherapy; and
12. sleep therapy, except for central or obstructive apnea when authorized by the Plan.

C. **Before or After Effective Date:** Charges for services provided either before the effective date of the person's coverage under this Plan or after such person's coverage is terminated, unless provisions have been made to extend coverage.

D. **Beyond Scope of Practice:** Charges for services performed beyond the scope of practice authorized by law for the type of Practitioner performing them under the state law.

E. **Birth Control:** Charges for birth control drugs and devices not specifically listed as a Covered Expense under this Plan, including items not approved by the FDA or prescribed for males.

F. **Close Relative/Residing With:** Charges for services performed by any Provider who is a Close Relative, or any person normally residing in the Covered Person's home.

G. **Completion of Forms:** Charges for the completion of any form or for medical information.

H. **Complications:** Charges related to complications of any non-covered services, including the diagnosis or treatment of any condition which arises as a complication of a non-covered service (e.g., services or supplies to treat a complication of cosmetic surgery).

I. **Cosmetic Services:** Charges for surgery and other Cosmetic Services performed for cosmetic rather than functional purposes, except as specifically listed as a Covered Expense under this Plan.

J. **Counseling:** Charges for marriage counseling, family counseling, bereavement counseling, pastoral counseling, financial counseling, legal counseling and custodial care counseling.

71

K. **Court Ordered:** Charges for services ordered by a court as a condition of parole, probation or other legal action.

L. **Custodial Care:** Charges for confinement in a nursing home for custodial, convalescent, intermediate level, or domiciliary care, rest cures or care, or services to assist in activities of daily living.

M. **Criminal Acts:** Charges resulting from the commission of a crime or any illegal act.

N. **Dental:** Charges for all general dental services not specifically listed as a Covered Expense under this Plan, including, but not limited to:

1. replacement of lost teeth or gums;
2. root canal treatments;
3. periodontal disease treatments; and
4. removal of teeth, except the surgical removal of impacted teeth.

Orthognathics is not covered.

O. **Diabetes Drugs/Supplies:** Charges for diabetic drugs and supplies not specifically listed as covered under the Plan.

P. **Dietary Supplements:** Charges for nutrients, vitamins and food supplements.

Q. **Education/Training:** Charges for training and education programs including vocational rehabilitation programs, except as specifically listed as a Covered Expense under this Plan or as included in the Recommended Wellness Services.

R. **Experimental/Investigative:** Charges for medical, surgical or other health care procedures, drugs or devices deemed by the Plan Administrator, in its discretion, to be Experimental or Investigative.

S. **Eyeglasses/Contacts:** Charges for the purchase and/or fitting of eyeglasses or contact lenses, except as specifically listed as a Covered Expense under this Plan.

T. **Eye Surgery:** Charges for radial keratotomy, myopic keratomileusis, LASIK procedures and any surgery involving corneal tissue for the purpose of altering, modifying or correcting myopic, hyperopia or stigmatic error.

U. **Failure to Keep Appointments:** Charges incurred as a result of the Covered Person's failure to keep a scheduled appointment.

V. **Foot Care:** Charges for the removal of corns, calluses, trimming of toenails and other routine podiatry services, unless the patient has a diagnosis of systemic medical disease affecting the lower limbs. Routine foot care services are considered Medically Necessary for peripheral vascular disease, metabolic or neurological disease and may be covered. Treatment of weak, strained or flat feet is not covered under this Plan. In addition, orthotic and/or supportive devices for the feet, including, but not limited to, orthopedic shoes, are also not covered under this Plan.

W. **Foreign Travel Immunizations:** Charges for immunizations related to foreign travel, except as specifically included in the Recommended Wellness Services.

X. **Genetic Services:** Charges for genetic counseling and surgical procedures performed as a result of genetic testing if performed from other than a Marietta Memorial PHO/Tier I Provider, or for genetic tests or related services that are not specifically listed as a Covered Expense under this Plan or included in the Recommended Wellness Services.

Y. **In Custody:** Charges for services received while incarcerated or in the custody of law enforcement officials when such is the financial responsibility of the applicable prison system.

Z. **Infertility:** Charges for reproductive technologies, including, but not limited to, in vitro fertilization, artificial insemination, GIFT and ZIFT.

AA. **Hearing:** Charges for hearing aids, other than as specifically listed as covered through a Marietta Memorial PHO/Tier I Provider, or for cochlear implants.

AB. **Lifestyle Improvement:** Charges for lifestyle improvement services, including but not limited to physical fitness programs and equipment, spas, air conditioners, humidifiers, personal hygiene and convenience items, mineral baths, massage and dietary supplements.

AC. **Medical Equipment:** Charges for the following medical equipment:
1. electric scooters;
2. modifications to motor vehicles or homes such as wheelchair ramps or lifts, water therapy devices such as Jacuzzis or hot tubs and exercise equipment; and
3. non-Medically Necessary braces, splints and corrective appliances.

Foot orthotics are not covered under this Plan.

AD. **Medically Necessary:** Charges which are determined not to be Medically Necessary for the treatment of an Illness or Injury, except as specifically listed as Covered Expense under this Plan.

AE. **Mental Health:** Charges for mental health services relating to any of the following, unless specifically listed as a Covered Expense under this Plan:
1. behavioral therapy;
2. modification or training;
3. milieu therapy;
4. sensitivity training;
5. marital counseling; and
6. Inpatient hospitalization for environmental change.

AF. **Military Service Related:** Charges for services received by veterans for any disease or Injury suffered as a result of or while in the military service to the extent that said services can be performed by a Veterans Administration Facility in the Covered Person's local area.

AG. **No Obligation to Pay:** Charges for any service that the Covered Person is not legally obligated to pay in the absence of this coverage, with the exception of charges made by volunteer ambulance organizations.

AH. **Not Specifically Covered:** Charges for any treatment, services or supplies which are not specifically set forth as covered under this Plan.

AI. **Organ/Tissue Transplants:** Charges for transplants that are covered under the Transplant Policy described in Section 10.1, or that are performed in a facility that is not a contracting Transplant Network Facility.

AJ. **Organ Donor:** Charges incurred by a Covered Person as an organ donor, including, but not limited to costs associated with harvesting, storage, and transport costs, unless the transplant recipient is also a Covered Person under this Plan.

AK. **Other Vision coverage:** Charges for routine vision exams are not covered under the medical provisions of the Plan if the Covered Person is enrolled in this Plan's separate vision coverage, unless included in the Recommended Wellness Services.

AL. **Prescription Drugs:** Charges for prescription drugs, except as administered to a Covered Person while a patient in a Hospital or emergency facility or as specifically listed as a

73

Covered Expense under this Plan. Prescription drugs purchased on an Outpatient basis may be covered under the Company's separate prescription drug plan.

AM. **Personal Comfort Items:** Charges for personal or comfort items (such as radio, TV, telephone and guest meals) during Inpatient hospitalization or Skilled Nursing Facility stays.

AN. **Private Duty Nursing:** Charges for private duty nursing, except as covered under the hospice or home health care benefits.

AO. **Private Rooms:** Charges for private rooms during Inpatient hospitalization or a Skilled Nursing Facility stay, unless Medically Necessary.

AP. **Reasonable & Customary:** Charges to the extent that they exceed the Reasonable and Customary charge for the service or supply in question.

