UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
COLUMBUS DIVISION

| | | |
|---|---|---|
| DAVITA INC. AND DVA RENAL HEALTHCARE, INC., | ) ) ) | Case No. 2:18-CV-1739 |
| Plaintiffs, | ) ) ) | Judge Sarah D. Morrison<br>Magistrate Kimberly A. Jolson |
| v. | ) ) ) | |
| MARIETTA MEMORIAL HOSPITAL EMPLOYEE HEALTH BENEFIT PLAN, MARIETTA MEMORIAL HOSPITAL, AND MEDICAL BENEFITS MUTUAL LIFE INSURANCE CO. | ) ) ) ) ) ) | |
| Defendants. | ) ) | |

**FIRST AMENDED COMPLAINT WITH JURY DEMAND ENDORSED HEREON**

Plaintiffs DaVita Inc. and DVA Renal Healthcare, Inc. (collectively, "DaVita") file this Amended Complaint against Defendants Marietta Memorial Hospital Employee Health Benefit Plan (the "Plan"), Marietta Memorial Hospital ("Marietta Memorial"), and Medical Benefits Mutual Life Insurance Co. ("MedBen") (collectively, "Defendants") stating as follows:

I.     **INTRODUCTION**

1.     DaVita provides life-sustaining dialysis treatment to beneficiaries of the Plan who suffer from End Stage Renal Disease ("ESRD").  ESRD is the most advanced stage of chronic kidney disease, and it occurs when a patient's kidneys are no longer able to filter waste and excess fluids from the blood.  Dialysis replaces these critical functions.  Without either dialysis or a kidney transplant, an ESRD patient cannot survive.

1

2.      Citing the "staggering cost" of dialysis for ESRD patients, Congress amended the Social Security Act in 1972 to provide that any patient suffering from ESRD would be eligible for Medicare, regardless of age or other condition.  This legislation made dialysis unique in the healthcare industry because Medicare can now relieve ESRD patients, commercial payers, and plan administrators like Marietta Memorial of the burden of paying for a patient's dialysis treatment *after 33 months*.  This includes an initial 3-month waiting period plus a 30-month coordination period during which Medicare is the secondary payer.  Because of this unique aspect of dialysis reimbursement, federal law requires commercial payers to maintain for dialysis patients the same coverage and benefits provided to all other covered patients during this 33-month period, with no discrimination or differentiation in benefits.

3.      Just as federal health insurance coverage for ESRD is unique, so is the protection Congress enacted to prevent group health plans from prematurely dumping patients off of their employer coverage onto Medicare.  As the Department of Health and Human Services explained in adopting regulations on this subject:

> Beginning in 1980, the Congress passed a series of amendments to section 1862 of the [Social Security] Act to make Medicare the secondary payer for services covered by other types of insurance.  In general, Medicare is now secondary to . . . Group health plans (GHPs) that cover end-stage renal disease (ESRD) patients (during the first 18 [now 30] months of Medicare eligibility or entitlement).

60 Fed. Reg. 45344, 45345 (Aug. 31, 1995).

4.      The Medicare Secondary Payer Act ("MSPA") makes "private insurers . . . the 'primary' payers and Medicare the 'secondary' payer" during an individual's first 30 months of ESRD-based Medicare eligibility.  Notably, the MSPA explicitly prohibits private employer plans like the Plan from "taking into account" a dialysis patient's eligibility for Medicare or differentiating in the benefits it provides between Medicare-eligible ESRD patients and other plan

2

participants.  42 U.S.C. § 1395y(b)(1)(C).  In enacting the MSPA, Congress was seeking to prevent group employer-sponsored plans from shifting onto Medicare the burden of serving as the primary payer during the coordination period, knowing employers would have economic incentives to do so.

5.      Federal law also prohibits group health plans like the Plan from discriminating against plan participants and beneficiaries on the basis of health condition and medical status, including disability.  *See* 29 U.S.C. § 1182(a)(1).  In enacting section 1182, Congress was concerned with group health plans' disparate treatment of individuals based on their health status or health status-related factors.

6.      Notwithstanding federal law against offering inferior benefits to individuals with ESRD, the Defendant Plan, as encouraged by Defendant MedBen, did exactly that.  Only for dialysis patients (all or virtually all of whom have ESRD) did the Plan adopt a lower reimbursement formula than it offers for other conditions.  And whereas the Plan offers a network of providers for other conditions so that those patients can receive the many benefits of in-network services, including avoiding most out-of-pocket charges, the Plan expressly states that "[t]here is no network for [outpatient dialysis] services."

7.      By exposing critically ill patients to higher costs and inferior benefits, the Plan increases the likelihood those patients prematurely abandon their coverage under the Plan to go onto Medicare.  This is precisely why employers like Defendant Marietta Memorial adopt such provisions in plan documents and why Congress enacted penalties that apply to such actions. Congress made such discriminatory treatment illegal through the MSPA and in the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001 *et seq*.

8.    Defendant MedBen serves as the Third Party Administrator ("TPA") of the Plan. MedBen itself acts in a fiduciary capacity in a number of respects and has also caused the Plan to breach the fiduciary duties it owes to its beneficiaries.  On its website, MedBen touts its ability to reduce the amounts employers spend on dialysis procedures provided to ESRD patients.  MedBen states that "by implementing [its] proprietary dialysis health plan language, employers can realize a substantial savings on the procedure."  MedBen promotes that one client "who amended their plan reported that their dialysis costs fell by 80%."  While attempting to save insurance costs in some instances might be a laudable goal, it is not so here because the savings flow from a blatant violation of federal law.  MedBen also serves as a TPA for other ERISA health benefit plans throughout the Midwest, and, on information and belief, employs these same restrictions on dialysis in those other plans.

