UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

DAVITA INC., *et al.*,

      Plaintiffs,

                      :

v.

                                     Case No. 2:18-cv-1739
                                     Chief Judge Sarah D. Morrison
MARIETTA MEMORIAL            Magistrate Judge Kimberly A.
HOSPITAL EMPLOYEE            Jolson
HEALTH BENEFIT PLAN, *et al.*,  :

      Defendants.

## <u>OPINION AND ORDER</u>

This matter is before the Court on Marietta Memorial Hospital Employee Health Benefit Plan and Marietta Memorial Hospital's Motion for Summary Judgment (ECF No. 211) and Medical Benefits Mutual Life Insurance, Co.'s ("MedBen") Motion for Summary Judgment (ECF No. 212). Both Motions are fully briefed[1] and ripe for consideration. For the reasons that follow, both Motions are **GRANTED**.

## I.    FACTUAL BACKGROUND

### A.    The Parties

Marietta Memorial Hospital is a non-profit community hospital located in Marietta, Ohio. Marietta sponsors the Marietta Memorial Hospital Employee

---

[1] MedBen requests oral argument on its Motion for Summary Judgment, but the Court finds that oral argument would not aid the decisional process.

Health Benefit Plan (the "Plan").

The Plan is a self-funded group health plan that provides health and welfare benefits to Marietta's eligible employees and their eligible dependents in accordance with the Employee Retirement Income Security Act ("ERISA"). Marietta is the Plan Administrator and Named Fiduciary for the Plan.

MedBen is a third-party administrator located in Newark, Ohio. MedBen serves as the Benefit Manager of medical benefits for the Plan.

DaVita Inc. and its subsidiary DVA Renal Healthcare, Inc. (together, "DaVita") are dialysis care providers.

### B.      DaVita's Treatment of Patient A

Patient A, a former physician at Marietta and a former participant in the Plan, was diagnosed with End Stage Renal Disease ("ESRD") in 2017. ESRD is the final stage of chronic kidney disease, and individuals with the disease typically require routine dialysis treatment to stay alive unless and until they receive a kidney transplant.

Shortly after his diagnosis, Patient A began receiving outpatient dialysis treatment from DaVita. (*See* ECF No. 222-4.) When Patient A started treatment, he was a member of the Plan, and he agreed to assign his rights under the Plan to DaVita in connection with his treatment. (*Id.*) But Patient A dropped his coverage under the Plan in August 2018. (ECF No. 222-7, PAGEID # 4457.) He kept receiving treatment from DaVita for over a year thereafter, but his continued care was covered under COBRA and, later, Medicare. (*See id.*) Unfortunately, Patient A died in August 2020. (Pls.' Opp., ECF No. 222, PAGEID # 4288.)

2

While Patient A was a member of the Plan, DaVita received payment for his treatment in accordance with the terms of the Plan. (Weaver Dep., ECF No. 207, 267:9–23.) But DaVita avers that the Plan terms illegally discriminate against Plan members with ESRD, including Patient A. (*See* Am. Compl., ¶¶ 71–74.)

## C.    Terms of the Plan

The Plan offers three levels of benefits to all members of the Plan: (1) Tier I; (2) Tier II; and (3) Tier III. (Marietta Plan Doc., PAGEID # 2485.) Each level reimburses Plan members and covers expenses for medical treatment differently, and eligibility for coverage at a particular level generally depends on the category of the care provider treating the Plan member:

1. **Tier I**: Coverage under Tier I offers the most favorable reimbursement terms (i.e., coinsurance rate, copayment rate, and out-of-pocket limits) and covered expense terms for Plan members. Tier I coverage applies to treatment rendered by preferred providers that are part of the Marietta Memorial Physician-Hospital Organization ("PHO"), a partnership between Marietta and its physician-employees to provide care at negotiated payment rates. (*Id.*; Cantley Dep., 84:13–19.)

2. **Tier II**: Tier II offers the next most favorable reimbursement terms and covered expense terms. (Marietta Plan Doc., PAGEID # 2485.) Tier II covers treatment rendered by preferred care providers that are not part of the PHO but have an independent provider agreement for negotiated payment rates with the Plan. (*Id.*; Cantley Dep., 84:20–24.)