AQ. **Reversal of Sterilization:** Charges for reversals of voluntarily induced sterilization.

AR. **Riot:** Charges for treatment of an Illness or Injury incurred as a result of the Covered Person's voluntary participation in a riot.

AS. **Routine Examinations:** Charges for examinations specifically for the purpose of employment, recreation, insurance, immigration, school attendance or licensure, unless such services are otherwise included in the Recommended Wellness Services.

AT. **Self-Inflicted Injury:** Charges for any expenses resulting from voluntarily self-inflicted Injury or Illness or voluntarily attempted self-destruction, unless such act was the result of an underlying health condition, such as depression.

AU. **Sexual Dysfunction:** Charges related to treatment of sexual dysfunction not related to organic disease. This exclusion does not include any Medically Necessary psychological counseling in relation to sexual dysfunction.

AV. **Sexual Reassignment:** Charges related to sexual reassignment, including, but not limited to, surgery and hormonal therapy.

AW. **Telephone Consultations:** Charges for telephone consultations.

AX. **Transportation Services:** Charges for non-Emergency transportation between institutional care facilities , or to and from a Covered Person's residence.

AY. **Unbundled Services:** Charges submitted by a Tier II or Tier III provider for services which have not been bundled in accordance with the Centers for Medicare and Medicaid Services (CMS) guidelines.

AZ. **Vision Therapy:** Charges for low vision therapy or behavioral vision therapy.

BA. **War:** Charges resulting from war or any act of war, whether declared or undeclared.

BB. **Weight Loss:** Charges for dietary products or supplies, treatment for reducing or controlling weight, including gastric restrictive procedures, obesity treatment and exercise programs unless listed as a Covered Expense as described in Section 9.1 of the Plan.

BC. **White Fence Surgical Suites:** Services obtained through White Fence Surgical Suites will not be covered under the Plan, regardless of whether the Provider is part of any designated Preferred Provider network.

BD. **Worker's Compensation:** Charges related to any sickness or Injury for which coverage is available in whole or in part under any worker's compensation act or similar legislation.

## 13.2 DENTAL BENEFIT EXCLUSIONS AND LIMITATIONS

The following exclusions and limitations apply to dental expenses incurred by all Covered Persons and to all dental benefits provided by this Plan. Any exclusion listed below shall not apply to the extent that coverage for the service or supply is specifically provided under this Plan, or that the exclusion is prohibited under any applicable law:

A. **Analgesia:** Charges for local or partial Anesthesia (analgesia), including intravenous sedation.

B. **Benefits Provided by Governmental Units:** Charges to the extent that they are provided as a benefit by any governmental unit. This exclusion shall not apply to the extent that applicable law prohibits such exclusion.

C. **Close Relative:** Charges for services or supplies received from the Covered Person's Close Relative.

D. **Congenital Malformation:** Charges for services or supplies necessary to correct a congenital or developmental malformation.

E. **Cosmetic Treatment:** Charges for cosmetic treatment intended primarily to improve appearance but not to restore body function or correct deformity from disease, trauma, or prior therapeutic processes including:

    1. treatment of cleft palate;

    2. anodontia and mandibular prognathicism;

    3. capping teeth to cover stains;

    4. laminate veneers; and

    5. shaping false teeth to make them look like the real teeth they replace.

F. **Covered under Medical Plan:** Charges for services and supplies to the extent that such charges are paid under a medical plan. Any remaining charges for services or supplies not paid by the medical provisions of this Plan will be considered under the dental provisions of this Plan.

G. **Crowns under 16:** Charges for permanent Crowns for Covered Person under age sixteen (16).

H. **Duplicate Appliances:** Charges for a duplicate (spare) prosthetic device or Appliance.

I. **Education and Convenience:** Charges for plaque control programs, dietary or oral hygiene instruction and convenience items.

J. **Employment Related:** Charges for services or supplies which are for an Illness or Injury occurring in the course of employment if whole or partial compensation is available under the laws of any governmental unit. This exclusion applies whether or not the Covered Person claims such compensation or recovers losses from a third party.

K. **Employer's Medical/Dental Department:** Charges received from a dental or medical department maintained by or on behalf of an employer, mutual benefit association, labor union, trust or similar person or group.

L. **Excessive Charges due to Transfer to Another Dentist:** Excessive charges resulting from the repetition of services or replacement of Appliances when not necessary which are the result of the Covered Person's transfer from one (1) Dentist to another during a course of treatment, including, but not limited to charges for:

    1. missed appointments;

    2. services which were rendered by more than one (1) Dentist; or

    3. Restoration of the same tooth surface within six (6) months.

Marietta Memorial Hospital Employee Health Benefit Plan Summary Plan Description————————

M. **Experimental/Investigative:** Charges for services or supplies which are Experimental or Investigative or related to such, whether incurred prior to, in connection with, or subsequent to the Experimental or Investigative service.

N. **Gold Foil Restorations:** Charges for gold foil Restorations.

O. **Impressions prior to Effective Date:** Charges for prosthetic devices or Crowns installed after a Covered Person's effective date of coverage under this Plan, if the Impressions were taken prior to such effective date.

P. **Installation after Termination:** Charges for prosthetic devices or Crowns after the person's coverage under this Plan is terminated, even if the Impressions were taken while the coverage was in effect.

Q. **Loss or Theft:** Charges resulting from the loss or theft of an artificial Denture or orthodontic Appliance.

R. **Medicare:** Charges for which benefits are payable under Medicare Part A and/or Medicare Part B, or would have been payable if the Covered Person had applied for Medicare Part A or Medicare Part B, except when the laws and regulations governing the Medicare program require that this Plan pay its benefits as primary.

S. **Non-Dental Charges:** Charges for telephone consultations, missed appointments, completion of claim forms, or medical records.

T. **No Legal Obligation to Pay:** Charges which the Covered Person has no legal obligation to pay in the absence of this or like coverage.

U. **No Satisfactory Result:** Charges for services for which a satisfactory result cannot be obtained in the professional judgment of the attending Dentist.

V. **Not Medically Necessary:** Charges wthat the Plan Administrator determines are not Medically Necessary.

W. **Not Prescribed/Performed by Physician/Dentist:** Charges for services or supplies which are not prescribed by or performed by or upon the direction of a Physician or Dentist.

X. **Not Specifically Listed as Covered:** Charges for services or supplies which are not specified in this Plan as Covered Expenses.

Y. **Occlusal Adjustment:** Charges for Restorations or Appliances to restore or correct the Occlusion.

Z. **Other Than a Provider:** Charges for services or supplies which are received from other than a Dentist, a Physician or a Dental Hygienist.

AA. **Personalized/Specialized Dentures or Bridges:** Charges for personalized Restorations and specialized techniques in constructing Dentures or Bridges.

AB. **Prior/Subsequent to Effective Date:** Charges for services or supplies rendered or furnished prior to the Covered Person's effective date of coverage under this Plan, or subsequent to the person's termination of coverage under this Plan.

AC. **Reasonable and Customary:** Charges in excess or the Reasonable and Customary charge for a service or supply.

AD. **Stabilization of Teeth:** Charges for services and supplies to stabilize the teeth in their supporting structures, including periodontal Splinting and implantology, or for extra oral grafts.

AE. **TMJ:** Charges related to temporomandibular joint (TMJ) dysfunction or disorder.