9.    In its capacity as the TPA for the plans at issue, MedBen has inappropriately induced the Plan to slash reimbursement for DaVita's life-saving dialysis treatment for ESRD patients in a way that intentionally hurts dialysis patients and is intended to shift more of the costs of dialysis onto the Medicare program, exactly what Congress sought to avoid in the MSPA.

10.    In this case, DaVita seeks redress for Defendants' wrongful conduct and systematic underpayments to DaVita for the dialysis services DaVita provided to ESRD patients who are members of the Plan.  DaVita brings this action in its own capacity and as assignee of Patient A to remedy the wrongs done to it by Defendants under the MSPA.  *See* 42 U.S.C. § 1395y(b).  DaVita also sues as assignee under ERISA § 502, 29 U.S.C. §§ 1132(a)(1)(B) & (a)(3), to recover benefits due under the Plan, which is covered by ERISA.  DaVita also sues under ERISA § 502 as assignee of Patient A to enjoin the Plan's adverse provisions directed toward individuals with ESRD as prohibited discrimination based on health status factors under 29 U.S.C. § 1182.

4

## II.    PARTIES

11.    Plaintiff DaVita is a Delaware corporation with its principal place of business in Denver, Colorado.  DaVita is a leading provider of quality dialysis care in the United States.  As compared to other dialysis care providers, DaVita has the highest percentage of facilities meeting or exceeding quality performance standards in the Five-Star Quality Rating System and the Quality Incentive Program established by the Centers for Medicare & Medicaid Services.  For the fourteenth consecutive year, *Fortune* magazine has named DaVita one of the World's Most Admired Companies.  As detailed below, DaVita is also the assignee of claims from Patient A.

12.    Plaintiff DVA Renal Healthcare, Inc. is a Tennessee corporation with its principal place of business in Denver, Colorado.  DVA Renal Healthcare, Inc. is a subsidiary of DaVita Inc.  DVA Renal Healthcare, Inc. provides dialysis services to ESRD patients throughout the United States, including in Ohio.

13.    Defendant Marietta Memorial Hospital Employee Health Benefit Plan is a self-funded health benefit plan governed by ERISA.  The Plan is located in Marietta, Ohio.

14.    Defendant Marietta Memorial Hospital funds and serves as the plan administrator for the Plan.  Marietta Memorial is located in Marietta, Ohio.

15.    Defendant MedBen is a "benefit manager" for the Plan.  MedBen is located in Newark, Ohio.  Together with Marietta Memorial, MedBen exercises control and/or authority over the decision to deny or limit benefits to Plan members.

## III.    JURISDICTION AND VENUE

16.    This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 because this action arises under the laws of the United States.  This Court also has

subject matter jurisdiction pursuant to 29 U.S.C. § 1132(e)(1) because the matter in controversy involves the enforcement of rights under ERISA.

17.     This Court has personal jurisdiction over all Defendants in this action because Defendants regularly conduct business in the State of Ohio and have engaged in the conduct alleged herein in Ohio targeted toward Ohio residents, businesses and/or interests.  In addition, ERISA provides for nationwide service of process.  *See* 29 U.S.C. § 1132(e)(2).  All Defendants are residents of the United States, and the Court therefore has personal jurisdiction over them.

18.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to the claims alleged herein occurred in this judicial district and because Defendants conduct a substantial amount of business in this judicial district. Venue is also proper in this district pursuant to 29 U.S.C. § 1132(e)(2) because Defendants administered relevant ERISA plans in the district, the wrongdoing took place in the district, and/or Defendants are found in the district.  In addition, many of the Plan members can be found within this district.

## IV.     **FACTS**

### A.     **Relationship Among the Parties**

19.     DaVita provides life-saving dialysis treatment to approximately 205,000 dialysis patients in 2,795 outpatient dialysis centers across the United States.  Until November 8, 2019, DaVita provided dialysis to Patient A, an ESRD Patient who was formerly a member of the Plan until August 31, 2018, when Medicare became Patient A's primary insurance.[1]  Patient A passed

---

[1] DaVita is not identifying Patient A by name in this Complaint to avoid disclosure of Protected Health Information subject to the Health Insurance Portability and Accountability Act ("HIPAA"), 42 U.S.C. §§ 1320d *et seq.*  DaVita will disclose the identity of Patient A to Defendants' counsel subject to appropriate confidentiality safeguards consistent with HIPAA.

away between the time of filing of the original Complaint in this action and the filing of this First Amended Complaint.