3. **Tier III**: Tier III coverage offers the least favorable reimbursement terms and covered expense terms for medical treatment. (Marietta Plan Doc., PAGEID # 2485.) Coverage applies to treatment rendered by providers that are not part of the PHO and do not otherwise have an agreement with the Plan regarding set payment rates for treatment. (*Id.*, PAGEID # 2485–86; Cantley Dep., 88:4–13.) As opposed to Tier I and Tier II providers, these providers fall outside the Plan's Preferred Provider network. (Marietta Plan Doc., PAGEID # 2485.) With no agreement in place, the Plan covers expenses for treatment rendered by Tier III providers based on the "Reasonable and Customary fee" for the treatment, and Plan members are responsible for any amount billed by the provider in excess of that fee (i.e., balance billing). (*Id.*, PAGEID # 2486.)

The Plan does not offer a Preferred Provider network for outpatient dialysis services. (*Id.*, PAGEID # 2492.) As a result, the Plan determines covered expenses based on the "Reasonable and Customary fee" for the treatment, in line with Tier III coverage. (*Id.*) The "Reasonable and Customary fee" for outpatient dialysis under the Plan is any amount, in Marietta's sole discretion, up to 125% of the current Medicare allowable fee (i.e., the amount Medicare pays for such treatment). (*Id.*) Unlike the covered expense terms, the Plan reimburses outpatient dialysis as a Tier II benefit. (*Id.*, PAGEID # 2487, 2489.) Yet outpatient dialysis patients are still

4

subject to balance billing, as they would be under Tier III. (*Id.*, PAGEID # 2486, 2492.)

Though the outpatient dialysis terms apply equally to all Plan members regardless of any health status or medical condition, DaVita asserts that Marietta targeted Plan members with ESRD in adopting the terms because "[n]early every patient requiring dialysis has ESRD." (*See* Am. Compl., ¶¶ 52, 71–74.)

### D. Development of the Plan Terms

The Plan did not always treat outpatient dialysis uniquely. (*See* 2012 Marietta Plan Doc., ECF No. 222-11, PAGEID # 4756–62.) Prior to 2016, outpatient dialysis services were subject to the same terms as all other medical treatment: the Plan offered a Preferred Provider network for such services, and the applicable reimbursement and covered expense terms were wholly dependent upon the category of provider that the member received treatment from. (*Id.*)

### 1. Marietta tracks cost drivers of the Plan.

In 2012, Marietta's CEO, Scott Cantley, requested medical intelligence reports from MedBen's CEO, Kurt Harden, "after seeing the damage Employee Health Insurance did to [Marietta's] monthly financials." (ECF No. 222-13, PAGEID # 4829.) Over the next few years, Mr. Harden periodically sent such reports—which detailed, among other things, "drivers of cost" of the Plan—to Mr. Cantley. (*Id.*; ECF No. 222-14; ECF No. 222-15.) Mr. Cantley forwarded these reports to Tricia Engfehr, Marietta's then-Director of Human Resources. (ECF No. 222-13, PAGEID # 4829; ECF No. 222-16, ¶ 4; ECF No. 222-17, ¶ 12.) Mrs. Engfehr in turn reviewed portions of the reports and "periodically report[ed] some cost drivers" detailed in the

reports back to Mr. Cantley. (ECF No. 222-17, ¶ 12.) Marietta considered the reports in making decisions regarding benefits offered under the Plan "from a stop-loss perspective." (ECF No. 222-16, ¶ 4.)

By July 2014, one of these medical intelligence reports identified chronic renal failure as the Plan's second most costly chronic illness. (ECF No. 222-15, PAGEID # 4969.) The same report identified DaVita as the Plan's fifth costliest care provider. (*Id.*, PAGEID # 4970.)

### 2. MedBen recommends dialysis repricing terms to Marietta.

While MedBen was sending these reports to Marietta, it was separately working with H.H.C. Group, a third-party medical claims repricer, to set up a dialysis repricing program for its clients. (ECF No. 222-21, PAGEID # 5538.) H.H.C. Group represented to MedBen that it had the ability to use reference-based pricing to reprice dialysis claims based on a percentage of the Medicare allowable fee, which would cut health plan costs for MedBen's clients. (ECF No. 222-18; ECF No. 222-19.) In pitching the repricing program to MedBen, H.H.C. Group touted its success in helping another health plan save over $500,000 in connection with an "ESRD Dialysis claim." (ECF No. 222-19, PAGEID # 5159.) MedBen ultimately partnered with H.H.C. Group and began offering the repricing program to its clients, including Marietta. (ECF No. 222-21, PAGEID # 5538; ECF No. 222-24, PAGEID # 5613.)