——————————————————— Marietta Memorial Hospital Employee Health Benefit Plan Summary Plan Description

AF. **Vertical Dimension:** Charges for Restorations or Appliances to increase Vertical Dimension.

AG. **Visits:** Charges for visits at home, in a nursing home, or in a Hospital, except for visits in connection with oral surgery or Emergency care.

AH. **War, Riot, etc.:** Charges for dental care required due to an Illness, Injury, disease or physical condition caused by an act of war, riot, insurrection, civil disobedience, nuclear explosion or accident or major disaster.

## 13.3 VISION PLAN BENEFIT EXCLUSIONS AND LIMITATIONS

The following exclusions and limitations apply to expenses incurred by all Covered Persons and to all vision benefits provided by this Plan. Any exclusion listed below shall not apply to the extent that coverage for the service or supply is specifically provided under this Plan, or that the exclusion is prohibited under any applicable law:

A. **Auxiliary Testing:** Charges for auxiliary testing not included as part of the normal service.

B. **Before and After Coverage Terminates:** Charges for services or supplies provided before a Covered Person's coverage begins or after it ends.

C. **Covered under Another Contract:** Charges for services or supplies which are covered by some other contract.

D. **Employment Related:** Charges for services or supplies resulting from the Covered Person's employment.

E. **Excess Contact Lens Allowance:** Cosmetic Contact Lenses in excess of Plan allowances listed in Sections 2.15 and 2.16.

F. **Excess Frame Allowance:** Charges for a frame in excess of the Plan allowance listed in Sections 2.15 and 2.16.

G. **Extra Pairs in Lieu of Bifocals:** Charges for two (2) pairs of glasses in lieu of bifocals.

H. **Extras:** Charges for any extra item listed in Section 12.3 that is not otherwise specifically listed as a Covered Expense under this Plan, or for any extra item listed under Section 12.3 which is obtained from a non-Participating Provider.

I. **Lost, Stolen or Broken Glasses:** Charges for services or supplies to replace lenses or frames which are lost, stolen or broken except at the Covered Person's normal eligibility intervals.

J. **Medical/Surgical:** Charges for medical or surgical treatment of the eyes.

K. **No Legal Obligation to Pay:** Charges for which the Covered Person has no legal obligation to pay or for which no charge would be made if the Covered Person had no vision coverage.

L. **Not Specifically Listed as Covered:** Charges for any services or supplies for which are not specifically listed as a Covered Expense under the vision coverage.

M. **Orthoptics/Vision Training:** Charges for orthoptics or vision training; subnormal vision aids; or nonprescription lenses.

N. **Prescription Drugs:** Charges for prescription drugs or any other medication.

O. **Provided Free by Clinic:** Charges for services or supplies which are provided free by a clinic which is operated by or for the Employer, union or similar group.

P. **Safely Glasses/Goggles:** Charges for safety glasses or safety goggles.

Marietta Memorial Hospital Employee Health Benefit Plan Summary Plan Description

Q. **Sales Tax:** Charges for sales tax.

R. **Work Related:** Charges for services or materials provided as a result of any worker's compensation law or similar legislation, or obtained through or required by any governmental agency or program whether federal, state or any subdivision thereof.

# ARTICLE XIV
# GENERAL INFORMATION

## 14.1    COORDINATION OF BENEFITS

Coordination of benefits (COB) is a feature that prevents duplicate payment under this Plan and other health insurance or prepayment plans, including Medicare Part A or Part B or other types of insurance. A Covered Person may have coverage under this Plan, some other health plan of coverage or other kind of insurance policy at the same time. Other health plans of coverage include a group sickness and accident insurance policy or program, a group contract of a health maintenance organization, an individual sickness and accident insurance policy and an individual contract of a health maintenance organization. Other kinds of insurance policies include your automobile insurance policy's medical payments and uninsured motorist's coverage. For example, a person may be covered by an employer's group insurance program and also by the group program provided by a spouse's employer. Or a person may be covered by an employer's group insurance and also have coverage under a parent's group plan.

If a Covered Person files a claim under this Plan for services or supplies that are also covered under another plan or insurance policy, for instance, one of the plans or policies listed in the first paragraph, payments will be "coordinated." This means that this Plan will adjust its benefit payments so that combined payments under this and any other health plan(s) or insurance policy will be no more than the usual, Customary, and Reasonable fee payments.

Once a Covered Person has provided this Plan with information about other health benefits plans and health benefits under other insurance policies under which he or she has coverage, the Plan will handle the coordination. This will be done according to the "Order of Benefit Determination." The Order of Benefit Determination works as follows:

A.  The plan that pays first is called the primary plan. Any other plan that covers the Covered Person is called the secondary plan. A group or individual plan or policy that does not contain a COB feature is always primary.

B.  A plan that covers a person as the certificate holder or the contract holder is primary. In the two examples given, the coverage the person has through his or her employer would be primary. The coverage through a spouse's or parent's employer would be secondary. The exception to this would be when the laws and regulations governing Medicare require that the plan covering the person as a Dependent pay its benefits as primary to Medicare, but such laws and regulations also provide that the plan covering them as the certificate holder/contract holder should pay its benefits as secondary to Medicare. In such a case, the plan which is required to pay as primary to Medicare shall also pay as primary to the other coverage.

C.  If a person is covered as a Dependent child of two working parents, the plan of the parent whose birthday falls earliest in the year has primary responsibility for paying the claim. The plan of the parent with the later birthday becomes the secondary plan. If both parents have the same birthday, the parent whose coverage has been in effect the longest is primary. The ages of the respective parents are not relevant. This method of coordinating benefits is commonly referred to as the "birthday rule." If divorced or separated parents (and/or their current spouses) each have group health care coverage that includes a Dependent, the order of benefit determination will be determined, as follows:

1.  the plan of the custodial parent, if any, shall pay its benefits first;

2.  the plan of the spouse of the custodial parent, if any, will pay next;

3.  the plan of the non-custodial parent, if any, will pay after the prior listed plans; and

4.  the plan of the spouse of the non-custodial parent, if any, shall pay it benefits last.

However, if a court order establishes responsibility for payment of health care benefits with the parent who does not have custody of the Dependent and the entity that would be

obligated to pay the benefits has actual knowledge of the court order's terms, the plan of such non-custodial parent shall pay its benefits before any of the other plans listed above. If the non-custodial parent named in the court order as responsible for the health care benefits does not have any health coverage, the plan of the non-custodial parent's spouse, if any, shall pay its benefits before any of the other plans listed above.

If the court order specifies that the parents have joint custody, and neither parent is named as the primary residential custodian, or the court order requires both parents to provide health care coverage, the "birthday rule" specified above shall apply.

D. A plan that covers a person as an active employee or as a Dependent of an active employee is primary to a plan that covers a person as an inactive employee, such as a laid-off or retired employee or as a Dependent of a laid-off or retired employee.

E. There are some situations in which none of these rules apply. Here the program that has been in effect longer is primary. An example would be when a person who works two jobs has health coverage through both employers.

F. A plan or policy that covers a specific event may be primary to a plan that provides general coverage. For example, if a person is injured in an automobile accident with an uninsured motorist, his or her automobile policy's uninsured motorist's coverage would be primary to a group health plan if both policies had similar provisions regarding other insurance.