20.     Virtually all patients requiring dialysis treatment are patients suffering from ESRD (as opposed to an acute illness or condition requiring shorter-term dialysis treatment).  In 2014, there were nearly 700,000 ESRD patients in the United States, virtually all of whom required dialysis.  *See* United States Renal Data System, 2019 Annual Data Report, Reference Table B. Prevalence.  By contrast, that same year, there were only 28,000 patients with acute kidney injury who required dialysis.  *See* Pavkov ME, Harding JL, Burrows NR., *Trends in Hospitalizations for Acute Kidney Injury — United States, 2000–2014*, Morbidity & Mortality Wkly. Rep., March 16, 2018,  67:289–293,  Table,  https://www.cdc.gov/mmwr/volumes/67/wr/mm6710a2.htm.    And while ESRD patients require an average of three treatments per week for the rest of their lives or until they receive a kidney transplant, patients with an acute kidney injury require dialysis only temporarily.  Accordingly, nearly all enrollees of the Plan who require or will require dialysis are individuals with ESRD who need such treatment to sustain life.  Perhaps more significantly, because ESRD patients—in contrast to AKI patients—constitute the overwhelming majority of dialysis patients, and because ESRD patients require dialysis three times a week for life rather than for very short periods of time, virtually all Plan expenditures on dialysis are attributable to patients with ESRD.

21.     Hemodialysis, the most common form of dialysis, works by circulating and filtering a patient's blood through a machine (known as a dialyzer) that effectively replaces the function of the kidney.  A hemodialysis treatment typically lasts three to four hours and is administered three times per week, or approximately 156 times per year.  Individuals suffering from ESRD require dialysis treatment for the rest of their lives, or until they receive a kidney transplant.  As a result,

ESRD patients tend to require dialysis for long periods.  Congress made a deliberate policy choice in allocating the costs of such treatment between private employer coverage and coverage under Medicare (and the American taxpayer).

22.     Many health plans and commercial insurers establish network plans for their beneficiaries.  The plans and insurers negotiate contracts with providers to participate in the network.  Typically, those preferred provider contracts give beneficiaries of the plans and insurers discounts when they use the in-network providers, and the plans and insurers give their beneficiaries incentives, such as lower deductibles and copayments, to use the in-network providers.  Providers who are out of network may still treat beneficiaries of these plans and insurers, but that exposes the beneficiaries to higher payments to healthcare providers.

23.     Like all other dialysis providers, DaVita does not have a contract with Marietta Memorial stating terms and conditions for its services to Plan members.  Thus, DaVita is "out-of-network" with the Plan.

**B.     The Plan Provisions Governing Reimbursement**

24.     The Marietta Memorial Hospital Employee Health Benefit Plan Summary Plan Description is attached hereto as **Exhibit A.**  The Plan is a PPO plan that provides three levels of benefits.  MedBen is the TPA for the Plan.  The highest level of reimbursement (Tier 1) is available for services received from Preferred Providers who are part of the Marietta Memorial Physician-Hospital Organization (PHO).  The second highest level of reimbursement (Tier 2) is available for services received from Providers who are part of a preferred provider network but who are not directly affiliated with Marietta Memorial (i.e., not part of the Marietta Memorial PHO).  The lowest reimbursement level (Tier 3) applies to providers, like DaVita, who are "out-of-network."

25.     Unlike its coverage for other services, the Marietta Memorial Plan offers **no network** of contracted dialysis providers.  The summary plan description for the Marietta Memorial Plan explicitly states that, for dialysis, "[t]here is no network for these services."  Ex. A at 17.  Therefore, **all** providers of dialysis for the Marietta Memorial Plan ESRD patients are out-of-network and subject to a discriminatory reimbursement methodology described below.

26.     The Plan generally provides for reimbursement based on a "reasonable and customary" fee if a provider is "out-of-network."   A "reasonable and customary" amount is understood in the healthcare industry to be a measure of reimbursement based on providers' billed charges in a particular geographic area.[2]  "Reasonable and customary" is **not** generally understood in the industry to be a discounted, in-network managed care rate or a discounted rate based on a percentage of what Medicare will pay for the service.

27.     Here, however, the Plan unlawfully singles out dialysis services for further reimbursement limitations.  Unlike reimbursement for other out-of-network services which are reimbursed based on an actual "reasonable and customary" fee, the Marietta Memorial Plan summary plan description provides an "alternative basis for payment" applicable only to "dialysis-related services and products."  The summary plan description states that the Plan will reimburse out-of-network dialysis providers a "reasonable and customary" amount that "**will not exceed the maximum payable amount applicable . . . which is typically one hundred twenty-five percent (125%) of the current Medicare allowable fee**."[3]  Ex. A at 17.  In other words, the Marietta

---

[2] UCR (Usual, Customary, and Reasonable) is defined as the "amount paid for a medical service in a geographic area based on what providers in the area usually charge for the same or similar medical service."  https://www.healthcare.gov/glossary/ucr-usual-customary-and-reasonable/

[3] The Centers for Medicare & Medicaid Services (CMS) establishes Medicare rates of reimbursement, which are intended to govern the amount a provider will receive from Medicare to cover a given service provided to a Medicare beneficiary.

Memorial Plan summary plan description invents a definition of "reasonable and customary" (tying it to a Medicare-based rate) that is contrary to the industry-wide understanding of that term, and then applies that newly-invented definition *solely* for out-of-network dialysis services.  By imposing a Medicare-based rate for dialysis services, Defendants intentionally and knowingly reduced reimbursement far below industry-accepted standards for "reasonable and customary" reimbursement.