In meetings with Marietta throughout 2014 and 2015, MedBen discussed the dialysis repricing program and explained that Marietta could implement the program by amending certain terms of the Plan. (ECF No. 222-24; ECF No. 222-25;

6

ECF No. 222-26; Harden Dep., 116:18–117:10.) By mid-2015, MedBen formally recommended that Marietta amend the Plan terms to adopt the dialysis repricing program via a "Benefits Confirmation Form." (2015 Benefits Confirmation Form, ECF No. 222-28.) Specifically, MedBen recommended that the Plan use "an alternative basis for payment of claims associated with [both inpatient and outpatient] dialysis-related services and products . . . limited to 125% of the Medicare allowable fee." (*Id.*, PAGEID # 5625.) In making this recommendation, MedBen noted that "[d]ialysis charges are often a source of high cost for health plans due to the frequency and duration necessitated by illnesses, including, but not limited to kidney failure" and the recommended amendments would help the Plan "better control costs related to these claims." (*Id.*)

### 3.  MedBen revises its recommendation to Marietta.

In July 2015, Ms. Engfehr completed the "Benefits Confirmation Form" on Marietta's behalf and indicated that Marietta wanted to modify the Plan in accordance with MedBen's recommendation. (*Id.*) After completing the form, however, Ms. Engfehr was informed that MedBen could not implement the dialysis repricing terms and that "MedBen recommended that the Plan [] should remain as it was, with no carve out for dialysis and no Medicare-based repricing." (ECF No. 222-16, ¶ 8.)

But just a few months later, MedBen revisited dialysis repricing with Marietta. (*See* ECF No. 222-26.) By that point, Dan Weaver had replaced Ms. Engfehr as Marietta's Director of Human Resources. (Weaver Dep., 201:2–8.) In a

November 2015 meeting, Mr. Harden informed Mr. Weaver that Marietta could implement dialysis repricing terms, but it would need to apply the terms solely to outpatient dialysis. (*Id.*, 203:1–13.) Soon thereafter, MedBen sent Mr. Weaver a proposed addendum to the "Benefits Confirmation Form" that Ms. Engfehr signed, indicating that the Plan would be amended to include the repricing terms for outpatient dialysis claims only. (2015 Benefits Confirmation Form, PAGEID # 5638.) Mr. Weaver signed the addendum in November 2015, effectuating the Plan terms that are the focal point of this dispute. (*Id.*; Weaver Dep., 210:1–10.)

### E.      MedBen's Actions in Connection with Other Health Plans

After the Plan was amended, MedBen continued to recommend that its other clients adopt dialysis repricing terms. (*See* ECF No. 222-33, PAGEID # 6074.) As with Marietta, MedBen initially recommended that its other clients adopt the repricing terms for both inpatient and outpatient dialysis claims, but it later determined that the terms should only apply to outpatient dialysis services. (*Id.*) According to MedBen's Director of Claims, Bobbie Painter, MedBen changed its stance because "special dialysis repricing doesn't work on inpatient claims." (*Id.*)

Yet MedBen did not amend its other clients' plan documents to apply the repricing terms to outpatient claims only, as it did with the Plan. (ECF No. 222-38, PAGEID # 6477–78.) Instead, MedBen continued to "write the plan documents to show that both inpatient and outpatient dialysis claims are carved out and processed" in accordance with the repricing terms, even though MedBen knew that inpatient claims could not be repriced. (*Id.*) MedBen undertook this course of action to maintain "'plausible deniability'" if the plans were "challenged on ESRD

8

discrimination issues" because it was informed that outpatient dialysis, unlike inpatient dialysis, is "primarily performed on ESRD patients." (ECF No. 222-1, PAGEID # 4300.)