If coverage under this Plan is primary, benefits will be paid as if the Covered Person had no other coverage. But if this coverage is secondary, this Plan's payments will be calculated by subtracting the primary plan's benefits for the services and supplies covered under this Plan from the usual, customary and reasonable allowance for the services and supplies. Of course, the Plan will not pay more when secondary than it would if primary. **In order to receive coverage under this Plan, all precertification/preauthorization requirements listed in Article VI must be met, even if this Plan pays its benefits as secondary.** By accepting coverage under this Plan, a Covered Person agrees to do two things to enable the Plan to coordinate benefits. First, the Covered Person will supply the Plan with information about other coverage he or she has when asked. Second, if the Plan makes a payment and later finds out that the coverage under this Plan should not have been primary, the Covered Person will return the excess amount to the Plan. The Plan has the right to obtain information needed to coordinate benefits from others as well, i.e., insurance companies and other persons, for instance.

In the case of Medicare services that are furnished to End Stage Renal Disease ("ESRD") Participants who are covered under this Plan:

A. if any Covered Person is eligible for Medicare benefits because of ESRD, the benefits of the Plan will be determined before Medicare benefits for the first thirty (30) months of Medicare entitlement, unless applicable Federal law provides to the contrary, in which event the benefits of the Plan will be determined in accordance with such law; and

B. in order to coordinate Covered Expenses under this Plan with Medicare coverage, the Covered Person is required to:

1. notify the Plan Administrator and send a copy of his or her Medicare card when enrolled in Medicare; and

2. notify the Plan Administrator if or when he or she begins to receive dialysis treatments.

If Medicare reimbursement rates are neither available nor applicable, rates will be set in accordance with this Plan's Customary and Reasonable provision and other provisions.

## 14.2    THIRD PARTY RECOVERY, SUBROGATION AND REIMBURSEMENT

### Payment Condition

The Plan, in its sole discretion, may elect to conditionally advance payment of benefits in those situations where an Injury, Illness, disease or disability is caused in whole or in part by, or results from the acts or omissions of Participants, and/or their Dependents, beneficiaries, estate, heirs, guardian, personal representative, or assigns (collectively referred to hereinafter in this section as "Covered Person(s)") or a third party, where any party besides the Plan may be responsible for expenses arising from an incident, and/or other funds are available, including but not limited to no-fault, uninsured motorist, underinsured motorist, medical payment provisions, third party assets, third party insurance, and/or guarantor(s) of a third party (collectively "Coverage").

Covered Person(s), his or her attorney, and/or Legal Guardian of a minor or incapacitated individual agrees that acceptance of the Plan's conditional payment of medical benefits is constructive notice of these provisions in their entirety and agrees to maintain one hundred percent (100%) of the Plan's conditional payment of benefits or the full extent of payment from any one (1) or combination of first and third party sources in trust, without disruption except for reimbursement to the Plan or the Plan's assignee. The Plan shall have an equitable lien on any funds received by the Covered Person(s) and/or their attorney from any source and said funds shall be held in trust until such time as the obligations under this provision are fully satisfied. The Covered Person(s) agrees to include the Plan's name as a co-payee on any and all settlement drafts. Further, by accepting benefits the Covered Person(s) understands that any recovery obtained pursuant to this section is an asset of the Plan to the extent of the amount of benefits paid by the Plan and that the Covered Person shall be a trustee over those Plan assets.

In the event a Covered Person(s) settles, recovers, or is reimbursed by any Coverage, the Covered Person(s) agrees to reimburse the Plan for all benefits paid or that will be paid by the Plan on behalf of the Covered Person(s). If the Covered Person(s) fails to reimburse the Plan out of any judgment or settlement received, the Covered Person(s) will be responsible for any and all expenses (fees and costs) associated with the Plan's attempt to recover such money.

If there is more than one (1) party responsible for charges paid by the Plan, or may be responsible for charges paid by the Plan, the Plan will not be required to select a particular party from whom reimbursement is due. Furthermore, unallocated settlement funds meant to compensate multiple injured parties of which the Covered Person(s) is/are only one (1) or a few, that unallocated settlement fund is considered designated as an "identifiable" fund from which the plan may seek reimbursement.

### Subrogation

As a condition to participating in and receiving benefits under this Plan, the Covered Person(s) agrees to assign to the Plan the right to subrogate and pursue any and all claims, causes of action or rights that may arise against any person, corporation and/or entity and to any Coverage to which the Covered Person(s) is entitled, regardless of how classified or characterized, at the Plan's discretion, if the Covered Person(s) fails to so pursue said rights and/or action.

If a Covered Person(s) receives or becomes entitled to receive benefits, an automatic equitable lien attaches in favor of the Plan to any claim, which any Covered Person(s) may have against any Coverage and/or party causing the sickness or Injury to the extent of such conditional payment by the Plan plus reasonable costs of collection. The Covered Person is obligated to notify the Plan or it authorized representative of any settlement prior to finalization of the settlement, execution of a release, or receipt of applicable funds. The Covered Person is also obligated to hold any and all funds so received in trust on the Plan's behalf and function as a trustee as it applies to those funds until the Plan's rights described herein are honored and the Plan is reimbursed.

The Plan may, at its discretion, in its own name or in the name of the Covered Person(s) commence a proceeding or pursue a claim against any party or Coverage for the recovery of all

damages to the full extent of the value of any such benefits or conditional payments advanced by the Plan.

If the Covered Person(s) fails to file a claim or pursue damages against:

    A. the responsible party, its insurer, or any other source on behalf of that party;

    B. any first party insurance through medical payment coverage, personal Injury protection, no-fault coverage, uninsured or underinsured motorist coverage;

    C. any policy of insurance from any insurance company or guarantor of a third party;

    D. workers' compensation or other liability insurance company; or

    E. any other source, including but not limited to crime victim restitution funds, any medical, disability or other benefit payments, and school insurance coverage,

the Covered Person(s) authorizes the Plan to pursue, sue, compromise and/or settle any such claims in the Covered Person(s)' and/or the Plan's name and agrees to fully cooperate with the Plan in the prosecution of any such claims. The Covered Person(s) assigns all rights to the Plan or its assignee to pursue a claim and the recovery of all expenses from any and all sources listed above.

Right of Reimbursement

The Plan shall be entitled to recover one hundred percent (100%) of the benefits paid, without deduction for attorneys' fees and costs or application of the common fund doctrine, make whole doctrine, or any other similar legal theory, without regard to whether the Covered Person(s) is fully compensated by his or her recovery from all sources. The Plan shall have an equitable lien which supersedes all common law or statutory rules, doctrines, and laws of any State prohibiting assignment of rights which interferes with or compromises in any way the Plan's equitable lien and right to reimbursement. The obligation to reimburse the Plan in full exists regardless of how the judgment or settlement is classified and whether or not the judgment or settlement specifically designates the recovery or a portion of it as including medical, disability, or other expenses. If the Covered Person(s)' recovery is less than the benefits paid, then the Plan is entitled to be paid all of the recovery achieved. Any funds received by the Covered Person are deemed held in constructive trust and should not be dissipated or disbursed until such time as the Covered Person's obligation to reimburse the Plan has been satisfied in accordance with these provisions. The Covered Person is also obligated to hold any and all funds so received in trust on the Plan's behalf and function as a trustee as it applies to those funds until the Plan's rights described herein are honored and the Plan is reimbursed.