28.  The Plan's differential treatment of dialysis patients directly and severely impacted Patient A (the Plan's member).  For the dialysis service itself, the Plan reimburses at a much lower rate.  The Plan specifies a 70% plan benefit for the actual dialysis treatment.  However, the 70% that the Plan pays for dialysis treatment is a percentage of a depressed number:  the Plan pays 70% of 125% of the Medicare rate, equaling 87.5% of the Medicare rate, and the Medicare rate is already far below the industry-wide definition of a "reasonable and customary" fee.  Likewise, for most claims that DaVita submitted, the Plan provided no separate reimbursement for dialysis-related drugs.  And, for some claims for reimbursement submitted by DaVita, the Plan has reimbursed only 50% of DaVita's charges for dialysis-related drugs.  Moreover, all, or virtually all, of the enrollees who are affected by this discriminatory provision are Plan members suffering from ESRD.

**C.  DaVita Provides Dialysis to a Member of the Plan With ESRD and Submits Claims for Reimbursement to the Plan**

29.  Patient A suffered from ESRD and was a member of the Plan up until August 31, 2018 when Medicare became Patient A's primary insurance and began making conditional payments to cover Patient A's dialysis treatment.  On July 1, 2017**,** Patient A became entitled to Medicare by virtue of having ESRD.  Patient A received dialysis treatment from a DaVita dialysis

location known as Grand Central Dialysis on an out-of-network basis beginning on April 15, 2017. DaVita's treatment of Patient A continued until November 8, 2019.

30.     While Patient A was a member of the Plan, Marietta Memorial reimbursed DaVita at 70% of a depressed rate, *i.e.*, 125 percent of the Medicare rate for those services.

31.     As is customary in the provision of healthcare services, before receiving treatment, Patient A signed an "Assignment of Benefits" form that documents the assignment of the patient's rights to reimbursement to DaVita.  The form provided:

> I hereby assign to Facility and DaVita all of my right, title and interest in any cause of action and/or any payment due to me (or my estate) under any employee benefit plan, insurance plan, union trust fund, or similar plan ('Plan'), under which I am a participant or beneficiary, for services, drugs or supplies provided by Facility to me or my dependents for purposes of creating an assignment of benefits under ERISA or any other applicable law.  I also hereby designate DaVita as a beneficiary under any such Plan and instruct that any payment be made solely to and sent directly to DaVita. If I receive any payment directly from any Plan for services, drugs or supplies provided to me by DaVita, including insurance checks, I recognize that such payment sent directly to me was inappropriate and I agree to immediately endorse and forward such payment to DaVita.

32.     During the time Patient A was receiving coverage from the Plan, DaVita submitted on behalf of Patient A to MedBen claims for reimbursement of the charges for the dialysis services provided.  MedBen then directly reimbursed DaVita for these services in DaVita's capacity of assignee of the patient's rights under the ERISA plan.

33.     The assignments Patient A executed entitle DaVita to assert the patient's legal rights under ERISA, including the rights to recover benefits and to seek legal and equitable relief as to unpaid benefits.  DaVita notified the Plan on each claim form that it was in possession of an assignment of benefits.  Defendants accepted DaVita's assignment of benefits, as demonstrated by repeatedly making payments directly to DaVita in accordance with the assignments.

34.     After providing dialysis treatment to Patient A, DaVita submitted claims for reimbursement to MedBen.  DaVita did so by submitting claims information on a UB-04 claim form, which indicated the dates of treatment, the treatment provided, and that DaVita had obtained an assignment from the patient.

35.     Likewise, DaVita regularly submitted to MedBen timely appeals of MedBen's payment determinations relating to the dialysis services provided to Patient A.  In appealing these payment determinations, DaVita stated that MedBen was "taking a substantial reduction of the charges based on 'reasonable and customary' fee determinations," and that DaVita has "made numerous attempts to address this issue, but we have still not been provided with the actual evidence that supports these reductions."  In issuing decisions on DaVita's appeals, MedBen exercised discretionary authority and control over the decision to pay benefits under the Plan.  In denying DaVita's appeals, MedBen stated that the "excluded charges have been determined by the Plan to exceed the allowable claim limits under the terms of the Plan Document."  **Exhibit B.** Although MedBen stated further that "[t]he claimant should not be balance billed for these amounts," MedBen lacked any contractual or other authority to prohibit DaVita from billing Patient A for the unpaid amounts.

   D.     **The Dialysis Industry and ESRD**

       1.     **Medicare's Unique Coverage of ESRD**

36.     In 2017, nearly 750,000 people in the United States suffered from ESRD, and approximately 124,000 people started treatment for ESRD that year.  According to the Centers for Disease Control and Prevention, every 24 hours, more than 300 people begin as new dialysis patients for treatment for kidney failure in the United States.

37.     In response to a historic lack of available private health coverage for dialysis for patients with ESRD, Congress passed legislation in 1972 providing coverage under Medicare for dialysis services to individuals suffering from ESRD, regardless of their age or whether they would otherwise qualify for Medicare.  Over the years, insurers increasingly added dialysis coverage to their plans to cover gaps in Medicare's dialysis coverage.  In the 1980s and 1990s, Congress passed a series of amendments to the Social Security Act that made Medicare the secondary payer for dialysis services for individuals with ESRD covered by other types of insurance.  According to the 1995 final Rule preamble discussing amendments to the MSPA, the "intent of the MSP provisions is to ensure that Medicare does not pay primary benefits for services for which a [group health plan] . . . is the proper primary payer and that beneficiaries covered under these plans are not disadvantaged vis-à-vis other individuals who are covered under the plan but are not entitled to Medicare."  60 Fed. Reg. 45344 (Aug. 31, 1995).