## II. PROCEDURAL BACKGROUND

### A. This Court dismissed DaVita's original Complaint.

DaVita first filed this action in December 2018, asserting the following claims: (1) Count I – Violation of the Medicare Secondary Payer Act ("MSPA") (Marietta and the Plan); (2) Count II – Claim for benefits under ERISA § 502 (All Defendants); (3) Count III – Breach of ERISA fiduciary duty (Marietta); (4) Count IV – Breach of ERISA fiduciary duty (MedBen); (5) Count V – ERISA co-fiduciary liability (MedBen); (6) Count VI – Knowing participation in ERISA fiduciary breach (MedBen); and (7) Count VII – Violation of ERISA § 702(a)(1) (Marietta and the Plan). (Compl., ECF No. 1.)

Defendants moved to dismiss all claims under Rule 12(b). In September 2019, this Court issued an Opinion and Order granting Defendants' motions and dismissing DaVita's complaint in full with prejudice. (ECF No. 46.)

### B. The Sixth Circuit reversed on Counts I, II, and VII.

DaVita timely appealed, and the Court of Appeals for the Sixth Circuit issued a decision reversing in part and remanding the case "for further discovery and proceedings" on Counts I, II, and VII. *DaVita, Inc. v. Marietta Mem'l Hosp. Emp. Health Benefit Plan*, 978 F.3d 326 (6th Cir. 2020), *rev'd in part*, 596 U.S. 880 (2022). The mandate issued in January 2021, and the case was officially sent back to this Court. (ECF No. 55.)

Soon thereafter, DaVita filed an unopposed motion for leave to amend its complaint to "incorporate[] legal and factual developments that ha[d] occurred since" the case began. (ECF No. 60.) DaVita's motion was granted (ECF No. 61), and the Amended Complaint became the operative pleading. Counts I, II, and VII of the original Complaint correspond directly to Counts I, II, and III of the Amended Complaint. (*Compare* Compl., *with* Am. Compl.)

### C. The Supreme Court then reversed the Sixth Circuit.

In May 2021, Defendants filed a petition for writ of certiorari with the United States Supreme Court. (ECF No. 72.) The writ of certiorari issued, the Supreme Court heard the case, and a decision came down in Defendants' favor. *Marietta Mem'l Hosp. Emp. Health Benefit Plan v. DaVita, Inc.*, 596 U.S. 880 (2022). But the Supreme Court only addressed DaVita's claim under the MSPA. *Id.* So, the case was remanded to the Sixth Circuit to address the remaining ERISA claims, and the Sixth Circuit, in turn, remanded it here. (ECF No. 85.)

### D. Defendants moved for judgment on DaVita's Amended Complaint.

Following remand, Defendants moved for judgment on the pleadings on all counts of DaVita's Amended Complaint, arguing that the Supreme Court's decision foreclosed DaVita's ability to pursue the action in its entirety. This Court granted Defendants' motion in part, agreeing that the Supreme Court's decision disposed of Count I. (ECF No. 95, PAGEID # 1089.)

But the Court disagreed as to Counts II and III. (*Id.*, PAGEID # 1090–91.) Count III of the Amended Complaint alleges that the Plan discriminates against its

participants with ESRD. (Am. Compl., ¶ 73.) Defendants argued that this Court should apply the Supreme Court's finding of nondiscrimination under the MSPA (Count I) to ERISA § 702 (Count III). (ECF No. 92.) However, the Supreme Court underscored that the MSPA is a coordination-of-benefits statute, not an antidiscrimination statute like ERISA § 702. *Marietta Mem'l Hosp.*, 596 U.S. at 887 n.2. And the Sixth Circuit found that DaVita stated a valid claim under ERISA § 702, noting that "[d]iscovery may yield evidence of Defendants' motive for instituting unique reimbursement terms for dialysis services." *DaVita*, 978 F.3d at 346 n.14. That finding was neither discussed nor disturbed by the Supreme Court, so this Court denied Defendants' motion as to Count III. (ECF No. 95, PAGEID # 1090–91.)

Count II of the Amended Complaint is a claim for benefits under ERISA § 502 based on the purported violations comprising Counts I and III. (Am. Compl., ¶¶ 67, 68.) Because Defendants were entitled to judgment on Count I, this Court held that Defendants were also entitled to judgment on Count II to the extent it was based on Count I. (ECF No. 95, PAGEID # 1091.) But the Court denied Defendants' motion to the extent it was based on Count III, given that DaVita stated a plausible claim under Count III. (*Id.*, PAGEID # 1090–91.)