No court costs, experts' fees, attorneys' fees, filing fees, or other costs or expenses of litigation may be deducted from the Plan's recovery without the prior, express written consent of the Plan.

The Plan's right of subrogation and reimbursement will not be reduced or affected as a result of any fault or claim on the part of the Covered Person(s), whether under the doctrines of causation, comparative fault or contributory negligence, or other similar doctrine in law. Accordingly, any lien reduction statutes, which attempt to apply such laws and reduce a subrogating Plan's recovery will not be applicable to the Plan and will not reduce the Plan's reimbursement rights.

These rights of subrogation and reimbursement shall apply without regard to whether any separate written acknowledgment of these rights is required by the Plan and signed by the Covered Person(s).

This provision shall not limit any other remedies of the Plan provided by law. These rights of subrogation and reimbursement shall apply without regard to the location of the event that led to or caused the applicable sickness, Injury, disease or disability.

Covered Person is a Trustee Over Plan Assets

Any Covered Person who receives benefits and is therefore subject to the terms of this section is hereby deemed a recipient and holder of Plan assets and is therefore deemed a trustee of the Plan solely as it relates to possession of any funds which may be owed to the Plan as a result of any

settlement, judgment or recovery through any other means arising from any Injury or accident. By virtue of this status, the Covered Person understands that he/she is required to:

    A. notify the Plan or it authorized representative of any settlement prior to finalization of the settlement, execution of a release, or receipt of applicable funds;

    B. instruct his/her attorney to ensure that the Plan and/or its authorized representative is included as a payee on all settlement drafts;

    C. in circumstances where the Covered Person is not represented by an attorney, instruct the insurance company or any third party from whom the Covered Person obtains a settlement, judgment or other source of Coverage to include the Plan or its authorized representative as a payee on the settlement draft; and

    D. hold any and all funds so received in trust, on the Plan's behalf, and function as a trustee as it applies to those funds, until the Plan's rights described herein are honored and the Plan is reimbursed.

To the extent the Covered Person disputes this obligation to the Plan under this section, the Covered Person or any of its agents or representatives is also required to hold any/all settlement funds, including the entire settlement if the settlement is less than the Plan's interests, and without reduction in consideration of attorneys fees, for which he/she exercises control, in an account segregated from their general accounts or general assets until such time as the dispute is resolved.

No Covered Person, beneficiary, or the agents or representatives thereof, exercising control over plan assets and incurring trustee responsibility in accordance with this section will have any authority to accept any reduction of the Plan's interest on the Plan's behalf.

Excess Insurance

If at the time of Injury, sickness, disease or disability there is available, or potentially available, any Coverage (including but not limited to Coverage resulting from a judgment at law or settlements), the benefits under this Plan shall apply only as an excess over such other sources of Coverage, except as otherwise provided for under the Plan's Coordination of Benefits section.

The Plan's benefits shall be excess to any of the following:

    A. the responsible party, its insurer, or any other source on behalf of that party;

    B. any first party insurance through medical payment coverage, personal Injury protection, no-fault coverage, uninsured or underinsured motorist coverage;

    C. any policy of insurance from any insurance company or guarantor of a third party;

    D. workers' compensation or other liability insurance company; or

    E. any other source, including but not limited to crime victim restitution funds, any medical, disability or other benefit payments, and school insurance coverage.

Separation of Funds

Benefits paid by the Plan, funds recovered by the Covered Person(s), and funds held in trust over which the Plan has an equitable lien exist separately from the property and estate of the Covered Person(s), such that the death of the Covered Person(s), or filing of bankruptcy by the Covered Person(s), will not affect the Plan's equitable lien, the funds over which the Plan has a lien, or the Plan's right to subrogation and reimbursement.

Wrongful Death

In the event that the Covered Person(s) dies as a result of his or her Injuries and a wrongful death or survivor claim is asserted against a third party or any Coverage, the Plan's subrogation and reimbursement rights shall still apply, and the entity pursuing said claim shall honor and enforce these Plan rights and terms by which benefits are paid on behalf of the Covered Person(s) and all others that benefit from such payment.

Marietta Memorial Hospital Employee Health Benefit Plan Summary Plan Description————————————

Obligations

It is the Covered Person's/Covered Persons' obligation at all times, both prior to and after payment of medical benefits by the Plan:

    A. to cooperate with the Plan, or any representatives of the Plan, in protecting its rights, including discovery, attending depositions, and/or cooperating in trial to preserve the Plan's rights;

    B. to provide the Plan with pertinent information regarding the sickness, disease, disability, or Injury, including accident reports, settlement information and any other requested additional information;

    C. to take such action and execute such documents as the Plan may require to facilitate enforcement of its subrogation and reimbursement rights;

    D. to do nothing to prejudice the Plan's rights of subrogation and reimbursement;

    E. to promptly reimburse the Plan when a recovery through settlement, judgment, award or other payment is received;

    F. to notify the Plan or its authorized representative of any settlement prior to finalization of the settlement;

    G. to not settle or release, without the prior consent of the Plan, any claim to the extent that the Covered Person may have against any responsible party or coverage;

    H. to instruct his/her attorney to ensure that the Plan and/or its authorized representative is included as a payee on any settlement draft;

    I. in circumstances where the Covered Person is not represented by an attorney, instruct the insurance company or any third party from whom the Covered Person obtains a settlement to include the Plan or its authorized representative as a payee on the settlement draft; and

    J. to make good faith efforts to prevent disbursement of settlement funds until such time as any dispute between the Plan and Covered Person over settlement funds is resolved.

If the Covered Person(s) and/or his or her attorney fails to reimburse the Plan for all benefits paid or to be paid, as a result of said Injury or condition, out of any proceeds, judgment or settlement received, the Covered Person(s) will be responsible for any and all expenses (whether fees or costs) associated with the Plan's attempt to recover such money from the Covered Person(s).

The Plan's rights to reimbursement and/or subrogation are in no way dependent upon the Covered Person's/Covered Persons' cooperation or adherence to these terms.

Offset

If timely repayment is not made, or the Covered Person and/or his or her attorney fails to comply with any of the requirements of the Plan, the Plan has the right, in addition to any other lawful means of recovery, to deduct the value of the Covered Person's amount owed to the Plan. To do this, the Plan may refuse payment of any future medical benefits and any funds or payments due under this Plan on behalf of the Covered Person(s) in an amount equivalent to any outstanding amounts owed by the Covered Person to the Plan. This provision applies even if the Covered Person has disbursed settlement funds.

Minor Status

In the event the Covered Person(s) is a minor as that term is defined by applicable law, the minor's parents or court-appointed guardian shall cooperate in any and all actions by the Plan to seek and obtain requisite court approval to bind the minor and his or her estate insofar as these subrogation and reimbursement provisions are concerned.

If the minor's parents or court-appointed guardian fail to take such action, the Plan shall have no obligation to advance payment of medical benefits on behalf of the minor. Any court costs or legal fees associated with obtaining such approval shall be paid by the minor's parents or court-appointed guardian.

Language Interpretation

The Plan Administrator retains sole, full and final discretionary authority to construe and interpret the language of this provision, to determine all questions of fact and law arising under this provision, and to administer the Plan's subrogation and reimbursement rights. The Plan Administrator may amend the Plan at any time without notice.