38.     Federal law now provides that ESRD patients who are enrolled in group health plans have the right to choose to retain coverage through their employer-based plans for an additional 30 months after they become eligible for Medicare because of a diagnosis of ESRD. The patient's existing plan, in turn, is obligated to pay as the primary insurer for dialysis treatment until Medicare becomes the primary payer.  The 30-month coordination period begins, in most cases, after a 3-month "waiting" or "qualification" period that precedes the inception of Medicare coverage.  During the 30-month coordination period, the group health plan pays as the primary insurer and Medicare functions as the secondary payer.

## 2.     The Medicare Secondary Payer Act Protects Dialysis Patients, Providers, and the Medicare Program

39.     Although ESRD patients are eligible to drop out of their group health plans and begin receiving Medicare coverage immediately after the "waiting" or "qualification" period,

many such patients opt to stay in their private group health plans through the entire 30-month coordination period and beyond for a variety of reasons. For example, members with ESRD who are enrolled in employer group plans that do not take into account the member's ESRD status or differentiate in the benefits provided on the basis of ESRD are normally able to receive treatments in network, and thus have less financial exposure due to lower deductibles, co-payments, and co-insurance. In addition, private employer group plans generally offer members better disease management services, which are important for critically ill dialysis patients who suffer from multiple co-morbidities, *i.e.*, other diseases or disorders that co-occur with ESRD such as diabetes, hypertension, cardiovascular disease, neurological problems, and malnutrition. Importantly, private plans also typically provide family coverage, which dialysis patients lose if they drop the plan coverage and opt for Medicare.

40. While ESRD patients have these incentives to maintain their group health plan coverage, the employer plans, by contrast, have an incentive to unload ESRD patients whose chronic illness costs the plan more than their other enrollees. As previously explained, ESRD patients typically require dialysis services for long periods of time at great expense. In order to ensure that group health plans like the Marietta Memorial Plan do not improperly induce ESRD patients to cancel health plan coverage to which they would otherwise be entitled, Congress enacted the "take into account" and "anti-differentiation" provisions of the MSPA, 42 U.S.C. § 1395y(b)(1)(C).

41. The MSPA provides that:

A group health plan . . .

(i) ***may not take into account*** that an individual is entitled to or eligible for [Medicare benefits due to end stage renal disease] during the [30]-month period which begins with the

14

first month in which the individual becomes entitled to benefits . . .; and

(ii) *may not differentiate in the benefits* it provides between individuals having end stage renal disease and other individuals covered by such plan on the basis of the existence of end stage renal disease, the need for renal dialysis, or in any other manner . . . .

42 U.S.C. § 1395y(b)(1)(C) (emphasis added).

42. The regulations implementing the "take into account" prohibition clarify that a group health plan unlawfully "take[s] into account" an individual's Medicare-eligible status if the plan, among other things:

- "*impos[es] limitations on benefits* for a Medicare entitled individual that do not apply to others enrolled in the plan, such as providing less comprehensive health care coverage, excluding benefits, [or] reducing benefits";

- "*pay[s] providers and suppliers less for services furnished to a Medicare beneficiary* than for the same services furnished to an enrollee who is not entitled to Medicare"; and/or

- "*provide[s] misleading or incomplete information* that would have the *effect of inducing a Medicare entitled individual to reject the employer plan*, thereby making Medicare the primary payer."

42 C.F.R. § 411.108(a)(5), (8), (9) (emphasis added).

43. In other words, the Plan cannot consider the fact that a beneficiary may also be covered by Medicare or eligible for Medicare coverage in setting benefits or payment levels.  Nor can the Plan consider the beneficiary's Medicare coverage or eligibility for coverage in taking an action that is designed to induce a beneficiary to prematurely leave the employer plan for Medicare.

44.     The Department of Health and Human Services also adopted regulations implementing the "anti-differentiation" provisions of the MSPA.  A group health plan "may not differentiate in the benefits it provides between individuals who have ESRD and others enrolled in the plan, on the basis of ESRD, or the need for renal dialysis, or in any other manner."  42 C.F.R. § 411.161(b)(1).  According to these regulations, actions that "differentiate" in the benefits provided include:

- "[*t*]*erminating coverage of individuals with ESRD*, when there is no basis for such termination unrelated to ESRD . . .";

- "*[i]mposing on persons who have ESRD, but not others enrolled in the plan, benefit limitations* such as less comprehensive health plan coverage, reductions in benefits, exclusions of benefits, a higher deductible or coinsurance . . .";

- "[c]harging individuals with ESRD higher premiums"; and

- "*[p]aying providers . . . less for services furnished to individuals who have ESRD* than for the same services furnished to those who do not have ESRD . . .".

42 C.F.R. § 411.161(b)(2) (emphasis added).  Taken together, these provisions prevent commercial insurers and employee benefit plans from taking actions with the intent or effect of pushing individuals suffering from ESRD off their employer-provided insurance and onto Medicare.

### 3.     Dialysis Providers Depend on Adequate Commercial Reimbursement To Provide Care

45.     The vast majority of patients with ESRD—approximately 90%—receive primary coverage through Medicare.  Payment rates under Medicare are generally significantly lower than rates paid by commercial insurance plans.

16

46.     Thus, providers like DaVita depend heavily on revenue from treating patients who are still covered through commercial insurance to sustain their business and provide accessible healthcare for all of their patients.