Defendants now move for summary judgment on Count II and Count III of the Amended Complaint.

## III.    STANDARD OF REVIEW

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.

R. Civ. P. 56(a). The movant has the burden of establishing there are no genuine issues of material fact, which may be achieved by demonstrating the nonmoving party lacks evidence to support an essential element of its claim. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986); *Barnhart v. Pickrel, Schaeffer & Ebeling Co.*, 12 F.3d 1382, 1388–89 (6th Cir. 1993). The burden then shifts to the nonmoving party to "set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986) (quoting Fed. R. Civ. P. 56). When evaluating a motion for summary judgment, the evidence must be viewed in the light most favorable to the non-moving party. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970).

A genuine issue exists if the nonmoving party can present "significant probative evidence" to show that "there is [more than] some metaphysical doubt as to the material facts." *Moore v. Philip Morris Cos.*, 8 F.3d 335, 339–40 (6th Cir. 1993). In other words, "the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Anderson*, 477 U.S. at 248; *see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (concluding that summary judgment is appropriate when the evidence could not lead the trier of fact to find for the non-moving party).

## IV.    ANALYSIS

Marietta and the Plan move for summary judgment separately from MedBen. (ECF Nos. 211, 212.) However, all Defendants assert many of the same arguments, including that both of DaVita's remaining claims fail as a matter of law because DaVita cannot prove intentional discrimination. (*See* ECF Nos. 211, 212, 225, 226.)

12

For the reasons below, the Court agrees. Therefore, the Court need not—and does not—address the remainder of Defendants' arguments. For ease of analysis, the Court addresses DaVita's remaining claims out of order.

### A. Marietta and the Plan are entitled to judgment on Count III.

In Count III, DaVita alleges that "the Plan discriminated against its enrollees suffering from ESRD by eliminating network coverage for enrollees with ESRD and, by extension, by exposing enrollees to higher costs" in violation of ERISA § 702(a)(1). (Am. Compl., ¶ 73.) DaVita brought this claim against Marietta and the Plan only, but *all* Defendants have lodged arguments against the claim. (*See* ECF Nos. 211, 212, 225, 226.) Defendants argue that DaVita has failed to make a factual showing that the Plan terms governing outpatient dialysis discriminate against Plan members with ESRD. (*See* ECF Nos. 211, 212, 225, 226.)

> ERISA § 702(a)(1) provides, in relevant part:
>
> [A] group health plan, and a health insurance issuer offering group health insurance coverage in connection with a group health plan, may not establish rules for eligibility (including continued eligibility) of any individual to enroll under the terms of the plan based on [their health status or medical condition].

29 U.S.C. § 1182(a)(1). The provision's accompanying regulations clarify that "rules for eligibility" include rules governing a health plan's benefits. 29 C.F.R. § 2590.702(b)(2)(i)(B); *see also DaVita*, 978 F.3d at 346. Even so, plan terms can properly "limit or exclude benefits in relation to a specific disease or condition . . . [or] for certain types of treatments or drugs" so long as the limitation or exclusion "applies uniformly to all similarly situated individuals and is not directed at

individual participants or beneficiaries based on any health factor." 29 C.F.R. § 2590.702(b)(2)(i)(B).

ERISA § 702 is focused on preventing "disparate treatment" of individuals based on protected factors, rather than requiring health plans to accommodate every need of their participants. *Warren Pearl Const. Corp. v. Guardian Life Ins. Co. of Am.*, 639 F. Supp. 2d 371, 379 (S.D.N.Y. 2009) ("[ERISA § 702's] legislative history suggests that Congress was concerned with the disparate treatment of individuals."); *Curtiss-Wright Corp. v. Schoonejongen*, 514 U.S. 73, 78 (1995) ("ERISA does not create any substantive entitlement to employer-provided health benefits or any other kind of welfare benefits. Employers or other plan sponsors are generally free under ERISA, for any reason at any time, to adopt, modify, or terminate welfare plans."). In other words, ERISA § 702 "is an antidiscrimination statute in the traditional vein." (ECF No. 95, PAGEID # 1090.)