Severability

In the event that any section of this provision is considered invalid or illegal for any reason, said invalidity or illegality shall not affect the remaining sections of this provision and Plan. The section shall be fully severable. The Plan shall be construed and enforced as if such invalid or illegal sections had never been inserted in the Plan.

## 14.3    MEDICARE BENEFITS

This provision prevents duplication of benefits for Covered Expenses when Medical Care benefits are available from Medicare. Benefits under this Plan will be reduced to the extent that the Participant or his or her Dependents are reimbursed or entitled to reimbursement for those expenses by Medicare. Any individual at any time entitled to enroll in Medicare will be considered enrolled in Part A and Part B even if the individual did not enroll.

Under the Tax Equity and Fiscal Responsibility Act of 1982, as amended (TEFRA), active employees and/or their spouses who are 65 or over may choose to have the Company program as primary coverage, in which case Medicare may pay benefits on a secondary basis. Otherwise, an employee may elect to drop out of the company program and choose Medicare as primary coverage. Employees in this category who are enrolled under this Plan will remain so enrolled with this Plan as primary coverage unless an option form is on file indicating otherwise.

The Plan may also pay its benefits as primary to Medicare's in other situations, as prescribed by applicable laws and regulations.

The Plan intends to comply with the federal Social Security Act, as amended, and other Medicare Benefits applicable laws, as such apply to Medicare benefits.

## 14.4    ADDITIONAL RIGHTS OF RECOVERY

If payments are made under the Plan that should not have been made, the Plan may recover that incorrect payment. The Plan may recover this payment from the person to whom it was made or from any other appropriate party. If any such incorrect payment is made to the Participant, the Plan may deduct it when making future payments directly to the Participant. Once the Plan Administrator determines that a previous benefit payment should be reimbursed, in whole or in part, either due to the provisions described in Section 14.2 or because such benefit payment should not have been made in accordance with the provisions of this Plan, the Participant and/or the applicable Provider will be notified of such overpayment, and a request will be made for such Participant/Provider to reimburse the Plan. If the reimbursement is not made as requested, such amount will constitute a lien against future claim payments that would otherwise be paid on the Participant or the Covered Person's behalf. The Plan Administrator retains the right to reduce or withhold such future claim payments until the lien is satisfied.

This Plan will comply with Sections 609(b)(1), (2) and (3) of the Employee Retirement Income Security Act with regard to Covered Persons eligible for Medicaid. An Employee's or Dependent's eligibility for, or participation in, Medicaid will not affect determination of whether or not payments should be made. Under state and federal law, should a Covered Person be entitled to payment of a claim under this Plan, and all or part of that claim has been paid by Medicaid, then the state is subrogated to the Covered Person's right to payment under this Plan to the extent of the amount paid by Medicaid, and reimbursement under this Plan will be made in that amount directly to the state.

85

## 14.5    FACILITY OF PAYMENT

Whenever a Covered Person or Provider to whom payments are directed to be made is mentally, physically, or legally incapable of receiving or acknowledging receipt of such payments, neither the Plan Administrator nor the Benefit Manager shall be under any obligation to see that a legal representative is appointed or to make payments to such legal representative, if appointed. A determination of payment made in good faith shall be conclusive on all persons. The Plan Administrator, Benefit Manager or any fiduciary shall not be liable to any person as a result of a payment made and shall be fully discharged from all future liability with respect to a payment made.

## 14.6    ADMINISTRATION OF THE PLAN

Except as otherwise specifically provided for in the Plan, the Plan Administrator shall have the exclusive authority to control and manage the operation and administration of the Plan and shall be Named Fiduciary of the Plan for purposes of ERISA. The Plan Administrator shall have all power necessary or convenient to enable it to exercise such authority. In connection therewith, the Plan Administrator may provide rules and regulations, not inconsistent with the provisions thereof, for the operation and management of the Plan, and may from time to time amend or rescind such rules or regulations. The Plan Administrator may accept service of legal process for the Plan and shall have the full discretion, power, and the duty to take all action necessary or proper to carry out the duties required under ERISA and all other applicable law.

The Plan Administrator may delegate duties involved in the administration of this Plan to such person or persons whose services are deemed necessary or convenient; provided however, that both the ultimate responsibility for the administration of this Plan and the authority to interpret this Plan shall remain with the Plan Administrator. The Employer shall indemnify any employee to whom duties are delegated by the Plan Administrator pursuant to this section from and against any liability that such employee may incur in the administration of the Plan, except for liabilities arising from the recklessness or willful misconduct of such employee.

The Plan Administrator shall be responsible for controlling and managing the operation and administration of this Plan, including, but not limited to, the power:

A.  to employ one (1) or more persons or entities to render advice with respect to any responsibility the Plan Administrator has under this Plan;

B.  to construe and interpret this Plan;

C.  to adopt such rules, regulations, forms and procedures as from time to time it deems advisable or appropriate in the proper administration of this Plan;

D.  to decide all questions of eligibility and to determine the amount, manner and time of payment of any benefits hereunder;

E.  to prescribe procedures to be followed by any person in applying for any benefits under this Plan and to designate the forms, documents, evidence or such other information as the Plan Administrator may reasonably deem necessary to support an application for any benefits under this Plan;

F.  to authorize, in its discretion, payments of benefits properly payable pursuant to the provisions of this Plan;

G.  to prepare and to distribute, in such manner as it deems appropriate, information explaining the Plan;

H.  to apply consistently and uniformly to all Covered Persons in similar circumstances its rules, regulations, determinations and decisions;

I.  to prepare and file such reports and to complete and to distribute such other documents as may be required to comply fully with the provisions of ERISA and all other applicable laws, and all regulations promulgated thereunder; and

86

J. to retain counsel (who may, but need not, be counsel to the Company), to employ agents and to provide for such clerical, medical, accounting, auditing and other services as it may require in carrying out the provisions of the Plan.

The Plan Administrator shall be the sole judge of the standards of proof required in any case. In the application and interpretation of this Plan document, the decision of the Plan Administrator shall be final and binding on the Participants, Dependents, and all other persons. The Plan Administrator shall have the full power and authority, in its sole discretion, to construe and interpret the provisions and terms of this Plan document and all other written documents. Any such determination and any such construction adopted by the Plan Administrator in good faith shall be binding upon all of the parties hereto and the beneficiaries thereof and may not be reversed by a court of competent jurisdiction unless the court finds the determination to be arbitrary and capricious.

## 14.7    NON-ALIENATION AND ASSIGNMENT

The Plan shall not be liable for any debt, liability, contract or tort of any employee or Covered Person. The Plan shall pay all benefits due and payable for Covered Expenses directly to the Covered Person who incurred the Covered Expenses, and no Plan benefits shall be subject to anticipation, sale, assignment, transfer, encumbrance, pledge, charge, attachment, garnishment, execution, alienation or any other voluntary or involuntary alienation or other legal or equitable process not transferable by operation of law; provided however, that a Covered Person to whom benefits are otherwise payable may assign benefits to a Hospital, Physician or other service Provider; provided further, that any such assignment of benefits by a Covered Person to a Hospital, Physician or other service Provider shall be binding on the Plan only if:

A. the Plan Administrator or Benefit Manager is notified of such assignment prior to payment of benefits;

B. the assignment is made on a form provided by, or approved by, the Plan Administrator or the Benefit Manager; and

C. the assignment contains such additional terms and conditions as may be required from time to time by the Plan Administrator or Benefit Manager.