**E.     Defendants' Wrongful Conduct**

47.     On information and belief, MedBen drafted the Plan's governing document and exercises discretion over the payment of benefits jointly with Marietta Memorial as the Plan Administrator.

48.     In contrast to other covered services, the Plan does not provide its enrollees any network of providers for outpatient dialysis services.  This means Patient A did not have, and other enrollees suffering from ESRD do not have, any in-network option for dialysis services and are exposed to higher copayments, coinsurance amounts, and/or deductibles.

49.     In addition, the Plan document generally provides for reimbursement based on a "reasonable and customary" fee if a provider is "out-of-network."  However, the Plan unlawfully singles out dialysis services and provides a dramatically lower reimbursement rate for dialysis treatment provided on an out-of-network basis, referred to as an "alternative basis for payment" applicable only to "dialysis-related services and products."   The summary plan description provides for reimbursement for other out-of-network services, at a "reasonable and customary" fee.  (As explained above, the concept of "reasonable and customary" fee is understood in the healthcare industry to be a fee based on what providers charge in a given geographic area.)  With respect to out-of-network dialysis, however, the Plan reimburses providers a "reasonable and customary" amount that "***will not exceed the maximum payable amount applicable . . . which is typically one hundred twenty-five percent (125%) of the current Medicare allowable fee.***"  Ex. A at 17.  In other words, the Marietta Memorial Plan document manipulates the definition of

17

"reasonable and customary" to be based on a percentage of Medicare (contrary to the general industry understanding of usual, customary, and reasonable rates), and does so **solely** for out-of-network dialysis services.  Eliminating in-network benefits for dialysis treatment coupled with the exposure to higher out-of-pocket costs illegally encourages, or even forces, ESRD patients to move from the Plan to Medicare.

50.     The Plan also provides that, to the extent benefits are available from Medicare, "[b]enefits under this Plan will be reduced to the extent that the Participant or his or her Dependents are reimbursed or entitled to reimbursement for those expenses by Medicare."  Ex. A at 85.  In other words, to the extent that an enrollee is covered by or eligible for Medicare, the Plan provides that the amount the Plan will reimburse will be reduced by the amount that Medicare pays or could pay.  This provision expressly reduces employer health plan benefits based on an enrollee's Medicare-eligible status and runs afoul of the MSPA's prohibition against "tak[ing] into account" an individual's Medicare-eligible status.  By reducing benefits, this provision also exposes ESRD patients, including Patient A while Patient A participated in the Plan, to higher out-of-pocket costs and has the effect of encouraging enrollees to drop their employer-provided coverage prematurely and go on Medicare before the ESRD coordination period has run its course.

51.     Finally, the Plan imposes on dialysis, and only dialysis, heightened scrutiny from the plan, such as "cost containment review" and "claim audit and/or review."  Ex. A at 58.  These unusual plan terms, calling out dialysis specifically for extra scrutiny as well as unspecified "administrative services" further encourages dialysis patients, and especially ESRD patients, to abandon the Plan and move onto Medicare.

52.     Both separately, and when considered in combination, these Plan provisions expressly target dialysis treatment and, in doing so, the Plan illegally takes into account an ESRD

patient's Medicare eligible status, in addition to differentiating benefits between those with ESRD and others enrolled in the Plan.  Nearly every patient requiring dialysis has ESRD, as did Patient A, and all, or virtually all, of the Plan's expense for dialysis is for services to patients with ESRD. Thus, these provisions removing dialysis patients' access to in-network options, drastically reducing reimbursement, and singling out dialysis benefits for heightened scrutiny run afoul of the MSPA's prohibition on taking into account an ESRD patient's Medicare-eligible status when determining their benefits, *see* 42 U.S.C. § 1395y(b)(1)(C)(i), and differentiating in the benefits it provides ESRD patients on the basis of their need for renal dialysis.  42 U.S.C. § 1395y(b)(1)(C)(ii).  These Plan provisions and Defendants' conduct in targeting dialysis treatment also run afoul of the prohibition in 29 U.S.C. § 1182(a)(1) on group health plans establishing rules for eligibility and continued eligibility based on health status-related factors, including health status, medical condition, and disability.

53.     DaVita suffered damages as a result of Defendants' actions.  In addition, although Patient A is no longer a member of the Plan as of August 31, 2018, and is now deceased, when Medicare became the patient's primary insurance, the harms that DaVita has suffered as a result of Defendants' conduct in removing dialysis patients' access to in-network options, drastically reducing reimbursement, and singling out dialysis benefits for heightened scrutiny are capable of repetition, yet evading review.  Specifically, DaVita (and its dialysis patients) are subjected to the discriminatory Plan provisions and drastically reduced benefits during the 3-month waiting period and 30-month coordination period during which Medicare is the secondary payer.  As was the case with Patient A, the patient may go onto Medicare before well before the 33-month period is over. This duration is too short to be fully litigated prior to the end of the coordination period.  Moreover, there is a reasonable expectation that DaVita will be subjected to the same discriminatory conduct

by Defendants again, given DaVita's status as a lead provider of dialysis services and the widespread prevalence of ESRD in the population. Finally, DaVita is still owed money for Defendants' underpayments during Patient A's life, and the Medicare program is still out of pocket for the period of time that Patient A was prematurely on Medicare.