As an antidiscrimination statute that targets disparate treatment, ERISA § 702 prohibits both (1) plan terms that facially discriminate against protected health factors, and (2) neutral plan terms "adopted with an invidious *intent* to harm" participants based on protected health factors. *See DaVita*, 978 F.3d at 364 (Murphy, J., dissenting) (alteration in original) (citation omitted).

### 1. The Plan terms do not facially discriminate against ESRD.

Here, it is undisputed that "the Plan language does not discriminate against patients with ESRD on its face." (Pls.' Opp., PAGEID # 4277; *see also* Marietta Plan Doc., PAGEID # 2485–92.) Therefore, the Court must determine whether there is a

genuine issue of material fact as to whether the Plan's neutral terms were adopted with the intent to harm ESRD patients.

### 2. Marietta did not intend to discriminate against patients with ESRD by adopting the Plan terms.

To establish that these facially neutral Plan terms discriminate against participants with ESRD, DaVita must prove that: (1) Patient A was a member of a protected class; (2) Patient A was adversely affected by the Plan terms; and (3) the Plan terms were a product of discriminatory intent, meaning that they were adopted "at least in part because of, not merely in spite of, [their] adverse effects upon" Plan members with ESRD. *See Pers. Adm'r of Massachusetts v. Feeney*, 442 U.S. 256, 279 (1979); *see also DaVita*, 978 F.3d at 346 n.14.

There is no dispute that Patient A, as a former Plan participant with ESRD, is a member of a class protected under ERISA § 702. (*See* ECF No. 222-41, PAGEID # 6842.) The survivability of DaVita's claim thus depends on whether it has presented evidence of both an adverse effect on Patient A and discriminatory intent.

### a. Adverse Effect

Patient A was adversely affected by Marietta's implementation of unique benefits terms for outpatient dialysis services. Specifically, DaVita presented evidence that Patient A was exposed to financial liability—including, but not limited to, balance billing—that he would not have been exposed to but for Marietta's adoption of Plan terms that: (1) eliminated network coverage for outpatient dialysis services; and (2) used reference-based pricing to reimburse claims for those services. (Marietta Plan Doc., PAGEID # 2486, 2492; ECF No. 222-

44, PAGEID # 6962–64; ECF No. 222-45, PAGEID # 7334, ECF No. 222-2, PAGEID # 4303.)

### b. Discriminatory Intent

Still, "proof of discriminatory motive is critical" to DaVita's claim because ERISA § 702 prohibits disparate *treatment* rather than mere disparate *impact*. *Hazen Paper Co. v. Biggins*, 507 U.S. 604, 609 (1993) (citation omitted). In other words, discriminatory intent is an essential element of a claim under ERISA § 702. For that reason, the Court must assess "evidence of Defendants' motive for instituting unique reimbursement terms for dialysis services" to determine whether DaVita's claim survives summary judgment. *DaVita*, 978 F.3d at 346 n.14.

The Court is aware of only one case that has analyzed discriminatory intent in connection with a claim under ERISA § 702: *Fitzwater v. CONSOL Energy, Inc.*, No. 1:17-cv-03861, 2020 WL 6231207 (S.D.W. Va. Oct. 22, 2020). In *Fitzwater*, the plaintiffs asserted that a plan term governing retirement benefits violated § 702 because the plan administrator intended to discriminate against plan members based on claims experience, a protected health factor, even though the term was facially neutral. *Id.* at *17–18. In assessing the claim at summary judgment, the court found that there was no direct evidence that the administrator ever considered claims experience in enacting the term, and the circumstantial evidence presented offered only speculation "as to whether [the administrator] had actually considered claims experience." *Id.* at *20. As a result, that court held that the plaintiffs failed to show discriminatory intent because "plaintiffs cannot create a

16

genuine issue of material fact through mere speculation or the building of one inference upon another." *Id.* (citation modified). Summary judgment was therefore granted in the defendant plan administrator's favor. *Id.* at *22.