## 14.8    FAILURE TO ENFORCE

Failure to enforce any provision of this Plan does not constitute a waiver or otherwise affect the Plan Administrator's right to enforce such a provision at another time, nor will such failure affect the right to enforce any other provision.

## 14.9    FIDUCIARY RESPONSIBILITIES

No fiduciary of the Plan shall be liable for any acts or omission in carrying out his, her or its responsibilities under the Plan, except as may be provided under ERISA and other applicable laws. Each fiduciary under the Plan shall be responsible only for the specific duties assigned to such fiduciary under the Plan and shall not be directly or indirectly responsible for the duties assigned to another fiduciary, except as may be otherwise provided in ERISA and other applicable laws.

## 14.10    DISCLAIMER OF LIABILITY

The Plan is not responsible for the efficiency or integrity of any health care Provider delivering services or supplies utilized by the Participant. The Plan is not liable in any way for the effect of delivery of such services or supplies, the results of actions taken as a result of such services or supplies being limited or not covered by the Plan, nor any limitations imposed on the cost sharing responsibility of the Plan.

Nothing contained herein shall confer upon a Covered Person any claim, right or cause of action, either at law or at equity, against the Plan, Plan Administrator, Benefit Manager, or any Employer for the acts or omissions of any health care Provider from whom a Covered Person receives care, or for the acts or omission of any Physician from whom the Covered Person receives care under

the Plan, or for any acts or omissions of any Provider of services or supplies under this Plan. Neither the Plan, nor the Plan Administrator, nor the Benefit Manager have any responsibility for or control over the actions of any Preferred Provider networks offering services and/or supplies under the Plan.

## 14.11   ADMINISTRATIVE AND CLERICAL ERRORS

The benefits payable to or on behalf of a Participant or Dependent under this Plan will not be decreased nor increased due to administrative or clerical errors made by the Employer, the Plan Administrator, the Utilization Review Service or the Benefit Manager. If written application for coverage for an eligible employee or Dependent is submitted by the employee/Participant within the applicable time frame specified in Article V, any subsequent administrative or clerical error made by the Employer, the Plan Administrator or the Benefit Manager shall not act to delay the effective date of such person's coverage beyond the date such coverage would otherwise become effective if such application was processed in a timely manner. In addition, any such error made in claims processing, utilization review or other administrative functions shall not affect the benefits payable to or on behalf of a Covered Person under this Plan. The Plan Administrator may require proof of an error described in this provision. The Plan Administrator shall have the sole responsibility to determine when an error is an "administrative or clerical" error and will be the sole judge of any proof required.

## 14.12   RESCISSION OF COVERAGE

A rescission of coverage means that the coverage may be legally voided all the way back to the day the Plan began to provide an individual with coverage, just as if he or she never had coverage under the Plan. Such coverage can only be rescinded if the individual (or a person seeking coverage on an individual's behalf) perform an act, practice, or omission that constitutes fraud; or unless the individual (or a person seeking coverage on the individual's behalf) make an intentional misrepresentation of material fact, as prohibited by the terms of this Plan. Coverage can also be rescinded due to such an act, practice, omission or intentional misrepresentation by an employer.

Such individual will be provided with thirty (30) calendar days' advance notice before coverage is rescinded. Such individual has the right to request an internal appeal of a rescission of his or her coverage. Once the internal appeal process is exhausted, Such person has the additional right to request an independent external review.

## ARTICLE XV
## PRIVACY

### 15.1    PRIVACY OF HEALTH INFORMATION

This provision is intended to bring this Plan into compliance with the privacy provisions of the Health Insurance Portability and Accountability Act of 1996, as amended, and the regulations issued thereunder. Health Information transmitted or maintained by the Plan will be subject to the provisions described in this article.

### 15.2    USE AND DISCLOSURE OF PROTECTED HEALTH INFORMATION

Protected Health Information will only be disclosed or used by the Plan under one (1) of the following conditions:

A.  with the specific consent of the individual who is the subject of the Protected Health Information, provided that the Plan obtains any required authorization;

B.  for payment of claims submitted to the Plan, or for utilization review activities as described in Article VI, including, but not limited to, the review of any grievances or appeals involved in such activities which are generated by the Covered Person or his or her authorized representatives; and

C.  for other reasonable purposes necessary to operate the Plan, to the extent that such Protected Health Information is required for such purposes, including:

  1.  quality assessment and improvement activities;

  2.  evaluation of Plan performance;

  3.  underwriting and premium rating and other activities relating to the procuring, renewal or replacement of stop loss or excess loss insurance;

  a.  conducting or arranging for medical review, legal services and auditing functions, including fraud and abuse detection and compliance programs;

  b.  business planning and development of the Plan;

  c.  business management and general administrative activities of the Plan, including, but not limited to, enrollments, billing, customer service and the resolution of internal grievances; and

  d.  other health care operations listed under 45 C.F.R. § 164.501.

No other use or disclosure of Protected Health Information is permitted by this Plan.

### 15.3    DISCLOSURES OF HEALTH INFORMATION TO THE COMPANY

The Plan Administrator will disclose, or permit the disclosure of, Health Information to the Company only as described below:

A.  for any of the purposes and under the conditions described in Section 15.2;

B.  as Summary Health Information, if requested by the Company for the following purposes:

  1.  obtaining premium bids from health plans for providing health insurance coverage under the Plan; or

  2.  modifying, amending or terminating the Plan; or

C.  for informational purposes regarding whether an individual is participating in the Plan, provided such information is only used by the Company for the purpose of performing Plan administrative functions;

Prior to any disclosure of Health Information to the Company, such entity must agree:

A.  not to use or further disclose the information other than as permitted or required by this section, or as required by law;

89

Marietta Memorial Hospital Employee Health Benefit Plan Summary Plan Description————————————

    B.  that it will ensure that any agents, including subcontractors, employed by the Company or Plan Administrator for Plan administration or other Plan purposes to whom it provides Protected Health Information, including, but not limited to, the Benefit Manager, any Utilization Review Service or pharmacy benefit manager, agree to the same restrictions and conditions that apply to the Company with respect to such information;

    C.  not to use or disclose the Protected Health Information for employment-related actions and decisions, or in connection with any other benefit or employee benefit plan sponsored by the Company;

    D.  that it will report to the Plan Administrator any use or disclosure of the information that is inconsistent with the uses or disclosures provided for in this section of which it becomes aware;

    E.  that it will make available Protected Health Information to the subject of such information, and allow amendment to such information as described in Section **Error! Reference source not found.** and Section 15.5;

    F.  that it will provide an accounting in accordance with 45 C.F.R. § 164.528, upon the request of the subject of Protected Health Information, of the disclosure of such information by the Plan made within six (6) years of the request, except information exempted from such accounting under that section;

    G.  that it will make available its internal practices, books, and records relating to the use and disclosure of Protected Health Information received from the Plan to the Secretary of the United States Department of Health and Human Services for the purpose of determining compliance by the Plan with the privacy provisions of HIPAA;

    H.  that it will, if feasible, return or destroy all Protected Health Information received from the Plan that the Company still maintains in any form, and that it will not retain any copies of such information when no longer needed for the purpose for which the disclosure was made. If return or destruction is not feasible, that it will limit further uses and disclosures to those purposes which make the return or destruction of the information infeasible; and

    I.  that it will provide for adequate separation between the Plan and the Plan Sponsor by implementing the following procedures:

        1.  access to Protected Health Information will only be provided to employees of the Company's Human Resources Department with responsibility for Plan operations;

        2.  that access to and use by such employees or other persons as described above will be limited to the Plan administration functions that the Company performs for the Plan; and

        3.  any non-compliance by such named individuals with the privacy provisions of this Plan will be addressed in accordance with the Company's established employee discipline and termination procedures.