## COUNT I

## VIOLATION OF THE MEDICARE SECONDARY PAYER ACT

### (As to Marietta Memorial and the Plan)

54.    The allegations contained in paragraphs 1 through 53 are incorporated by reference as if fully set forth herein.

55.    The Plan places dialysis patients, almost all of whom have ESRD, at a significant disadvantage. First, in contrast to other services, the Plan explicitly states that, for dialysis, "[t]here is no network for these services." Then, having eliminated network coverage for all dialysis patients, the Plan imposes a sharply reduced reimbursement rate for all out-of-network dialysis treatment, basing the reimbursement on a so-called "reasonable and customary" rate that is actually based on a percentage of the Medicare rate. The Plan document also gives the Plan Administrator (*i.e.*, Marietta Memorial) discretion to impose a number of additional burdens on claims of individuals with ESRD (*i.e.*, members who require dialysis) such as "claim audits," "cost containment review," and unspecified "administrative services."

56.    While Patient A was a participant in the Plan, DaVita provided regular dialysis treatment to Patient A and continued to treat Patient A after Patient A ceased participating in the Plan. As an out-of-network dialysis provider, DaVita was subject to the discriminatory and artificially low "alternative basis for payment" for dialysis services.

20

57.     The Plan's practices violate the "take into account" and "anti-differentiation" prohibitions of the MSPA.  The Plan imposes limitations on the benefits for a Medicare-entitled individual that do not apply to others enrolled in the Plan. These benefit limitations are specifically identified by the regulations as actions that constitute unlawfully "taking into account" that an individual is entitled to or eligible for Medicare based on ESRD.  *See* 42 C.F.R. § 411.108(a)(5); § 411.161(a).

58.     The Plan also unlawfully differentiates in the benefits it provides between individuals having ESRD and the benefits provided to other individuals covered by the Plan.  *See* 42 U.S.C. § 1395y(b)(1)(C)(ii).  As a result of this conduct, Patient A, during the time Patient A participated in the Plan, was exposed to additional payment obligations not faced by other plan enrollees who do not have ESRD or do not require dialysis.  For example, Patient A was exposed to higher co-pays, co-insurance, and deductibles.  These provisions were intended to, and did, force Patient A to leave the Plan and enroll prematurely in Medicare, at substantial cost to the Medicare Program.

59.     Defendants are motivated by their desire to induce members of the Plan with ESRD to drop out of the Plan and instead enroll in Medicare.  MedBen specifically emphasizes the high cost of dialysis treatment for ESRD patients in promoting to its customers MedBen's proprietary (and illegal) methods that purport to reduce costs related to dialysis reimbursement.

60.     DaVita has been damaged as a result of Defendants' failure to provide appropriate reimbursement as primary payer for its enrollees and other illegal practices in violation of the MSPA.  Accordingly, DaVita, as an assignee of Patient A and in its own right, is entitled to double-damages pursuant to 42 U.S.C. § 1395y(b)(3)(A).

## COUNT II

## CLAIM FOR ERISA BENEFITS PURSUANT TO 29 U.S.C. § 1132(a)(1)(B)

### (As to All Defendants)

61.     The allegations contained in paragraphs 1 through 60 are incorporated by reference as if fully set forth herein.

62.     Section 502 of ERISA allows a participant or beneficiary covered by a welfare benefit plan to sue to "recover benefits due . . . under the terms of his plan, to enforce rights under the terms of the plan, or to clarify . . . rights to future benefits under the terms of the plan." 29 U.S.C. § 1132(a)(1)(B). Section 502 also allows a participant or beneficiary "to enjoin any practice or act which violates [ERISA] or the terms of the plan" or "to obtain other appropriate equitable relief[.]" *Id.* § 1132(a)(3).

63.     DaVita is the assignee of health care benefits to which Plan members are entitled and is therefore entitled in its capacity as assignee to recover benefits due under the terms of the Plan.  DaVita has standing as an assignee to assert the claims of Patient A.

64.     An ERISA claim for benefits under 29 U.S.C. § 1132(a)(1)(B) can be brought against plans, plan fiduciaries, plan administrators, and TPAs that exercise discretion over the payment of plan benefits.  The Plan is a self-funded employer group plan governed by ERISA. Marietta Memorial serves as the named plan administrator for the Plan.  MedBen is the named TPA and/or the claims administrator for the Plan and exercises discretion over the payment of plan benefits.  In particular, the summary plan description gives MedBen authority over the "consideration" and "settlement" of claims.  *See* Ex. A at 21.  MedBen in fact exercised discretionary authority and control over the decision to pay plan benefits in rendering initial benefit

22

determinations and served as the entity to conduct discretionary review of appeals of the denial of plan benefits.  *See* Ex. B.

65.     DaVita has exhausted the administrative remedies under the ERISA plan at issue. DaVita either submitted timely written appeals to MedBen, or is excused from exhausting its administrative remedies because MedBen failed to follow claims procedures required by ERISA and its implementing regulations.  *See* 29 C.F.R. § 2560.503-1.  Alternatively, exhaustion of administrative remedies was not required in whole or in part because it was futile.

66.     With respect to Patient A, Marietta Memorial was required to reimburse DaVita pursuant to the terms of the Plan document and other applicable law.  As explained below, to the extent the Plan terms provide for reimbursement based on terms that violate federal law, those provisions must be severed.  *See* 29 U.S.C. § 1132(a)(3).