In this case, DaVita has offered evidence that purportedly shows that both Marietta *and* MedBen intended to discriminate against Plan members with ESRD by implementing unique benefits terms for outpatient dialysis services. (Pls.' Opp., PAGEID # 4277–83.) As previously noted, however, DaVita brought this claim against *only* Marietta and the Plan. (Am. Compl., PAGEID # 746.) DaVita has cited no authority, and the Court has found none, suggesting that MedBen's intent can be imputed to Marietta. (*See* ECF No. 222.) Nor did DaVita offer any evidence of the Plan's intent, presumably because a health plan itself is not capable of acting at all, let alone with any intent. (*See id.*) Therefore, the Court will only consider evidence bearing on Marietta's motive for implementing the Plan terms to determine whether DaVita has made a sufficient factual showing of discriminatory intent.

The evidence DaVita offered to establish Marietta's intent as to the Plan terms boils down to the following: (1) Marietta's review of medical intelligence reports; (2) Marietta's general inquiry into dialysis treatment; (3) Marietta's discussion of the Plan terms with MedBen before adopting them; and (4) the Plan terms' disparate impact on ESRD patients. (*See* ECF No. 222.) The evidence presented by DaVita involving MedBen's dealings with H.H.C. Group and MedBen's internal discussions and actions with respect to other health plans did not involve

17

Marietta and is therefore not relevant to Marietta's intent. The Court addresses each piece of relevant evidence below.

### i. Medical Intelligence Reports

DaVita first identifies Marietta's review of medical intelligence reports, which Marietta considered in making decisions regarding benefits offered under the Plan, as evidence of Marietta's intent to target ESRD patients. (Pls.' Opp., PAGEID # 4278.) In particular, DaVita points to the fact that one of these reports flagged "chronic renal failure" as the Plan's second most costly chronic illness and DaVita as the Plan's fifth costliest care provider. (*Id.*)

Even though Marietta generally considered these reports before "mak[ing] decisions from a stop-loss perspective," there's no evidence that Marietta actually considered costs associated with ESRD when implementing the Plan terms at issue. (*See* ECF No. 222-16, ¶ 4.) In fact, the testimony of Marietta's former Director of Human Resources suggests the opposite. (ECF No. 222-17, ¶ 16 ("I do not recall ever discussing end stage renal diseases or ESRD. That simply was not a factor by Marietta and the Plan in any of its decisions.").)

Moreover, contrary to DaVita's contention, chronic renal failure is not synonymous with ESRD. Rather, ESRD represents only the most advanced stage of chronic renal failure, which is a progressive condition consisting of multiple stages. *See* Satyanarayana R. Vaidya & Narothama R. Aeddula, *Chronic Kidney Disease*, National Library of Medicine, July 31, 2024. Thus, the reports do not even establish that Marietta's high costs were caused by ESRD in particular.

18

At best, DaVita's evidence offers speculation that Marietta was aware of—and considered—the Plan terms' adverse effects on ESRD patients before adopting them; this is insufficient to create a genuine issue of material fact as to discriminatory intent. This evidence simply shows that Marietta exercised due diligence by analyzing cost data before making decisions with respect to the Plan, which is permitted under ERISA. S*ee A-T-O, Inc. v. Pension Benefit Guarantee Corp.*, 634 F.2d 1013, 1021 (6th Cir. 1980) (citing S. Rep. No. 94-383 (1974)) ("[ERISA] is a finely tuned balance between protecting [] benefits for employees while limiting the cost to employers.").

### ii.    Dialysis Inquiry

DaVita next argues that Ms. Engfehr's inquiry into dialysis treatment under the Plan supports a finding that Marietta implemented the outpatient dialysis terms with an intent to discriminate against ESRD patients. (Pls.' Opp., PAGEID # 4265.) But the extent of Ms. Engfehr's inquiry is as follows: (1) she asked a colleague to find out where employees were having their dialysis completed; and (2) her colleague responded with a list of dialysis providers that included DaVita. (ECF No. 222-16, PAGEID # 5117–18.) This evidence is insufficient to raise even an inference that Marietta intended to discriminate against ESRD patients because no part of the inquiry mentions or alludes to ESRD. (*See id.*)

The timing of the inquiry further weakens any basis for an inference of discriminatory intent, as it occurred more than two years before Marietta adopted

19

the Plan terms and nearly a year before chronic renal failure was identified as a cost driver of the Plan. (*See id.*)

This evidence is too tenuous to establish that Marietta acted with discriminatory intent. Even if considered alongside the medical intelligence reports, the result remains the same because an ERISA plaintiff cannot create a genuine issue of material fact by stacking speculative inferences. *See Fitzwater*, 2020 WL 6231207, at *20.