## 15.4 ACCESS OF COVERED PERSONS TO PROTECTED HEALTH INFORMATION

A Covered Person or other individual has the right of access to inspect and obtain a copy of Protected Health Information about such person as long as such information is maintained by the Plan, except for:

    A.  psychotherapy notes;

    B.  information complied in reasonable anticipation, or for use in, a civil, criminal or administrative proceeding or action; or

    C.  as such information is otherwise exempted from disclosure under 45 C.F.R. § 164.524.

Any such request must be made to the Plan Administrator a writing signed by the Covered Person whose information is being requested. The Plan Administrator will notify the Covered Person, in

writing, as to whether such request is approved or denied, and, if approved, will provide access to the information in accordance with 45 C.F.R. § 164.524(c), including the imposition of reasonable fees for the costs of providing such access.

## 15.5    AMENDMENT RIGHTS

A Covered Person or other individual has the right to have the Company amend Protected Health Information or other information about such individual as long as such information is maintained by the Plan. The Plan Administrator will deny such a request if:

    A. the information was not created by the Plan, unless the individual provides a reasonable basis to believe that the originator of the Protected Health Information is no longer available to act on the requested amendment;

    B. the information is not currently maintained in any record by the Plan;

    C. the information would not be available for inspection under the reasons cited in Section 15.4; or

    D. the information in the Plan's records is accurate and complete.

Any request for amendment of Protected Health Information must be provided in writing to the Plan Administrator and signed by the Covered Person or individual who is the subject of the information with an explanation as to why such person believes the information is inaccurate, incomplete or incorrect. The Plan Administrator will notify the Covered Person, in writing, as to whether such request is approved or denied, and, if approved, will make the necessary corrections to the information in accordance with 45 C.F.R. § 164.526(c). The Plan Administrator will make reasonable efforts to inform all entities which it has knowledge of such entity's receipt of any information which has been corrected. If the request is denied, the individual may submit a written statement disagreeing with the denial which includes the basis of such disagreement. The Plan Administrator may prepare a written rebuttal of such statement. The statement of disagreement, and the rebuttal, if any, will be included in any future disclosure of the information. Even if no statement of disagreement is submitted, the individual may request that the request for amendment and denial be included with any future disclosures of the information.

## 15.6    SECURITY OF PROTECTED HEALTH INFORMATION

The Company will implement administrative, physical and technical safeguards that reasonably and appropriately protect the confidentiality, integrity and availability of electronic Protected Health Information that is created, received, maintained or transmitted on behalf of the Plan, including reasonable and appropriate security measures between the Company and the Plan to support the requirements of Section 15.3. The Company will further ensure that any agent, including a subcontractor, to whom it provides access to Protected Health Information agrees to implement reasonable and appropriate security measures to protect the information, and will report any security incident of which it becomes aware to the Plan Administrator.

# ARTICLE XVI

## STATEMENT OF ERISA RIGHTS

As a Participant in this Plan, you are entitled to certain rights and protections under the Employee Retirement Income Security Act of 1974 (ERISA). ERISA provides that all Plan Participants shall be entitled to:

A. **Receive Information About Your Plan and Benefits:**

1. Examine, without charge, at the Plan Administrator's office and at other specified locations, such as worksites, all documents governing the Plan, including insurance contracts, and a copy of the latest annual report (Form 5500 Series) filed by the Plan with the U.S. Department of Labor and available at the Public Disclosure Room of the Employee Benefits Security Administration.

2. Obtain, upon written request to the Plan Administrator, copies of documents governing the operation of the Plan, including insurance contracts, and copies of the latest annual report (Form 5500 Series) and updated summary plan description. The administrator may make a reasonable charge for the copies.

3. Receive a copy of the Plan's annual financial report. The Plan Administrator is required by law to furnish each Participant with a copy of this summary annual report.

B. **Continue Group Health Plan Coverage:**

Continue health care coverage for yourself, spouse or Dependents if there is a loss of coverage under the Plan as a result of a Qualifying Event. You or your Dependents may have to pay for such coverage. Review this summary plan description and the documents governing the Plan on the rules governing your COBRA continuation rights.

C. **Prudent Actions by Plan Fiduciaries:**

In addition to creating rights for Plan Participants, ERISA imposes duties upon the people who are responsible for the operation of the employee benefit plan. The people who operate your Plan, called "fiduciaries" of the Plan, have a duty to do so prudently and in the interest of you and other Plan Participants and beneficiaries. No one, including your Employer or any other person, may fire you or otherwise discriminate against you in any way to prevent you from obtaining a welfare benefit or exercising your rights under ERISA.

D. **Enforce Your Rights:**

1. If your claim for a welfare benefit is denied or ignored, in whole or in part, you have a right to know why this was done, to obtain copies of documents relating to the decision without charge, and to appeal any denial, all within certain time schedules.

2. Under ERISA, there are steps you can take to enforce the above rights. For instance, if you request a copy of plan documents or the latest annual report from the Plan and do not receive them within thirty (30) days, you may file suit in a Federal court. In such a case, the court may require the Plan Administrator to provide the materials and pay you up to one hundred ten dollars ($110.00) a day until you receive the materials, unless the materials were not sent because of reasons beyond the control of the administrator. If you have a claim for benefits which is denied or ignored, in whole or in part, you may file suit, once the other appeal rights listed in this Plan are exhausted, in a state or Federal court. In addition, if you disagree with the Plan's decision or lack thereof concerning the qualified status of a medical child support order, you may file suit in Federal court. If it should happen that Plan Fiduciaries misuse the Plan's money, or if you are discriminated against for asserting your rights, you may seek assistance from the U.S. Department of Labor, or you may file suit in a Federal court. The court will decide who should pay court costs and legal fees. If you are successful the court may order the person you have sued to pay these costs and

92

Marietta Memorial Hospital Employee Health Benefit Plan Summary Plan Description

fees. If you lose, the court may order you to pay these costs and fees, for example, if it finds your claim is frivolous.

### E. Assistance with Your Questions:

If you have any questions about your Plan, you should contact the Plan Administrator. If you have any questions about this statement or about your rights under ERISA, or if you need assistance in obtaining documents from the Plan Administrator, you should contact the nearest office of the Employee Benefits Security Administration, U.S. Department of Labor, listed in your telephone directory or the Office of Participant Assistance and Communications, Employee Benefits Security Administration, U.S. Department of Labor, 200 Constitution Avenue N.W., Washington, D.C. 20210. You may also obtain certain publications about your rights and responsibilities under ERISA by calling the publications hotline of the Employee Benefits Security Administration.