67.     The Plan eliminates in-network coverage for dialysis services.  In addition, the Plan provides for an "alternative basis for payment" applicable only to "dialysis-related services and products."  Further, the Plan provides a strikingly low reimbursement rate for dialysis treatment that is based on a percentage of the Medicare rate (instead of reasonable and customary rates). These provisions are illegal because they violate the "take into account" and "anti-differentiation" prohibitions of the MSPA.  As noted above, by imposing limitations on the benefits for a Medicare-entitled individual that do not apply to others enrolled in the Plan, these provisions run afoul of the MSPA's intent that Medicare-eligible patients not be disadvantaged in relation to other individuals who are covered under the Plan but are not eligible for or entitled to coverage under Medicare. Because these payment provisions targeting dialysis-related treatment are illegal, they must be

severed from the Plan.[4]  *See* <u>29 U.S.C. § 1132(a)(3)</u>.  Accordingly, the Plan is obligated to reimburse DaVita for the out-of-network services provided to Patient A, at its undiscounted charges or, at a minimum, at the reasonable and customary rates for dialysis as typically understood in the industry.

68.    Defendants' conduct constitutes a breach of the ERISA plans at issue and an abuse of discretion.  Such conduct has denied DaVita benefits to which it is entitled as assignee.

69.    Defendants' failure to pay DaVita what they were obligated to pay for the dialysis services provided to Patient A was motivated by their desire to transfer liability for treatment of ESRD patients onto the dialysis provider, the Medicare program, and the patients themselves. Accordingly, their actions constitute a conflict of interest and bad faith.  Defendants' refusal to pay DaVita for claims for dialysis rendered to Patient A at the legally required levels was wrong, incorrect, improper, unlawful, not based on any evidence, an abuse of discretion, and/or arbitrary and capricious.

70.    As assignee of the benefits to which members of the ERISA plan at issue are entitled pursuant to their plans, DaVita demands recovery of benefits and all other relief due pursuant to <u>29 U.S.C. § 1132(a)(1)(B)</u> against Defendants.

---

[4] The Plan's summary plan description contains a severability provision that provides:  "In the event that any section of this provision is considered invalid or illegal for any reason, said invalidity or illegality shall not affect the remaining sections of this provision and Plan. The section shall be fully severable.  The Plan shall be construed and enforced as if such invalid or illegal sections had never been inserted in the Plan."

## COUNT III

## VIOLATION OF 29 U.S.C. § 1182(a)(1)

## (As to Marietta Memorial and the Plan)

71.     The allegations contained in paragraphs 1 through 70 are incorporated by reference as if fully set forth herein.

72.     ERISA prohibits group health plans like the Plan from discriminating against plan participants and beneficiaries on the basis of health condition and medical status, including disability. 29 U.S.C. § 1182. This prohibition applies to improperly reducing benefits on the basis of ESRD.

73.     As noted, the Plan discriminated against its enrollees suffering from ESRD by eliminating network coverage for enrollees with ESRD and, by extension, by exposing enrollees to higher costs.

74.     A violation of 29 U.S.C. § 1182 may be remedied by an ERISA participant's claim "to enjoin any act or practice which violates any provision of this subchapter." *See* 29 U.S.C. § 1132(a)(3). DaVita, as assignee, is thus entitled to an injunction under 29 U.S.C. § 1132(a)(3) of ERISA prohibiting the Plan and MedBen from engaging in future discriminatory and illegal conduct prohibited by 29 U.S.C. § 1182(a)(1). DaVita is further entitled to attorneys' fees under 29 U.S.C. § 1132(g).

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray that the Court award the following relief:

a) That DaVita be awarded its compensatory damages plus applicable prejudgment and statutory interest;

b) That DaVita be awarded statutory double damages pursuant to <u>42 U.S.C. § 1395y(b)(3)(A)</u>;

c) That DaVita recover all benefits due under ERISA plans pursuant to <u>29 U.S.C. § 1132(a)(1)(B)</u>;

d) That DaVita be awarded reformation of any illegal ERISA plan provisions pursuant to <u>29 U.S.C. § 1132(a)(3)</u>;

e) That DaVita be awarded injunctive relief and appropriate equitable relief under <u>29 U.S.C. § 1132(a)(3)</u>;

f) That a trial by jury be had on all issues so triable;

g) That DaVita recover all costs and expenses of this litigation, including its attorneys' fees and expenses pursuant to <u>29 U.S.C. § 1132(g)(1)</u>; and

h) That DaVita be granted such other and further relief as is just and proper.

Respectfully submitted,

*s/Jason P. Conte*
Jason P. Conte
ULMER & BERNE LLP
Ohio Bar No. 0071401
600 Vine Street, Suite 2800
Cincinnati, OH 45202-2409
(513) 698-5072/Fax: (513) 698-5073
jconte@ulmer.com

KING & SPALDING LLP
Bobby R. Burchfield
D.C. Bar No. 289124
Matthew M. Leland
D.C. Bar No. 495812
1700 Pennsylvania Avenue NW, Suite 200
Washington, DC 20006
(202) 737-0500
bburchfield@kslaw.com
mleland@kslaw.com

James W. Boswell
Ga. Bar No. 069838
Jennifer S. Lewin
Ga. Bar No. 397958
1180 Peachtree Street, N.E.
Atlanta, GA 30309
(404) 572-4600
jboswell@kslaw.com
jlewin@kslaw.com

## <u>JURY DEMAND</u>

Plaintiffs hereby request a trial by jury on all issues triable by a jury.


*s/ Jason P. Conte*
Jason P. Conte