### iii.     Discussions with MedBen

DaVita also offers as evidence of discriminatory intent the fact that, throughout 2014 and 2015, Marietta had meetings with MedBen, during which dialysis repricing terms were discussed. (Pls.' Opp., PAGEID # 4279.) The evidence cited, however, shows only that "Dialysis Carve-Out" and "Dialysis Language" were agenda items for meetings between the two entities. (ECF No. 222-24; ECF No. 222-25; ECF No. 222-26; Harden Dep., 116:18–117:10.) This evidence does no more than show that Marietta staff discussed the Plan terms with MedBen before implementing them. Without any evidence of what was actually discussed in connection with the Plan terms, the suggestion that ESRD was part of the discussion is wholly speculative. As the Court has already explained, such evidence is not sufficient to create a genuine issue of material fact regarding discriminatory intent, nor does it become sufficient when viewed in conjunction with DaVita's other speculative offerings.

###### iv.    Disparate Impact

Lastly, DaVita points to the disparate impact that the Plan terms had on ESRD patients as evidence of Marietta's motive for adopting the terms. (*See* Pls.' Opp., PAGEID # 4282–83.)

DaVita has presented evidence that the Plan terms disproportionately affected Plan members with ESRD. (Roffe Dep., ECF No. 222-20, 121:16–122:1 (testifying that the only outpatient dialysis claims repriced under the Plan terms came from individuals with ESRD).) And a "practice's disparate impact on [a protected group] can be evidence of the intent to harm" that group. *DaVita*, 978 F.3d at 364 (Murphy, J., dissenting) (citation omitted). Such evidence alone, however, cannot amount to a factual showing of discriminatory intent. *See Lyon v. Ohio Educ. Ass'n & Pro. Staff Union*, 53 F.3d 135, 139 (6th Cir. 1995) (holding that a practice's disparate effect on a protected group is insufficient evidence of discriminatory intent). To hold otherwise "would render meaningless the carefully-wrought distinction between disparate-impact and disparate-treatment theories of discrimination." *Id.*

DaVita has failed to present any evidence that Marietta considered ESRD when adopting the Plan terms at issue. Even assuming that the terms disproportionately affected ESRD patients, DaVita cannot "cure [its] lack of evidence of *intent* by inferring discriminatory animus on the basis of a disparate *effect*." *Id.* (alteration in original).

### v.    Cumulative Evidence

Considered altogether, DaVita's evidence fails to establish that Marietta adopted unique benefits terms for outpatient dialysis services because of their adverse effects on Plan participants with ESRD. DaVita thus lacks evidence to support an essential element of its ERISA § 702 claim: discriminatory motive. Accordingly, no reasonable jury could return a verdict for DaVita on Count III.

Marietta and the Plan's Motion (ECF No. 211) is **GRANTED** as to Count III.

### B.    All Defendants are entitled to judgment on Count II.

Count II of the Amended Complaint is a claim for benefits under ERISA § 502. (Am. Compl., ¶¶ 61–70.) Section 502 of ERISA allows a participant or beneficiary to "recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan." 29 U.S.C. § 1132(a)(1)(B). Section 502 also allows a participant or beneficiary "to enjoin any act or practice which violates [ERISA] or the terms of the plan." *Id.* § 1132(a)(3).

What remains of Count II is based entirely on the violation of ERISA § 702 alleged in Count III. (ECF No. 95, PAGEID # 1091.) Because Marietta and the Plan are entitled to judgment on Count III, it follows that all Defendants are entitled to judgment on Count II.

Defendants' Motions (ECF Nos. 211, 212) are **GRANTED** as to Count II.

22

## V.    CONCLUSION

For the reasons stated herein, Marietta and the Plan's Motion for Summary

Judgment (ECF No. 211) and MedBen's Motion for Summary Judgment (ECF No.

212) are both **GRANTED**. The Clerk is **DIRECTED** to **TERMINATE** this case.

**IT IS SO ORDERED.**

/s/ Sarah D. Morrison
**SARAH D. MORRISON, CHIEF JUDGE**
**UNITED STATES DISTRICT COURT**